Harper T. Segui*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
825 Lowcountry Blvd., Unit 101
Mount Pleasant, South Carolina 29464
T: 919-600-5000
hsegui@milberg.com

Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
280 S. Beverley Drive, PH
Beverly Hills, CA 90212
Tel: 917-471-1894
astraus@milberg.com

Rachel Soffin*
Jonathan Cohen*
Blake Yagman*
Erin Ruben*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York, 11530
Tel: 212-594-5300
rsoffin@milberg.com
jcohen@milberg.com
byagman@milberg.com
eruben@milberg.com

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY COHEN, KATHARINE VACCARELLA, and SIRISHA KONERU on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>v.<br><br>CBR SYSTEMS, INC., GI PARTNERS, and DOES 1-10,<br><br>                    Defendants. | Case No. 4:21-cv-06527<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Amy Cohen, Katharine Vaccarella, and Sirisha Koneru (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint (the "Action") against Defendants CBR Systems, Inc. ("Cord Blood Registry"), GI PARTNERS ("GI"), and Does 1-10 (collectively, "Defendants" or "CBR") based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information, investigation, and belief of their undersigned counsel.

## INTRODUCTION

1.      Few bonds in human existence are as sacred as that between a parent and their child. When a baby is born, one of the important decisions that parents, relatives, and caregivers make about the health and future of their child is whether to preserve the child's cord blood for future protection against blood disorders and cancer.

2.      According to the United States Food and Drug Administration ("FDA"), cord blood is "found in the blood vessels of the placenta and the umbilical cord … collected after a baby is born and after the umbilical cord is cut."[1] Cord blood's utility is "for use in 'hematopoietic stem cell transplantation' procedures, which are done in patients with disorders affecting the [blood forming] system. Cord blood contains blood-forming stem cells that can be used in the treatment of patients with blood cancers, such as leukemias and lymphomas, as well as certain disorders of the blood and immune systems, such as sickle cell disease and Wiskott-Aldrich syndrome."[2]

3.      "After cord blood is collected, it is frozen and stored for many years … [parents] may choose to store [their] baby's cord blood in a private bank so it can be available if needed in the future by [their] child or first- or second- degree relatives."[3]

---

[1]   https://www.fda.gov/consumers/consumer-updates/cord-blood-what-you-need-know   (last accessed August 23, 2021).

[2] *Id.*

[3] *Id.*

4.     Defendants, CBR, operate one such bank, which has an over 50% market share in the United States for private cord blood banking.[4] Over 900,000 cord blood samples are preserved by CBR in their warehouse in Arizona for parents to be able to use in the future, if necessary.

5.     The consumers in this Action are parents, relatives, and/or caregivers who made the decision to store and preserve their newborn children's cord blood with Defendants for the future protection of their children who may later develop blood disorders and blood cancers ("Consumers").

6.     When Consumers sign up with CBR, in order to secure the "once-in-a-lifetime opportunity[5]" to protect their children, they pay a substantial initial fee of approximately $1,500.00 or more, in addition to shipping costs of $150.00-$170.00. Consumers also contract with CBR to pay an annual storage fee of at least $125.00 over the lifespan of the cord blood storage in CBR's Arizona warehouse, which CBR deceptively leads Consumers to believe is a fixed fee through their sales representatives, website representations and the service contract.

7.     Consumers are willing to pay these exorbitant initial fees and costs, and fixed annual storage fees, to preserve their children's cord blood at birth in order to potentially protect their children in the event of a serious illness.

8.     While CBR's mission may seem altruistic, they abuse the very Consumers who depend on their services in the event of a health emergency. Specifically, CBR uses their possession and control of the cord blood to force Consumers to pay undisclosed costs to ensure the continued preservation of their children's cord blood.  When Consumers contract with CBR to store cord blood, through their marketing, advertising, and service contract, CBR leads Consumers to believe that the annual fee for storing the cord blood is a fixed amount.

---

[4] https://www.cordblood.com/cbr-difference/compare (last accessed June 18, 2021).

[5] www.cordblood.com/benefits-cord-blood/cord-blood-faqs#covid19

9.      However, unbeknownst to Consumers and inconsistent with CBR's pervasive marketing, advertising, and uniform service contract, the annual fee is not fixed. Rather, CBR slyly and substantially increases the annual fee over time, so that Consumers are paying hundreds of additional dollars in excess of the contracted amount over the course of the cord blood storage.  For Consumers who are storing cord blood for more than one child, these hidden and undisclosed fees could cost them thousands of additional dollars.  And, collectively, these excess storage fees charged to CBR's clients for the 900,000 cord blood samples over the course of the cord blood storage translate to tens of millions of dollars or more in revenue for CBR.

10.     These increased storage fees are not reasonably related to the service provided by CBR (i.e., cord blood storage), but are instead used by Defendants to pay for unrelated business expenses, such as customer service infrastructure, or to fund clinical studies that Defendants use to tout their cord blood services and attract new Consumers, thereby amassing greater profits. But paying for Defendants' unrelated business expenses and undisclosed clinical studies is not a burden that Consumers should have to bear, as such expenses are wholly unrelated to the storage of cord blood, and Consumers have already paid substantial up-front fees and costs for Defendants' services. The annual storage fee is just that – a fee for storage – and reasonable consumers do not expect this fee to include costs for unrelated business operations. Defendants' lack of financial resources to fund their business expenses or clinical studies, and their desire to avoid reducing their profits by funding such expenses themselves, are not sufficient reasons to deceptively and unlawfully tack additional, irrelevant charges onto the cord blood storage fees paid by Consumers.

11.     If and when Consumers discover the increased storage fees and explore the possibility of taking their business elsewhere, CBR represents that the transfer of cord blood to a competitor is difficult or impossible, effectively holding the cord blood for ransom and forcing Consumers to choose between

continuing to pay the increased annual storage fees or losing access to the cord blood they had been paying to store and preserve.

12.     Indeed, when Consumers cannot afford to pay the deceptive and unlawfully increased annual storage fees imposed upon them, CBR notifies the consumers that CBR now "owns" their children's cord blood and the consumers – in particular, the children whose cord blood is being stored – lose any possibility of ever being able to use it.  Once CBR collects and stores the cord blood in order to maintain its potential utility, CBR then increases the annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. CBR's conduct is fundamentally deceptive, unlawful, and unfair, and threatens the future health of Consumers by jeopardizing the potential life-saving utility of the stored cord blood.

13.     CBR takes advantage of the sacred bond between child and parent, relative, and/or caregiver, and abuses families who may ultimately have to depend on CBR's services in order to overcome terminal illness, thereby harming consumers and the public at-large.

14.     CBR's behavior is unlawful, deceptive, and ethically reprehensible. As such, Plaintiffs, individually on behalf of themselves and all others similarly situated, bring this Action against Defendants, seeking all allowable forms of damages, restitution, a public injunction, reasonable attorneys' fees, and all other relief that this Court deems necessary and proper.

15.     Further, this Action presents a classic circumstance warranting class treatment. Defendants' conduct, including all relevant practices, contracts, deceptive representations, and omissions, is uniform to all Consumers.  Defendants' common course of conduct will determine liability for the class, ensuring the rights of hundreds of thousands of Consumers are vindicated through the efficiency of a single trial.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d)(2) because: (1) there are one hundred or more (named and unnamed) Class Members, (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (3) there is minimal diversity because Plaintiffs and Defendants are citizens of different States. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

17.     This Court may exercise personal jurisdiction over Defendants, who do substantial business in this State and within this District, receive substantial compensation and profits from the marketing, distribution, and sale of services in this District, and have engaged in the unlawful practices described in this Complaint within this District.  In addition, Defendants' principal places of business are located in California. Further, this Court has personal jurisdiction because the agreement in this Action (the "Contract") governing the relationship between the parties requires the application of California law for certain claims.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants resides in this District and are residents of the State of California. Further, the Contract at issue in this Action governing the relationship between the parties requires the application of California law for certain claims.

## INTRADISTRICT ASSIGNMENT

19.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) and 3-5(b), this action is properly assigned to the San Francisco or Oakland division because a substantial part of the events and omissions which give rise to the claim emanated from California, and from San Francisco County in particular.

## PARTIES

20.     Plaintiff Amy Cohen is the grandparent of two children whose cord blood is stored and preserved by CBR. Plaintiff Cohen is a citizen and resident of Florida and was harmed by Defendants'

immoral, oppressive, and unlawful conduct alleged herein.  When Plaintiff Cohen contracted with CBR for cord blood banking, she was led to believe, through CBR's marketing and advertising, and the service contract, that the annual cord blood storage fees were fixed.

21.     Plaintiff Katharine Vaccarella is a parent of a child whose cord blood is stored and preserved by CBR. Plaintiff is a resident of New Jersey and was harmed by Defendants' immoral, oppressive, and unlawful conduct alleged herein. When Plaintiff Vaccarella contracted with CBR for cord blood banking, she was led to believe, through CBR's marketing and advertising, and the service contract, that the annual cord blood storage fees were fixed.

22.     Plaintiff Sirisha Koneru is a parent of a child whose cord blood is stored and preserved by CBR. Plaintiff Koneru is a citizen and resident of New York and was harmed by Defendants' immoral, oppressive, and unlawful conduct alleged herein. When Plaintiff Koneru contracted with CBR for cord blood banking, she was led to believe, through CBR's marketing and advertising, and the service contract, that the annual cord blood storage fees were fixed.

23.     Defendant CBR Systems, Inc. is a corporation headquartered in Los Angeles, California that specializes in the storage and preservation of cord blood.

24.     Defendant GI Partners is a private investment firm headquartered in San Francisco, California that acquired and merged with Defendant CBR in August 2018. Defendant GI Partners is a private investment firm that has raised over $28 billion in capital to invest in private equity, real estate, and data infrastructure. As indicated on its website, "[t]hroughout our history, our approach has remained consistently focused on identifying investments that optimize the balance between risk and return.[6]"

25.     Defendants Does 1-10 are subsidiaries, affiliates, or other related entities to the above Defendants that may be responsible for the conduct alleged herein. Such parties are named "Doe Defendants" pending the discovery portion of this Action.

---

[6] www.gipartners.com/about/investment-strategy (last accessed August 13, 2021).

26.     In August 2018, Defendant GI Partners acquired and merged with Defendant CBR, the world's largest stem cell collection and storage company, for a cost of $530 Million. The acquisition of CBR by GI Partners represented the fifth platform investment in GI Partners fund V, a $2.8 billion private equity fund raised in 2017, which was financed by Golub Capital and Owl Rock.[7] Since the acquisition, the CBR brand has operated under the Generate Life Sciences name. GI Partners endeavors to become the largest life sciences company in the world.

27.     At all times relevant herein, all Defendants jointly transacted and conducted business in California and the United States and continue to do so today.

28.     Defendants are the agents and/or alter egos of each other and the corporate interests of Defendants have merged so that they, in effect, have operated as one and the same entity for the purpose of creating, distributing, advertising, marketing, directing the marketing and advertising of, and selling the cord blood services.

29.     Defendants used, commingled, and combined their resources to create, distribute, advertise, market, and sell the cord blood services.

30.     At all times relevant herein, Defendants engaged in actual and/or *de facto* joint ventures in relation to the cord blood services.

31.     Together, Defendants' immoral, oppressive, and unlawful conduct alleged herein is the source of Plaintiffs' economic harm and harm to consumers and the public at-large.

## **FACTUAL ALLEGATIONS**

### **A.  The Cord Blood Registry**

32.     According to CBR, "Founded in 1992, CBR is entrusted by parents with storing more than 900,000 cord blood and cord tissue samples for their children. CBR is dedicated to advancing the clinical

---

[7] www.gipartners.com/news/gi-partners-completes-acquisition-and-merger-of-california-cryobank-and-cord-blood-registry

AMENDED CLASS ACTION COMPLAINT

application of cord blood and cord tissue stem cells by partnering with institutions to establish FDA-regulated clinical trials for conditions that have no cure today."[8]

33.     Of the 900,000 cord blood and cord tissue samples, "CBR has helped more than 600 families use their cord blood stem cells for established and experimental treatments."  Remarkably, this represents only .067% of its consumers.

34.     In any event, Consumers paying for cord blood banking do so in the event the cord blood is needed for life-saving treatment.

35.     On their website and in other marketing materials, CBR *aggressively* markets their private cord blood banking as a life-saving measure, with representations such as:

Doctors are *using cord blood to save lives today and researching cord blood as potential treatment for diseases that currently have no cure*. [Emphasis added][9]

\*\*\*

Today, cord blood stem cells are successfully being used to save lives. They also are being researched in an exciting new area of medicine called regenerative medicine, where scientists are studying the use of cord blood stem cells in experimental treatments for conditions like brain injury and acquired hearing loss.

\*\*\*

Currently, thousands of parents are taking advantage of this once-in-a-lifetime opportunity.

\*\*\*

Although no one can predict future illness or injury, published estimates of the odds of needing stem cells for current uses in transplant medicine are 1 in 217.

\*\*\*

Why do families choose to collect and store their babies' cord blood?

---

[8] https://www.cordblood.com/about-cbr/about-cbr (last accessed August 23, 2021).
[9] www.cordblood.com/faqs/CordBloodBanking. (last accessed August 23, 2021).

Banking may give families a powerful resource against injuries and diseases that can occur in the future. Every month, thousands of new parents, a number of them doctors, nurses, and scientists, store their newborn's stem cells with CBR. Some of the important reasons to save cord blood include the following:

- Cord blood is a rich source of hematopoietic stem cells, which are used in transplant medicine to treat many life-threatening diseases, such as leukemia and other cancers[].

- Cord blood is being evaluated today for its ability to treat cerebral palsy, traumatic brain injury, acquired hearing loss, and juvenile diabetes.

- Your baby's cord blood is available for your family if needed for treatment, without the need for painful and potentially time-consuming bone marrow harvest surgery. Early treatment can minimize disease progression.

- If ever required for a transplant, using your own family's cord blood instead of an unrelated donor's can have significant advantages, including fewer complications and improved medical outcomes.

- Current clinical trials in the U.S. that use cord blood require the child's own stem cells.

- Having a family history of disease.

- Having a baby of an ethnic minority or mixed ethnicity, in which there is greater difficulty finding stem cell donors.

- Adopting a newborn and wanting a valuable source of stem cells genetically identical to the adopted baby. *Id.*

36.     Defendants market themselves as "the world's largest stem cell collection and storage company," and dedicate a webpage to comparing themselves to the competition, including that they are the only company to offer a program for families to participate in a health registry where "CBR client families who join are the first to know about important clinical trials that could potentially help their loved ones" and is the only company that provides families access to Certified Genetic Counselors or clinical specialists to discuss how newborn stem cells may be appliable to the family, and is the "most recommended by OB/GYNs and expecting parents."[10]

---

[10] www.cordblood.com/CBR-Difference/Finding-Treatments-Together  and  www.cordblood.com/cbr-

37.    Further, in comparison to the competition, which CBR represents have storage facilities in Kentucky with "high tornado risk" and Florida with "high hurricane risk," CBR stores cord blood in Arizona, which has a "historically low risk of natural disasters.[11]"

38.    CBR also represents to consumer that their stem cell recovery is 95-97%, while the competition's is 76% and 64%.[12]

### i.    Defendants' Deceptive and Misleading Marketing of Fixed Annual Storage Fees.

39.    Defendants market their services in a variety of ways, including at obstetrician and gynecologists' offices (where they cannot be missed by parents visiting the office), on their own website, and in other marketing materials, such as sweepstakes where parents can hope to become one of the lucky few to win free cord blood services and storage.

40.    There is no doubt that the cost of cord blood banking is significant, which is exactly why Defendants aggressively market the service as having the ability *to save a child's life*. However, in order



difference/compare.  (last accessed August 23, 2021).

[11] *Id.*

[12] *Id.*

AMENDED CLASS ACTION COMPLAINT

to gain consumers' trust and to counter any concerns regarding the costs, Defendants lead Consumers to believe that there are no "hidden fees," as shown below[13]:

41.     Despite representing to Consumers that cord blood banking is "affordable" with "no hidden fees," Defendants' representations are false, as the annual storage fees charged to Consumers include substantial hidden fees, which they represent to consumers as fixed, but which are not.

### ii.     Defendants' Breach of the Uniform Contract, Which Promises and Leads Reasonable Consumers to Believe the Annual Storage Fees Are Fixed.

42.     Plaintiffs and each putative Class Member entered into substantially similar or the same contractual agreement with CBR governing their relationship with respect to cord blood banking, including cord blood storage. Copies of Plaintiffs' Contracts are attached hereto as Exhibits A and B.

43.     In the Contract, Plaintiffs and Class Members agree to the following: a hefty upfront initial cost of as much as $1,500.00, or more, and shipping of approximately $150.00-$170.00.

44.     In addition, pursuant to the uniform Contract, each Class Member agrees to a fixed annual fee for cord blood storage of $125.00 or more.[14]  Each contract has the same or substantially similar language confirming that the annual storage fees will be fixed from at least years 2-18 of storage.  This language is in a bold font, reaffirming to consumers that the annual fee will not change from years 2-18, as follows: "**Annual Storage Fee Per Year (Years 2-18)."**

45.     After entering into the Contract with CBR for the fixed annual storage fee, which is automatically charged to Consumers' credit cards on file with Defendants, CBR slyly increases the annual storage fee in breach of the plain terms of the Contract.

---

[13]  https://www.cordblood.com/cord-blood-banking-cost/cord-blood-stem-cells (last accessed June 18, 2021).

[14] The specific fixed amount depends on when the Consumer signed the Contract.

46.     CBR uses the increased costs to generate additional profits from Consumers, despite representing at the time they enter into the Contract that the annual storage fee is both fixed and legitimately related to the storage of cord blood.  In reality, the increase in fees bears no relation to storage costs and, even if it did, Consumers should not be responsible for paying additional fees due to Defendants' financial forecasting failures.

47.     Despite marketing the storage fee as fixed to consumers, and entering into a Contract with Consumers for the payment of the fixed storage fee, Defendants have systemically increased Consumers' storage fees for resources to innovate and finance new research related to cord blood, as reflected in emails to consumers stating the following:

> We are committed to keeping our costs low and our quality high, while we continue to work to advance the science of newborn stem cells. Recently, we've established the Family Health Registry™, which helps match families with researchers conducting clinical trials. We've also maintained a team of Certified Genetic Counselors available to all CBR families for questions on medical history and family health in using newborn stem cells. <u>We've partnered with and provided financial support to reputable research institutions on FDA-regulated clinical trials that investigate the potential for these cells to treat conditions that currently have no cure. To help us continue to offer programs and resources like these that help to advance the science of newborn stem cells, we've implemented an increase to the yearly fee of cord blood storage by $25 for your account currently at $125.</u>Your new yearly storage fee of $150* will be reflected in your next billing cycle.

48.     Defendants have also increased storage fees to pay for other business costs, such as investing in their call center and customer service infrastructure.

49.     Placing the burden on Consumers for payment of clinical trials and customer service infrastructure is not disclosed in the Contract or anywhere in Defendants' advertising and marketing. Notifying Consumers via email of an annual fee increase does not exonerate Defendants' blatant breach of the terms of the Contract; nor does it negate the fact that CBR markets their cord blood service as

"affordable" and having "no hidden fees," including promises from CBR's sales representatives that the annual storage fees are fixed.

50.      Even more, the storage fee increase is not a one-time assessment for a specific purpose, but rather is a continuing breach of the Contract as Defendants regularly increase the annual fee by up $25.00 every few years, or less.  Thus, the annual fee increases are substantial, and can amount to a more than 50% increase in storage fees over the lifetime of the storage, forcing Consumers to foot the bill for Defendants' customer service infrastructure, clinical research and marketing via their storage fees, which is deceptive and unlawful.

51.      Given that CBR is storing more than 900,000 samples, an increase of up to $25.00 every 2-3 years over the course of years 2-18 of storage would result in increased revenues that CBR is not entitled to in excess of $100,000,000.

52.      The fixed annual storage fee is just that – a fixed fee for storage which should not increase. Yet, Defendants have placed the burden of paying for their clinical trials or other business costs on Consumers and buried it within the annual storage fee, which has no relationship to the storage costs.

53.      It is up to Defendants to responsibly manage their funds, and not place the burden of unrelated expenses onto Consumers who enter into Contracts with Defendants based upon the reasonable belief that the annual storage fees they agreed to were fixed.

54.      Further, if and when Consumers learn of the unlawful increase in the annual storage fee, they are left with no choice but to pay the increased fee or lose their children's cord blood, which was stored for potential future lifesaving uses.

55.      Defendants have uniformly breached their Contract with Consumers by essentially holding the consumers' cord blood hostage in exchange for the extraction of the unfair and deceptive storage fee increase imposed on Consumers. Moreover, Defendants prevent the easy transfer of the cord

blood to a different cord blood storage facility, and take permanent possession of Consumers' cord blood if and when they refuse to pay or are unable to pay for continued storage due to the increased fee.

56.     Defendants breached the form Contract entered into by Plaintiffs and Class Members, and violated the duty of good faith and fair dealing by entering into a Contract with Plaintiffs and Class Members for their payment of fixed annual storage fees when the fees are not fixed, but rather are part of Defendants' plan to rope consumers into extended Contracts that they cannot break without losing the cord blood (which is irreplaceable) and all of the fees, costs, and expenses paid to that date.

57.     The increased annual storage fees are, in fact, unlawful hidden price increases, which force Plaintiffs and Class Members to pay more for services than agreed upon and are arbitrary in methodology and amount, except for the fact that they are not being used for costs associated with the storage of cord blood, but rather to fund Defendants' business expenses and clinical studies, and to potentially purchase new companies to add to their life sciences inventory, which Defendants use to market to Consumers and to increase their profits.

58.     The increased annual storage fees are contrary to Defendants' uniform marketing representations, which promise fixed storage fees and "no hidden fees," and which are not allowed by the form Contract.  Defendants used a pre-printed Contract to enter into uniform agreements with each Plaintiff and putative Class Member.  The form Contract expressly does not allow Defendants to charge storage fees beyond the fixed amount set forth in the Contract.

59.     By increasing the fixed annual storage fees, Defendants have breached the form Contracts at issue in that the fee—which is wholly unrelated to actual storage costs— is not subject to the agreed-upon annual storage fees.  The increased storage fee is a force-placed charge, the true nature of which is hidden from Plaintiffs and putative Class Members.

60.     Defendants have further engaged in a pattern and practice of deceptive, fraudulent, and unfair conduct in the increase of fixed annual storage fees, causing them to not be fixed, in contravention of CBR's marketing and advertising.

61.     Further, Defendants have failed to act in good faith in charging increased storage costs when the increased fees bear no relationship to the cord blood storage, but rather are (as Defendants admit) being used to fund Defendants' unrelated business expenses and clinical studies, and to preserve and increase Defendants' profits.

###     iii.     Consumer Complaints and CBR's Responses

62.     Numerous Consumers have complained to CBR about their deceptive and unlawful billing practices and, rather than changing their practices, CBR addresses each complaint and comes to a private agreement with the complaining Consumers.  Below is a small sample of these numerous Consumer complaints:

**Complaint Type**: Billing/Collection Issues; June 24, 2021

We banked our daughter's cord blood with CBR in 2013, and chose to pay an annual fee of $130 a year instead of a lifetime payment, knowing that we would always stay on top of this annual bill. CBR claimed that price was fixed, but instead has continued to raise storage fees annually, and this year our annual payment is up to $185. They mislead those of us who chose the annual fee years ago, and it feels like they are essentially holding our child's cord blood hostage and could just continue raising prices to whatever they feel like with no notification to those of us storing the cord blood with them. In addition, they recommend storing a credit card and doing automatic billing, which allows them to just annually bill whatever they feel like charging with no statement or explanation of billing ever presented. I would not recommend this company to others based on this misleading billing practice.

**Response**: June 30, 2021

*We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach*

*out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.* [15]

\*\*\*

**Complaint Type**: Billing/Collection Issues; March 2, 2021

Since my daughter was born in 2009 <u>the yearly storage fee has gone up year after year, when it was supposed to be a locked in rate for 18 years I was told</u>. 2009-2017 - $125 a year 2018 - $150 2019 - $175 2020 - $180 2021 - $185 This is absolutely ridiculous. I didn't realize this since my payment is autodraft.

**Response**: March 8, 2021

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[16]

\*\*\*

**Complaint Type**: Billing/Collection Issues; February 3, 2021

When I enrolled in CBR in 2015, a CBR representative \*\*\*\*\* \*\*\*\*\*\*\* informed me: "you do not need to do anything else to lock in the $130 annual storage fee. Now that you are enrolled, that $130 is locked in for 18 years." However, I was charged $145 in annual storage fee around 1/30/2019, $160 around 1/30/2020, and $175 around 1/30/2021. These charges were more than the $130 that was locked in for 18 years.

**Response**: February 5, 2021

We appreciate you taking the time to connect with our Client Services Team and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a va\*\*ed member of the CBR family today and continuing to partner with us into the future of stem cell science.[17]

---

[15] https://www.bbb.org/us/az/tucson/profile/cord-blood-banking/cbr-systems-inc-1286-20007493/complaints (last accessed July 22, 2021) (emphasis added)

[16] *Id.* (emphasis added).

[17] *Id.*

**Complaint Type**: Problems with Product/Service; May 4, 2020

CBR raises rates almost annually, even though the initial agreement was a level annual fee.

**Response**: May 7, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted. We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation. If we can be of any additional assistance please reach out to us at any time. Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[18]

\*\*\*

**Complaint Type**: Billing/Collection Issues; May 3, 2020

We selected the CBR to store my son cord blood & tissue in 2014. The option we chose is to pay one-time fee for collection and processing and then annual fee of $260 for the following 18 years, as clearly said on the document: The service we bought will end in 2032. We confirmed with the sales representative before deciding using their service that we will pay 260$ annually in the next18 years. Since purchasing this 18-year service package from CBR.We trusted and recommended CBR to my cousind. Again we selected CBr for my second baby in 2018 and paid for life long plan. we paid the bill every year in the past 5 years were very surprised by this unexpected bill change to 290$ in 2019. Since we observed this later just forgot it. Again this year we have got new invoice increased to 320$. This sounds unfair and there is no point of paying and lock in for 18 tears. This is really not acceptable and its not just a matter of few bucks. CBR is really taking advantage Since there is no other option for us other than maintaing [sic] the existing accounts.

**Response**: May 8, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted. We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation. If we can be of any additional assistance please reach out to us at any time. Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[19]

---

[18] *Id.*

[19] *Id.*

\*\*\*

**Complaint Type**: Billing/Collection Issues; April 28, 2020

I have been requesting my account to be closed for four years. I have sent my request in writing multiple times. CBR has failed to send me their required paperwork to close the account and continues to bill me an annual storage fee. This annual storage fee has increased twice, despite being told the rate was locked in until my child turned 18. The original annual storage rate was $125. It has increased by $25 two times, now to $175. CBR continues to contact me with past due statements and is threatening collection services. They refuse to close the account unless it is paid in full.

**Response**: May 8, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you.[20]

\*\*\*

**Complaint Type**: Billing/Collection Issues; April 13, 2020

I have banked both my kids cord blood with CBR. I have signed up for $125 storage fees for the first kid and $130 for the second kid and have set up auto pay for the annual fees. I have now realized that CBR has been increasing the annual storage fees pretty steeply. The $ 125 has become $180 in a matter of few of years and the 130 and has become 145. This is pretty steep increase in annual fees and I am not sure where this will stop. It was not made obvious or stated while signing up that the fees will increase sharply every year.

**Response**: April 13, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[21]

\*\*\*

**Complaint Type**: Billing/Collection Issues; January 15, 2020

---

[20] *Id* (emphasis added)

[21] *Id.*

I selected CBR for my 3 children and opted for this service as I was clearly told that my $125 rate would be locked in for 18 years. To my surprise, rates were increased by $25 twice in 3 years! I contacted the company, and was told that I could elect to have the samples destroyed or pay the higher fee. After the first increase, I was also told at that time that no further price increases were expected in the future and this was the first in 25 years. Two years later, another $25 increase. This was falsely advertised by CBR agent when told this rate would be locked in for 18 years. If there is a possibility of rate increases, then state that clearly. DON'T LIE! Disappointed and don't recommend this company.

**Response**: January 10, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[22]

\*\*\*

**Complaint Type**: Billing/Collection Issues; January 15, 2021

Like many other customers, CBR has raised my child's cord blood storage rate multiple times, despite the rep stating that it would remain the same rate of $125/year until my child reaches the age of 18. We selected CBR after reviewing several cord blood firms, and were happy and satisfied until we realized they had increased our rates beginning in 2017. In the last few years CBR has increased to cost of our storage rates by close to 40% despite being told that we would have the same storage rate of $125/year "locked in" for 18 years. In 2017, it went up from $125/yr to $150/yr. Two years later, it increased again to $175/yr. Since our account is setup for auto-pay through our bank and online billing, we did not notice the increases until doing our yearly budget planning this week. 40% increase in the span of 3 years is highway robbery and telling us it would be locked in and then changing that is fraudulent. We feel like we are being held hostage with big transfer fees and only alternative being to destroy the samples. As a single income family, we don't have extra money for these unexpected and unplanned expenses especially from a business that claimed and advertised locking in my original storage rate until they are 18. I am worried this trend will continue until it reaches the point it forces me to no longer continue and choosing between the health of my children and the ability to live within my means. I am disappointed, and very saddened, to be doing business with a company that does not honor their word treating and is treating their customers like this.

---

[22] *Id.*

**Response**: January 8, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted. We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation. If we can be of any additional assistance please reach out to us at any time. Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[23]

63.  In perhaps the most egregious of their responses, and what is a clear admission of wrongdoing, CBR admits that the added storage fees may not even benefit the Consumers who are paying such fees:

**Complaint Type**: Billing/Collection Issues; January 17, 2020

I have stored my two children's cord blood with CBR (2008 and 2011). Like many complaints listed here, I recall being told that the storage fee would remain the same for 18 years. Still, the price increased from $125/year to $150/year a couple of years ago and initially I didn't even notice it because I had automatic billing. Although I was told (in 2017 and this year) that the price increase was due to expense and need for R&D, the real reason is quite different. CBR was sold to AMAG in 8/2015 for $700M, and subsequently AMAG increased price (for the first time in a decade) in order to mine more money from this acquisition. In fact, AMAG boasted about CBR "growth" driving by annual storage fees in 2017. In June 2018, CBR was sold again to GI Partners for $530 million, and GI Partners once again increased the price to $175/year in 2019! Note that there was NO price increases when CBR's ownership didn't change prior to 2015, because the unit cost of storage should generally decrease when there are more units stored. Units being safely stored is all that I, as a customer, expects of CBR (so we shouldn't shoulder any R&D outside of storage and storage related issues); and CBR had been very profitable all along ($45M EBITDA on $126 million revenue in 2014, that's 36% margin, higher than a vast majority of American businesses). So at least CBR should be honest when they increased the price -- "our new owner really wants to harvest more money from our captive customer like you!". Because the way that CBR was increasing price, and because there was almost no alternative solution (I can't donate my children's cord blood to public banks), I feel that I am a captive hostage rather than a customer. CBR essentially treats people who have trusted it with their children's cord blood as a source to harvest more money. I'm so disappointed in the company and outraged by the corporate greed demonstrated by the two new owners.

---

[23] *Id.*

**Response:** January 27, 2020

Thank you again for trusting CBR with the stem cells of your family. Our goal as a company is to lead the industry in helping discover new, innovative ways cord blood and cord tissue might be used in the future, providing more long-term value to our families. We're investing in best-in-class technologies for storage, infrastructure, support services for clients, and scientific research. <u>While it may not immediately impact your family, these investments could mean a greater likelihood for our client families to have more opportunities to use their stem cells in the future</u>. As you know, CBR is committed to three key areas: quality, affordability, and investing in the research and development of newborn stem cell applications. Balancing these areas can be challenging, but a slight adjustment in annual storage rates will allow us to maintain our high standards of quality while investing more into R&D and expanding the potential value of your family's precious resource(s). We are glad to hear that you have been able to connect with our management team and work on the resolution of your concerns directly. Thank you again.[24]

## B. Injury to the Public At-Large and Potential for Future Harm

64.     Defendants' wrongful conduct harms the public-at-large.

65.     Namely, by raising monthly fees for the storage of cord blood, fewer families are able to afford paying for the continued storage and thus are forced to have it "disposed" of by Defendants. In effect, this causes the first- and second-degree relatives of the donor of the cord blood to lose the ability to use that cord blood to potentially save their life in the event of one of the aforementioned medical uses of cord blood. This literally endangers all potential end users of the cord blood and it proliferates harm beyond just the economic harm caused by the increases in price.

66.     In addition, because Defendants' deceptive advertising is ongoing and directed to the public, the deception poses an ongoing risk to the public.

67.     As such, a public injunction must be provided in order to enjoin Defendants' continued harm of Consumers and the public-at-large.

---

[24] *Id* (emphasis added)

68.     Similarly, should Defendants not be enjoined from their unlawful and deceptive conduct, Plaintiffs and Class Members face the potential for irreparable future harm, including continued, involuntary increases in storage fees and disposal of "life saving" cord blood.

## C. Unconscionability of Arbitration Clause

69.     The arbitration clause included in the uniform Contract is procedurally and substantially unconscionable due to the harsh, one-sided fee and cost-shifting provision for all arbitration and court costs, the requirement that Plaintiffs and Class Members pay all fees and costs to bring an arbitration, the procedural surprise associated with the vagueness of the arbitration clause, and the unequal bargaining power between the parties.

70.     The arbitration clause in the form Contract contains a harsh, one-sided fee and cost-shifting "loser pays" provision, indicating that "[i]n the event of arbitration, or any court proceedings, the court or arbitrator may awarded reasonable attorneys' fees and costs to the prevailing party in addition to any other relief to which the party is entitled."  This creates a greater risk in arbitrating claims than Plaintiffs and Class Members would face if they were to litigate the same claims in federal court.  This provision also only benefits Defendants, who are backed by billions of dollars in private investments and are in a substantially stronger bargain position due to having greater resources than Plaintiffs and Class Members.

71.     The harsh, one-sided fee and cost-shifting "loser pays" provision is also unconscionably broad, as it requires the losing party to pay both fees *and* costs in the event of arbitration *and any* court proceedings, which could include any initial decision of arbitrability, any costs associated with the arbitration, or any merits determinations in court or arbitration.  The intended and actual result of this provision is the creation of a chilling effect on Plaintiffs and Class Members' rights because it exposes

them to the possibility of paying attorneys' fees and costs associated with any and all litigation and arbitration issues.

72.     Further, the "loser pays" provision violates Title 9 of the California Code of Civil Procedure, which is referenced in the Contract, and states that such clauses are unlawful.  Specifically, California Code of Civil Procedure §1284.3 states that "(a) No neutral arbitrator or private arbitration company shall administer a consumer arbitration under any agreement or rule requiring that a consumer who is a party to the arbitration pay the fees and costs incurred by an opposing party if the consumer does not prevail in the arbitration, including, but not limited to, the fees and costs of the arbitrator, provider organization, attorney, or witnesses."

73.     Moreover, the vague language of the arbitration provision does not give Plaintiffs or Class Members an opportunity to fully understand the terms or nature of the agreement, including where to file, how to file, or the costs associated with filing, making the entire arbitration provision a procedural surprise.  Further, the arbitration provision is vague as to where any arbitration would be filed, or any other circumstances regarding filing, and consequently requires Plaintiffs and Class Members to pay all arbitration fees and costs. Thus, the arbitration provision is too vague to be enforceable.

74.     Further, had Plaintiffs or Class Members known that the annual cord blood fee was not fixed, contrary to CBR's marketing and advertising representations and the form Contract, but that the cost of the increased fees would likely be less than the costs of having to arbitrate their claims to seek redress for CBR's misconduct, they would not have signed the Contract with CBR on the same terms

75.     In addition, the standard CBR service Contract is a contract of adhesion, imposed upon Plaintiffs and Class Members without an opportunity to negotiate the terms.  Plaintiffs and Class Members are in a substantially weaker bargaining position than Defendants, which are owned and managed by a multi-billion-dollar private investment firm. The arbitration provision is presented to

consumers on a take-it-or-leave-it basis due to the inequality of bargaining power that resulted in no real negotiation and an absence of meaningful choice. This is especially true here, where Consumers are often parents or caregivers who are presented with the Contract while facing parenthood for the first time, or adding to their growing family, and are told that they must sign the Contract in order to take advantage of the "once-in-a-lifetime opportunity" of cord blood banking.

76.     Further, the arbitration provision is not clear or conspicuous, as it is buried within 11 pages of "Family Banking Enrollment Forms," which have multiple sections, including the client service agreement, medical and health history profile, and payment information.

77.     Plaintiffs request that this Court decide that the arbitration provision is unlawful, unfair, deceptive and unenforceable.

## PLAINTIFFS' ALLEGATIONS

### *Katherine Vaccarella*

78.     Plaintiff Katherine Vaccarella signed a Contract with CBR on January 23, 2015, for the collection and storage of her child's cord blood. Plaintiff Vaccarella's Contract with CBR is appended to this Class Action Complaint as Exhibit A.

79.     Prior to entering into the Contract with CBR for cord blood storage, Plaintiff Vaccarella performed research on cord blood banking, including on CBR's website. Plaintiff Vaccarella also spoke with a service representative of CBR. Through CBR's website representations and the promises from CBR's service representative, Plaintiff Vaccarella reasonably believed that the cord blood banking included a large up-front cost, and fixed annual storage fees.  The fixed nature of the annual storage fees was important to Plaintiff Vaccarella because of the significant expenses associated with cord blood banking, and for her future family planning.

80.     In that Contract, Plaintiff Vaccarella agreed to the following: a hefty upfront initial cost of $1,595.00, including shipping of $170.00, and a fixed annual storage fee of $130.00.

81.     Pursuant to that Contract, under the "Annual Storage Fee" provision, it states in bold font: "**Annual Storage Fee Per Year (Years 2-18)**  $130.00." *See* Exhibit A. This confirms that the annual storage fee is fixed pursuant to the Contract during the entirety of the cord blood storage for years 2-18.

82.     Contrary to CBR's website representation and the promises of the CBR service representative, as well as the promise in the service Contract, CBR unilaterally increased Plaintiff Vaccarella's annual storage fee to $160.00.

83.     CBR chose not to abide by their representations and promises on their website, and made through their service representatives, as well as the Contract terms that they drafted and to which they are a party.  In so doing, CBR chose to charge Plaintiff Vaccarella storage fees which were not consistent with the "Annual Storage Fee" provision of the Contract. Indeed, the annual storage fees that Plaintiff Vaccarella was charged are significantly higher than what the Contract guaranteed.

84.     Plaintiff Vaccarella relied on the aforementioned representations made by Defendants both in the Contract and in advertising, including representations on the CBR website and from their service representative, regarding the fixed nature of the annual storage fees.

85.     Plaintiff Vaccarella would not have signed the Contract with CBR on the same terms if CBR had disclosed the fact that the annual storage fee was not actually fixed and that CBR intended to charge her incrementally increased annual storage fees.

86.     As such, CBR breached their express warranties with Plaintiff Vaccarella, and the Contract with Plaintiff Vaccarella, and restitution and damages are required in order to make Plaintiff Vaccarella whole due to the breach.  In addition, CBR's conduct is fraudulent, deceptive, unlawful and misleading in violation of relevant consumer protection laws.

***Plaintiff Amy Cohen***

87.     Plaintiff Amy Cohen signed a Contract with CBR on October 25, 2012, and another Contract on November 7, 2013, for the collection and storage of her two grandchildren's cord blood. Plaintiff Cohen's Contracts with CBR are appended to this Class Action Complaint as Exhibit B.

88.     Plaintiff Cohen was persuaded to sign the Contracts with CBR because of their marketing representations that the cord blood is stored in Arizona, which CBR represents as having historically less natural disasters than competitor cord blood banking companies.  This was material to Plaintiff Cohen and her daughter because they live in Florida, where hurricanes regularly impact the State.

89.     Prior to signing both Contracts, Plaintiff Cohen also spoke with service representatives of CBR who confirmed that the annual cord blood storage fee would be fixed and charged annually on her grandchildren's birthdays. The fixed nature of the annual storage fees was important to Plaintiff Cohen because of the significant expenses associated with cord blood banking

90.     In the October 25, 2012, Contract, Plaintiff Cohen agreed to the following: a hefty upfront initial cost of as $1,945.00, including shipping of $150.00, and a fixed annual storage fee of $125.

91.     Pursuant to the October 25, 2012, Contract, under the "Annual Storage Fee" provision, it states in bold font: "**Annual Storage Fee Per Year (Years 2-18)** $125.00." *See* Exhibit B. This confirms that the annual storage fee is fixed pursuant to the Contract during the entirety of the cord blood storage for years 2-18.

92.     In the November 7, 2013, Contract, Plaintiff Cohen agreed to the following: a hefty upfront initial cost of $1,595.00, including shipping of $170.00, and a fixed annual storage fee of $130.00.

93.     Pursuant to the November 7, 2013, Contract, under the "Annual Storage Fee" provision, it states in bold font: "**Annual Storage Fee Per Year (Years 2-18)** $130.00." *See* Exhibit B. This confirms that the annual storage fee is fixed pursuant to the Contract during the entirety of the cord blood storage for years 2-18.

94.     Contrary to CBR's representations and the promises of the CBR service representative, as well as the promise in the service Contract, CBR unilaterally increased Plaintiff Cohen's annual storage fees of $125.00 subject to the October 25, 2012 contract to $150.00 in 2017 and 2018, $175.00 in 2019 and $180.00 in 2020, rather than the $125.00 fixed annual storage fee she agreed to.

95.     Contrary to CBR's representations and the promises of the CBR service representative, as well as the promise in the service Contract, CBR unilaterally increased Plaintiff Cohen's annual storage

fee subject to the November 7, 2013, Contract so that she is now paying $175.00, rather than the $130.00 fixed annual storage fee to which she agreed.

96.     CBR chose not to abide by their representations and promises and made through their service representatives, as well as the Contract terms that they drafted and to which they are a party.  In so doing, CBR chose to charge Plaintiff Cohen storage fees which were not consistent with the "Annual Storage Fee" provision of the Contracts. Indeed, the annual storage fees that Plaintiff Cohen was charged are significantly higher than what the Contracts guaranteed.

97.     Plaintiff Cohen relied on the aforementioned representations made by Defendants both in the Contracts and in their marketing, including representations from CBR's service representative, regarding the fixed nature of the annual storage fees.

98.     Plaintiff Cohen would not have signed the Contracts with CBR on the same terms if CBR had disclosed the fact that the annual storage fee was not actually fixed and that CBR intended to charge her incrementally increased annual storage fees.

99.     As such, CBR breached their express warranties with Plaintiff Cohen, and the Contracts with Plaintiff Cohen, and restitution and damages are required in order to make Plaintiff Cohen whole due to the breaches.  In addition, CBR's conduct is fraudulent, deceptive, unlawful and misleading in violation of relevant consumer protection laws.

*Sirisha Koneru*

100.     Plaintiff Sirisha Koneru signed a Contract with CBR on April 6, 2011, for the collection and storage of her child's cord blood. Plaintiff Koneru's Contract with CBR is appended to this Class Action Complaint as Exhibit C.

101.     Prior to entering into the Contract with CBR for cord blood storage, Plaintiff Koneru performed research on cord blood banking, including on CBR's website.  Plaintiff Koneru also spoke with a service representative of CBR. Through CBR's website representations and the promises from

CBR's service representative, Plaintiff Koneru reasonably believed that the cord blood banking included a large up-front cost, and fixed annual storage fees. The fixed nature of the annual storage fees was important to Plaintiff Koneru because of the significant expenses associated with cord blood banking, and for her future family planning.

102.    In that Contract, Plaintiff Koneru agreed to the following: a hefty upfront initial cost of as $1,445.00, including shipping of $150.00, and a fixed annual storage fee of $125.00.

103.    Pursuant to that Contract, under the "Annual Storage Fee" provision, it states in bold font: "**Annual Storage Fee Per Year (Years 2-18)** $125.00" *See* Exhibit C. This confirms that the annual storage fee is fixed pursuant to the Contract during the entirety of the cord blood storage for years 2-18.

104.    Contrary to CBR's website representation and the promises of the CBR service representative, as well as the promise in the service Contract, CBR unilaterally increased Plaintiff Koneru's fixed annual storage fee of $125.00 to $150.00 in 2017 and 2018, $175.00 in 2019[25], $180.00 in 2020, and $185.00 in 2021.

105.    CBR chose not to abide by their representations and promises on their website, and made through their service representatives, as well as the Contract terms that they drafted and to which they are a party. In so doing, CBR chose to charge Plaintiff Koneru storage fees which were not consistent with the "Annual Storage Fee" provision of the Contract. Indeed, the annual storage fees that Plaintiff Koneru was charged are significantly higher than what the Contract guaranteed.

106.    Plaintiff Koneru relied on the aforementioned representations made by Defendants both in the Contract and in advertising, including representations on the CBR website and from their service representative, regarding the fixed nature of the annual storage fees.

---

[25] Plaintiff Koneru received referral credits in 2019 and 2020 and thus did not pay those increased annual fees, but did not receive a credit in any other years, and thus her current annual storage fee is $185.00.

107.    Plaintiff Koneru would not have signed the Contract with CBR on the same terms if CBR had disclosed the fact that the annual storage fee was not actually fixed and that CBR intended to charge her incrementally increased annual storage fees.

108.    As such, CBR breached their express warranties with Plaintiff Koneru, and the Contract with Plaintiff Koneru, and restitution and damages are required in order to make Plaintiff Koneru whole due to the breach.  In addition, CBR's conduct is fraudulent, deceptive, unlawful and misleading in violation of relevant consumer protection laws.

## DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT

109.    The applicable limitations period in this Action has been tolled because Defendants concealed their misconduct such that Plaintiffs and Class Members could not discover the misconduct through the exercise of reasonable diligence.  Through the time period relevant to this Action, Defendants concealed from and failed to disclose to Plaintiffs and Class Members that they intended to breach the Contract and their express warranties regarding the fixed annual storage fee, and to impose additional fees upon Plaintiffs and Class Members for cord blood storage.

110.    Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence that the Contract terms would not be honored.  Prior to Defendants' imposition of increased annual cord blood storage fees, in contravention of Plaintiffs and Class Members' reasonable expectations, the plain terms of the Contract, and the plain representations in Defendants' marketing and advertising, Plaintiffs and Class Members reasonably trusted Defendants' representations that the annual storage fees were fixed.

111.    Further, CBR's conduct is a continuing breach and thus the statute of limitations is tolled during the pendency of the breach.

## FED. R. CIV. P. 9(b) ALLEGATIONS
### (Affirmative and By Omission)

112.     Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Although, Defendants are in the best position to know what content they placed on their website and in marketing materials during the relevant timeframe, to the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

113.     **WHO:** Defendants made material misrepresentations and/or omissions of fact in their uniform website representations, marketing, and the service Contract, that the annual cord blood storage fee would be fixed, when in reality, Defendants intended to, and did, systemically increase the annual cord blood storage fees.

114.     **WHAT:** Defendants' conduct here was, and continues to be, fraudulent because they omitted and concealed the fact that the annual cord blood storage fee was not fixed, and led reasonable Consumers to believe that the fee was fixed, when it was not.  If and when a Consumer learns of the unlawful increase in the annual storage fee, they are left with no choice but to pay the fee or lose their cord blood. Thus, Defendants are able to breach their Contract with Consumers because they essentially hold the Consumers' cord blood hostage in exchange for the extraction of the unfair and increased pricing imposed on Consumers.

115.     **WHEN:** Defendants made the material misrepresentations and omissions detailed herein at the time Plaintiffs and Class Members performed research on cord blood banking to gather information that would aid them in determining whether to bank their cord blood and, if so, whether to bank the cord blood with CBR or one of their competitors, prior to and at the time Consumers entered into the service Contracts for cord blood banking, and continuously through the applicable class period.

116.   **WHERE:** Defendants' material misrepresentations and omissions were made on their website, through their marketing materials, and in the service Contract, prior to and at the time Consumers entered into the service Contracts for cord blood banking.

117.   **HOW:** Defendants made material misrepresentations and omissions on their website, through their marketing materials, and in the service Contract, that the annual storage fees were fixed when they were not.

118.   **WHY:** Defendants engaged in the material misrepresentations and/or omissions detailed herein (e.g., knowing and concealing their knowledge of the deceptive and unlawful conduct) for the express purpose of inducing Plaintiffs and Class Members to enter into a Contract with Defendants for cord blood banking, so they could increase annual storage fees for the purpose of generating profits and funding their clinical studies or other business expenses that have no rational relationship to cord blood storage. CBR uses the increased annual storage fees to generate greater profits at the expense of Consumers after deceiving Consumers into believing (at the time they enter into the Contract) that the annual storage fee is both fixed and legitimately related to cord blood storage.  But the increased storage fees bear no relation to storage costs and, even if they did, Consumers should not be responsible for paying additional fees due to Defendants' financial forecasting failures.

119.   **INJURY:** Plaintiffs and Class Members have been injured because they were duped into entering into a Contract with CBR for cord blood banking, which promised and led reasonable Consumers to believe that it included a fixed annual storage fee, which is not actually fixed and will cost Consumers hundreds or thousands of additional dollars over the course of the cord blood storage.  If and when Consumers learn of the unlawful and unexpected increase in the annual storage fee, they are left with no choice but to pay the unlawful fee or lose their cord blood. Thus, Consumers have been or will be injured in the amount of unexpected and hidden storage fees.

## CLASS ACTION ALLEGATIONS

120.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following classes (hereinafter, the "Classes"):

**Nationwide Class**:
During the fullest period allowed by law, all Consumers who have contracted with CBR for cord blood or tissue storage.

**Florida Subclass**:
During the fullest period allowed by law, all Consumers in the State of Florida who have contracted with CBR for cord blood or tissue storage.

**New Jersey Subclass:**
During the fullest period allowed by law, all Consumers in the State of New Jersey who have contracted with CBR for cord blood or tissue storage.

**New York Subclass:**
During the fullest period allowed by law, all Consumers in the State of New York who have contracted with CBR for cord blood or tissue storage.

121.    Excluded from the Classes are Defendants, their subsidiaries, affiliates, officers, directors, and employees.

122.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The Members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Plaintiffs are informed and believe—based upon the publicly-available information discussed herein—that there are hundreds of thousands of Class Members, making joinder impracticable. Those individuals' identities are available through Defendants' records, and Class Members may be notified of the pendency of this Action by recognized, Court-approved notice dissemination methods.

123.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Defendants have acted in a manner generally applicable to Plaintiffs and the other Members of the proposed Classes. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class Members. The questions of law and fact common to the Classes predominate over the questions that may affect individual Class Members, including the following:

a. Whether Defendants breached their uniform Contracts with Plaintiffs and Class Members;

b. Whether any such breach caused harm or injury to Plaintiffs and Class Members;

c. Whether Defendants made or disseminated to the public any representation about the annual cord blood banking storage fees that were deceptive or misleading;

d. Whether Defendants breached the implied covenant of good faith and fair dealing with Plaintiffs and Class Members;

e. Whether Defendants violated the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*

f. Whether Defendants violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*;

g. Whether Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*;

h. Whether Defendants violated New York General Business Law § 349;

i. Whether Defendants violated New York General Business Law § 350;

j. Whether Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. §56:8-1, *et seq.*

k. Whether Defendants' conduct warrants a public injunction enjoining Defendants' continued course of conduct;

l. Whether compensatory or consequential damages should be awarded to Plaintiffs and the other Class Members;

m. Whether actual, punitive, trebled, or statutory damages should be awarded to Plaintiffs and other Class members;

n. Whether restitution should be awarded to Plaintiffs and the other Class Members;

o. Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

p. Additional common questions to be supplemented as a result of discovery.

124. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way. Plaintiffs and Class Members were subjected to Defendants' uniform marketing and advertising promising no hidden fees and fixed cord blood storage fees, and each entered into a uniform contract with Defendants for fixed storage fees.

125. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives because their interests do not conflict with the interests of Class Members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this Action vigorously. The Class Members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

126. **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making final, public injunctive relief or corresponding declaratory relief appropriate.

127. Injunctive relief, and specifically public injunctive relief, is necessary in this Action.

128. The harm that Defendants imposed on Consumers causes ripple effects for the public at-large.

129. Namely, by raising prices on fixed annual fees for the storage of cord blood, fewer families are able to afford paying for the continued storage and thus are forced to have it "disposed" of by Defendants. In effect, this causes the first- and second-degree relatives of the donor of the cord blood to

lose the ability to use that cord blood to potentially save their life in the event of one of the aforementioned medical uses of cord blood. This literally endangers all potential end users of the cord blood and it proliferates harm beyond just the economic harm caused by the increases in annual storage fees.

130.    **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (Against all Defendants)
### (Plaintiffs individually, and on behalf of the Nationwide Class, Florida, New York and New Jersey Subclasses)

131.    Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

132.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class and Subclasses.

133.    Plaintiffs and putative Class Members entered into a contractual agreement with CBR governing their relationship with respect to cord blood banking, including cord blood storage.

AMENDED CLASS ACTION COMPLAINT

134.   A material term of the Contract includes the Payment Information Section, which promises and represents that the annual storage fee will be fixed.  As shown in Exhibits A-B, the Contract states that annual storage fees will be fixed for years 2-18.

135.   Plaintiffs and putative Class Members fully performed their material obligations under the Contract with Defendants by paying the initial cord blood banking fees and annual storage fees thereafter.

136.   Defendants materially breached the Contract with Plaintiffs and Class Members because the storage fee was not fixed as promised and represented in the Contract.

137.   After entering into the Contract with Defendants for the fixed annual storage fee, which is automatically charged to consumers' credit cards on file with Defendants, CBR slyly increases the annual storage fee in breach of the plain terms of the Contract.

138.   CBR uses the increased annual storage fees to generate greater profits at the expense of Consumers after deceiving Consumers into believing (at the time they enter into the Contract) that the annual storage fee is both fixed and legitimately related to cord blood storage.   But the increased storage fees bear no relation to storage costs and, even if they did, Consumers should not be responsible for paying additional fees due to Defendants' financial forecasting failures.

139.   The annual storage fee is just that – a fee for storage.  Yet, Defendants have placed the burden of paying for their clinical trials on Consumers and tethered it to the annual storage fee, despite the fact that such clinical trials have no relationship to storage costs.

140.   Even more, the annual storage fee increase is not a one-time assessment, but rather is a continuing breach, as Defendants regularly increase the annual fees at up to $25.00 intervals every few years.  Thus, the annual storage fee increases are substantial, and can amount to a more than 50% increase in storage fees (or more) over the lifetime of the cord blood storage, deceptively and unlawfully forcing Consumers to foot the bill for Defendants' clinical research and marketing via their annual storage fees.

141.    Further, if and when Consumers learn of the unlawful increase of the annual storage fees, they are left with no choice but to pay the fees or lose their cord blood.

142.    Defendants thus breached the form Contract entered into by Plaintiffs and Class Members, and violated the duty of good faith and fair dealing by entering into a Contract with Plaintiffs and Class Members for their payment of fixed annual storage fees when the fees are not fixed, but rather are part of Defendants' plan to rope consumers into extended Contracts that they cannot break without losing the cord blood (which is irreplaceable) and all of the fees, costs, and expenses paid to that date.

143.    Further, the increased annual fees that Defendants require in order to continue storing Consumers' cord blood further breaches the Contract between Consumers and Defendants because Defendants increased the cost of services without providing proper consideration – namely, that Defendants increase the cost of their services without providing an added benefit to Consumers; and thus, Consumers fail to receive the benefit of their bargain when the storage fees are increased.

144.    Plaintiffs and Class Members were injured as a direct, proximate, and foreseeable result of Defendants' material breach of the Contracts. Had Defendants disclosed to Plaintiffs and Class Members that the annual storage fees were not fixed, but rather, that they would be increased over time in unknown amounts, costing Consumers hundreds or thousands of additional dollars for cord blood storage, they either would not have entered into the Contract with Defendants, or would not have agreed to pay Defendants as much as they did for cord blood banking.

145.    Plaintiffs and Class Members are entitled to an award of damages as redress for Defendants' material breach of the Contracts with Plaintiffs and Class Members, including, but not limited to, compensatory damages and/or benefit-of-the-bargain damages.

146.    Plaintiffs and Class Members, who continue to pay increased annual storage fees, are also entitled to injunctive relief to enjoin Defendants from continuing to breach their Contracts.

## COUNT II

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(Pled in the Alternative to Breach of Contract, Against all Defendants)**
**(Plaintiffs individually, and on behalf of the Nationwide Class, Florida, New York and New Jersey Subclasses)**

147.    Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

148.    Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and the Subclasses.

149.    Plaintiffs bring this cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing in the alternative to Count I.

150.    Plaintiffs and putative Class Members each entered into a contractual agreement with CBR governing their relationship with respect to cord blood banking, including cord blood storage. Copies of the subject agreement are attached hereto as Exhibits A-B.

151.    Plaintiffs and putative Class Members fully performed their material obligations under the Contract with Defendants by paying the initial cord blood banking fees and annual storage fees thereafter.

152.    A material term of the Contract includes the Payment Information Section, which promises and represents that the annual storage fee will be fixed.  As shown in Exhibit A-B, the Client Service Agreement states that annual storage fees will be fixed for years 2-18.

153.    The Contract includes the implied covenant of good faith and fair dealing.

154.    Pursuant to the implied covenant, Defendants have a duty not to commit acts that would improperly deprive Plaintiffs and Class Members of the intended benefits of the Contract.

AMENDED CLASS ACTION COMPLAINT

155.    The principal benefit and purpose for which Plaintiffs and Class Members contracted included cord blood and tissue banking, including storage.  The implied covenant imposes a duty upon Defendants to perform their obligations under the Contract in good faith.

156.    Defendants failed to act in good faith and acted contrary to fair dealing by increasing the annual storage fees, despite promising and representing to Plaintiffs and Class Members in the Contract that the fee would be fixed over the lifetime of the cord blood storage.

157.    Defendants unfairly interfered with Plaintiffs and Class Members' rights to receive the benefits of the Contract – the fixed annual storage fee for the safekeeping of the cord blood.  Defendants use the increased storage fees to generate profit at the expense of Consumers after deceiving Consumers into believing (at the time they enter into the Contract) that the fee is both fixed and legitimately related to cord blood storage.  But the increased storage fees bear no relation to storage costs and, even if they did, Consumers should not be responsible for paying additional fees due to Defendants' financial forecasting failures.

158.    The annual storage fee is just that – a fee for storage.  Yet, Defendants have placed the burden of paying for their clinical trials on Consumers and tethered it to the annual storage fee, despite the fact that such clinical trials have no relationship to storage costs.

159.    Even more, the storage fee increase is not a one-time assessment, but rather is a continuing breach, as Defendants regularly increase the annual fees at up to $25.00 intervals every few years.  Thus, the annual storage fee increases are substantial, and can amount to a more than 50% increase in fees (or more) over the lifetime of the storage, deceptively and unlawfully forcing Consumers to foot the bill for Defendants' clinical research and marketing via their storage fees.

160.    Further, if and when Consumers learn of the unlawful increase in the annual storage fee, they are left with no choice but to pay the fee or lose their cord blood.

161.     Plaintiffs and Class Members performed all conditions, covenants, and promises required to be performed in accordance with the Contract.  All conditions precedent to Defendants' performance have occurred or been satisfied.

162.     The foregoing facts constitute a violation of the implied covenant of good faith and fair dealing.

163.     As a result of such conduct, Plaintiffs and Class Members have been deprived of the intended benefit of the Contract (fixed annual storage fees) and have suffered, and continue to suffer, economic losses.

164.     Defendants' breach of the implied covenant of good faith and fair dealing is the direct, proximate, and producing cause of damages to Plaintiffs and Class Members.

165.     Because of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs and Class Members should be made whole for all amounts Defendants overcharged them by charging more than the fixed annual storage fees.

**COUNT III**
**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA")**
**Cal. Civ. Code §§ 1750, *et seq.***
**(Against all Defendants)**
**(Plaintiffs individually, and on behalf of the Nationwide Class)**

166.     Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

167.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

168.     Defendants' conduct constitutes violations under California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

169.    Defendants' conduct falls within the meaning of this statute because they caused transactions to occur, resulting in the sale or lease of goods or services to Consumers – namely, the sale of cord blood services, including preservation and storage, to Plaintiffs and Class Members.   The preservation and storage of cord blood is considered a service within the meaning of the statute under Civil Code § 1761(a) and Defendants' sale of cord blood services is considered a service under Civil Code § 1761(b).

170.    Plaintiffs and Class Members are consumers pursuant to the CLRA.

171.    Defendants violated the CLRA by way of the following provisions:

- In violation of Civil Code § 1770(a)(1), Defendants have passed off services as those of another by representing (and continuing to represent) the annual cord blood storage fees as fixed, when they are not;

- In violation of Civil Code § 1770(a)(5), Defendants have represented that their services have characteristics they do not have by representing (and continuing to represent) that annual cord blood storage fees as fixed, when they are not; and

- In violation of Civil Code §1770(a)(9), Defendants have advertised the cord blood banking as having fixed annual cord blood storage fees, when they are not fixed.

172.    When Consumers sign up with CBR, in order to secure the "once-in-a-lifetime opportunity[26]" to protect their children, they pay a substantial initial fee of $1,500.00 or more, in addition to shipping costs of $150.00 to $170.00. Consumers also contract with CBR to pay an annual storage fee of at least $125.00 over the lifespan of the cord blood storage in CBR's Arizona facility, which CBR deceptively leads Consumers to believe is a fixed fee.

---

[26] www.cordblood.com/benefits-cord-blood/cord-blood-faqs#covid19

173.    Consumers are willing to pay these exorbitant initial costs and fixed annual storage fees to preserve their children's cord blood at birth in order to potentially protect their children in the event of a serious illness.

174.    Because of the substantial up-front costs, Defendants heavily market the annual storage fees as fixed in their advertising materials and the Contract.

175.    In their marketing and advertising, with respect to cord blood banking, Defendants state, "we made it affordable" and represented to Plaintiffs and Class Members that the Contract would include "no hidden fees," and would be fixed from years 2-18.

176.    Prior to contracting with Defendants, Plaintiffs reviewed and relied upon statements in Defendants' marketing and advertising, and from Defendants' sales representatives, that the cord blood banking annual storage fee would be fixed.

177.    However, unbeknownst to Plaintiffs and Class Members, and inconsistent with CBR's pervasive marketing and advertising, and uniform service Contract, the annual storage fee is not fixed. Rather, Defendants slyly and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage.  For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars.

178.    Even more, the annual storage fee increase is not a one-time assessment, but rather is a continuing breach, as Defendants regularly increase the annual storage fees at $25.00 intervals every few years.  Thus, the annual storage fee increases are substantial, and can amount to a more than 50% increase in fees (or more) over the lifetime of the storage, deceptively and unlawfully forcing Consumers to foot the bill for Defendants' clinical research and marketing via their storage fees.

179.    The annual storage fee is just that – a fee for storage.  Yet, Defendants have placed the burden of paying for their clinical trials on Consumers and tethered it to the annual storage fee, despite the fact that such clinical trials have no relationship to storage costs.

180.    It is up to Defendants to responsibly manage their funds, and not place the burden of unrelated expenses onto Consumers, who enter into Contracts with Defendants based upon the reasonable belief that the annual storage fees they agreed to would be fixed.

181.    Further, if and when Consumers learn of the unlawful increase in the annual storage fee, they are left with no choice but to pay the fee or lose their cord blood.

182.    Reasonable Consumers would not have contracted with Defendants for the storage of their children's cord blood had they known Defendants would arbitrarily and unilaterally increase the fixed annual storage fees, and then hold the cord blood hostage in the event the Consumer refuses or is unable to make the additional fee payment.

183.    When Defendants deceptively and unlawfully increase Consumers' fixed annual storage fees, they do not do so in response to any quantifiable increase in storage costs, but rather to fraudulently preserve or increase their profits at the Consumers' expense, and to charge Consumers costs associated with research and development, which have no rational relationship to storage costs.

184.    That Defendants have nearly $30 billion in capital is evidence that they enjoy substantial benefits from their investments, including the CBR brand, and that they do not need to further dip into Consumers' pockets to fund their research, and do so only to preserve and increase their profits at the expense of Consumers.

185.    Plaintiffs and Class Members have suffered injury-in-fact and actual damages resulting from Defendants' omissions and misrepresentations because Defendants represented in their advertising

and marketing materials, and the form Contract, that the annual storage fees were fixed when they were not.

186.    As a result of Defendants' unlawful conduct, Plaintiffs and Class Members are entitled to recover injunctive and other equitable relief, including restitution, as determined by the Court, pursuant to the CLRA.

187.    On August 19, 2021 (to Defendant CBR Systems, Inc.) and August 20, 2021 (to Defendant GI Partners), via USPS certified letter, return requested, by undersigned counsel, Plaintiffs and Class Members put Defendants on written notice of the claims arising from violations of the numerous provisions of California Law, including the CLRA, in addition to breaches of warranties and other consumer protection statutes.  Defendants have not responded.

188.    Plaintiffs additionally seek monetary damages from Defendants in the form of actual, compensatory, trebled, statutory, punitive, or any other allowable damages permitted under the law that this Court deems just and proper.

**COUNT IV**
**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")**
**(Plaintiffs individually, and on behalf of the Nationwide Class)**

189.    Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

190.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

191.    Defendants engaged in unlawful, fraudulent, and unfair business practices.

192.    Defendants' conduct was unlawful because it violates the CLRA.

193.    Defendants' breach of contract is also unlawful in violation of the UCL.

194.    Defendants' breach of the implied covenant of good faith and fair dealing is also an unlawful violation of the UCL.

195.    Defendants' conduct is fraudulent because they have represented and continue to represent that the annual cord blood storage fees are fixed, when they are not.

196.    Defendants' acts and business practices, as alleged herein, are also unfair in violation of the UCL because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or are substantially injurious to Consumers.  There is no countervailing benefit of these acts and practices to Consumers or competition.  These acts and practices caused injures to Plaintiffs and Class Members and could not reasonably have been avoided because they were not informed of the breach until after Defendants were storing and maintaining their cord blood and Plaintiffs and Class Members had no choice but to pay the increased annual storage fees or lose the cord blood.

197.    Defendants' retention of profits from the aforementioned conduct does not outweigh the economic harm that said retention imposes on Consumers. The lone party that benefits is Defendants. Their conduct also harms competitors, who would otherwise be the recipients of Consumers' business, which Defendants acquired using omissions and misrepresentations.

198.    All of the conduct, representations, and omissions alleged herein occurred in the course of Defendants' business and were part of a pattern or generalized course of illegal conduct.

199.    When Consumers sign up with CBR, in order to secure the "once-in-a-lifetime opportunity[27]" to protect their children, they pay a substantial initial fee of $1,500.00 or more, in addition to shipping costs of $150.00 to $170.00. Consumers also contract with CBR to pay an annual storage fee

---

[27] www.cordblood.com/benefits-cord-blood/cord-blood-faqs#covid19

of at least $125.00 over the lifespan of the cord blood storage in CBR's Arizona facility, which CBR deceptively leads Consumers to believe is a fixed fee.

200.    Consumers are willing to pay these exorbitant initial costs and fixed annual storage fees to preserve their children's cord blood at birth in order to potentially protect their children in the event of a serious illness.

201.    Because of the substantial up-front costs, Defendants heavily market the annual storage fees as fixed in their advertising materials and the Contract.

202.    In their marketing and advertising, Defendants represented to Plaintiffs and Class Members that the Contract would include "no hidden fees," and would be fixed from ages 2-18.

203.    Prior to contracting with Defendants, Plaintiffs and Class Members reviewed and relied upon statements in Defendants' marketing and advertising materials, and from Defendants' sales representatives, that the cord blood banking annual storage fee would be fixed.

204.    However, unbeknownst to Plaintiffs and Class Members, and inconsistent with CBR's pervasive marketing and advertising, and uniform service Contract, the annual storage fee is not fixed. Rather, Defendants covertly and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed storage fees could cost them thousands of additional dollars.

205.    Even more, the annual storage fee increase is not a one-time assessment, but rather is a continuing breach, as Defendants regularly increase the annual fees at $25.00 intervals every few years. Thus, the annual storage fee increases are substantial, and can amount to a more than 50% increase in fees (or more) over the lifetime of the storage, deceptively and unlawfully forcing Consumers to foot the bill for Defendants' clinical research and marketing via their storage fees.

206.     The annual storage fee is just that – a fee for storage.  Yet, Defendants have placed the burden of paying for their clinical trials on Consumers and tethered it to the annual storage fee, despite the fact that such clinical trials have no relationship to storage costs.

207.     Reasonable Consumers would not have contracted with Defendants for the storage of their children's cord blood had they known Defendants would arbitrarily and unilaterally increase the fixed annual storage fees, and then hold the cord blood hostage in the event the Consumer refuses or is unable to make the additional fee payment.

208.     Defendants' acts and practices, as alleged herein, have caused injury to Plaintiffs and Class Members.

209.     Because Defendants violated the UCL, Plaintiffs and Class Members should be made whole for amounts Defendants overcharged them for cord blood storage.

210.     Plaintiffs, on behalf of themselves and all other similarly situated, seek an order of this Court awarding monetary damages, restitution, disgorgement, injunctive relief, and all other relief allowed under the UCL.

**COUNT V**
**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW,**
**Cal. Bus. & Prof. Code §17500 ("FAL")**
**(Plaintiffs individually, and on behalf of the Nationwide Class)**

211.     Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

212.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

213.     Defendants violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"), by publicly disseminating misleading and false advertisements through advertising and marketing statements, suggesting that annual storage fees are fixed when they are not.

214.    Defendants' false and misleading advertisements were made in order to increase profits at the expense of Consumers.

215.    Defendants knew these false and misleading advertisements were untrue, as evidenced by their increase in the annual storage fees, which they plainly represented as fixed, and by their admission to Consumers that they are incorporating unrelated fees for clinical studies into the storage fee, which is contrary to the terms of the Contract and Defendants' advertising and marketing representations that "we made it affordable" with "no hidden fees."

216.    Plaintiffs and Class Members would not have contracted with Defendants for the storage of their children's cord blood had they known Defendants would arbitrarily and unilaterally increase the fixed annual storage fees, and then hold the cord blood hostage in the event the Consumer refuses or is unable to make the additional fee payment.

217.    Pursuant to Business & Professions Code § 17500, Plaintiffs and Class Members seek an order of this Court permanently enjoining Defendants from continuing to publicly disseminate misleading and false advertisements as alleged herein. Plaintiffs and Class Members also seek an order requiring Defendants to: (a) make full restitution for all monies wrongfully obtained; and (b) disgorge all ill-gotten revenues and/or profits. Plaintiffs seek all other available relief as pled in this Complaint.

**COUNT VI**
**VIOLATION OF NEW YORK GBL §§ 349, *et seq*.**
**(Plaintiff Koneru individually, and on behalf of the New York Subclass)**

218.    Plaintiff Koneru realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

219.    Plaintiff Koneru brings this claim on behalf of herself and New York Subclass Members.

220.    New York General Business Law § 349 ("NY GBL § 349") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in furnishing of any service in this state. . . ." NY GBL § 349(a).

221.    Defendants' foregoing acts and practices, including their concealment and omissions, were directed at Consumers.

222.    Defendants' foregoing deceptive acts and practices, including their concealment and omissions, were material, in part, because they concerned a material aspect of the pricing for cord blood services offered and provided by Defendants, including fixed annual cord blood storage fees.

223.    Defendants aggressively and uniformly marketed and advertised the cord blood banking to Consumers as being reasonably priced, with statements such as "we made it affordable" with "no hidden fees," along with promises from their sales representatives that the annual storage fees would be fixed.

224.    Defendants made affirmations of fact and promises in the cord blood banking marketing and advertising, and in the form Contract, as described herein, regarding the fixed annual storage fees.

225.    Defendants misrepresented and/or omitted material facts regarding the costs associated with their cord blood services by advertising, marketing, and representing in their form Contract that the annual cord blood storage fees were fixed when they were not.

226.    Contrary to the above-described representations in Defendants' marketing, advertising, and form Contract that the annual cord blood storage fee was fixed, Defendants regularly increased the annual fees at $25.00 intervals every few years.

227.    Defendants did not disclose the fact that their annual cord blood storage fee would be regularly and incrementally increased to Consumers or otherwise cause this information to be disclosed to Consumers, including Plaintiff Koneru and New York Subclass Members.

228.    Defendants' foregoing deceptive and unfair acts and practices, including their concealment and omissions, were and are deceptive acts or practices in violation of the New York's General Business Law § 349, Deceptive Acts and Practices, N.Y. Gen. Bus. Law §§ 349, *et seq*., by:

    a.   Misrepresenting that the annual cord blood storage fee was fixed;

    b.   Concealing, omitting, and failing to disclose that the annual cord blood storage fee would be regularly and incrementally increased; and

    c.   Applied the increased annual cord blood storage fees towards business expenses unrelated to the storage costs.

229.    Defendants' business practices, in marketing, advertising, and selling cord blood services while misrepresenting, concealing, failing to disclose, concealing or omitting material information, including the fact that the fixed annual storage fees included in their form Contract were not, in fact, fixed and would be incrementally increased by Defendants, constitutes the use of fraud, misrepresentation, and deceptive practices.

230.    These practices deceived Plaintiff Koneru and New York Subclass Members, causing them to lose money by contracting and paying for Defendants' cord blood services or paying more than they otherwise would have, as herein alleged, and deceived and are likely to deceive the consuming public.

231.    Accordingly, Defendants' business acts and practices, as alleged herein, have caused injury to Plaintiff Koneru and New York Subclass Members.

232.    Plaintiff Koneru and New York Subclass Members suffered damages when they entered contractual agreements for Defendants' cord blood services.  Defendants' unconscionable, deceptive and/or unfair practices caused actual damages to Plaintiff Koneru and New York Subclass Members, who were unaware that, contrary to Defendants' marketing and advertising and the express terms of their form Contract, the fixed annual storage fees would be incrementally increased by Defendants and were not, in

fact, fixed. Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, Consumers acting reasonably under the circumstances.

233.    Consumers, including Plaintiff Koneru and New York Subclass Members, either would not have entered contractual agreements for Defendants' cord blood services had they known that the fixed annual storage fees would be increased by Defendants and were not, in fact, fixed, or they would have paid less for the cord blood services.

234.    As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Koneru and New York Subclass Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

235.    In addition, Plaintiff Koneru and New York Subclass Members seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## COUNT VII
## VIOLATION OF NEW YORK GBL §§ 350, *et seq.*
### (Plaintiff Koneru individually, and on behalf of the New York Subclass)

236.    Plaintiff Koneru realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

237.    Plaintiff Koneru brings this claim on behalf of herself and New York Subclass Members.

238.    New York General Business Law § 350 ("NY GBL § 350") prohibits "[f]alse advertising in the conduct of any business, trade or commerce . . . ." NY GBL § 350.

239.    Defendants' foregoing acts and practices, including their advertising, were directed at consumers.

240.    Through the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices, by falsely advertising and misleadingly representing that their annual cord blood storage fees were fixed.

241.    Defendants also committed unfair or deceptive acts and practices by concealing or omitting material information from their advertising and representations, including their failure to disclose that the fixed annual storage fees would be increased by Defendants and were not, in fact, fixed.

242.    Defendants did not disclose this information to consumers in their advertising or representations.

243.    Defendants' foregoing, consumer-oriented, unfair or deceptive acts and practices, including their advertising, representations, concealment and omissions, constitute false and misleading advertising in a material way in violation of the New York's General Business Law § 350.

244.    Defendants' false, misleading, and deceptive advertising and representations include:

   a.   Misrepresenting that the annual cord blood storage fee was fixed;

   b.   Concealing, omitting, and failing to disclose that the annual cord blood storage fee would be regularly and incrementally increased; and

   c.   Applied the increased annual cord blood storage fees towards business expenses unrelated to the storage costs.

245.    Defendants' false, misleading, and deceptive advertising and representations of fact were and are directed at Consumers.

246.    Defendants' false, misleading, and deceptive advertising and representations of fact were and are likely to mislead a reasonable Consumer acting reasonably under the circumstances.

247.    Defendants' false, misleading, and deceptive advertising and representations of fact have resulted in Consumer injury or harm to the public interest.

248.    Plaintiff Koneru and New York Subclass Members were injured because (a) they would not have contracted for Defendants' cord blood services on the same terms if the true facts concerning the incremental increases of annual blood cord storage fees had been known; (b) they would have paid less for the blood cord services if the true facts concerning Defendants' intent to incrementally increase the annual blood cord storage fees had been known; and (c) the annual blood cord storage fee is not fixed, despite Defendants' representations to the contrary.

249.    On behalf of herself and New York Subclass Members, Plaintiff Koneru seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

250.    Defendants' business practices, in marketing and advertising their cord blood services, while concealing, failing to disclose, suppressing or omitting material information, including the fact that Defendants would be incrementally increasing the annual blood cord storage fees, all while continuing to misrepresent to Consumers, including Plaintiff Koneru and New York Subclass Members that this storage fee was fixed, constitutes the use of fraud, misrepresentation, and deceptive practices. These practices deceived Plaintiff Koneru and New York Subclass Members, causing them to lose money by contracting for Defendants' cord blood services or paying more than they otherwise would, as herein alleged, and deceived and are likely to deceive the consuming public. Accordingly, Defendants' business acts and practices, as alleged herein, have caused injury to Plaintiff Koneru and New York Subclass Members.

251.    Plaintiff Koneru and New York Subclass Members suffered damages when they contracted and paid for Defendants' cord blood services. Defendants' unconscionable, deceptive and/or unfair practices caused actual damages to Plaintiff Koneru and New York Subclass Members who were unaware that the annual blood cord storage fees were not fixed and that Defendants would be

incrementally increasing these fees. Defendants' foregoing deceptive acts and practices, including omissions, were likely to deceive, and did deceive, Consumers acting reasonably under the circumstances.

252.    Consumers, including Plaintiff Koneru and New York Subclass Members, either would not have contracted and paid for Defendants' cord blood services had they known that the annual blood cord storage fees were not actually fixed, and that Defendants would be incrementally increasing these fees, or they would have paid less for the cord blood services.

253.    As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Koneru and New York Subclass Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

254.    In addition, Plaintiff Koneru and New York Subclass Members seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

### COUNT VIII
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") §§ 501.201, *et seq*.
### (Plaintiff Cohen individually, and on behalf of the Florida Subclass)

255.    Plaintiff Cohen realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

256.    Plaintiff Cohen brings this claim on behalf of herself and Florida Subclass Members.

257.    Plaintiff Cohen and the Florida Sub-Class are "consumers" within the meaning of Fla. Stat. § 501.203(7).

258.   Defendants engaged in "trade" or "commerce" within the meaning of Fla. Stat. § 501.203(8). The FDUTPA makes it unlawful to use "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).

259.   As described above, Plaintiff Cohen and Florida Subclass Members suffered damages because Defendants misrepresented in marketing and advertising that their annual cord blood storage fee was fixed. It caused Plaintiff Cohen and other Florida Sub-Class Members to sustain damages in the form of loss of money in connection with Defendants incrementally increasing the annual cord blood storage fee, which was represented as being fixed.

260.   Further, as a direct and proximate result of Defendants' unlawful conduct, Plaintiff Cohen and the Florida Sub-Class Members suffered harm in that they contracted and overpaid for Defendants' cord blood services, which they otherwise would not have, and they did not receive the benefit of their bargain.

261.   By making misrepresentations and material omissions to Plaintiff Cohen and the Florida Subclass regarding the cost of their annual cord blood storage fees, Defendants affected commerce and trade within the State of Florida. Specifically, Defendants engaged in unfair or deceptive acts or practices in violation of the FDUTPA when, in connection with marketing and advertising their cord blood services, Defendants:

   a.   Misrepresented that the annual cord blood storage fee was fixed;

   b.   Concealed, omitted, and failed to disclose that the annual cord blood storage fee would be regularly and incrementally increased; and

   c.   Applied the increased annual cord blood storage fees towards business expenses unrelated to the storage costs.

262.   Defendants knew that their annual cord blood storage fees were not fixed and that they intended to and did incrementally increase the annual cord blood storage fees charged to Plaintiff Cohen and Florida Subclass Members, yet continued to represent that these fees were fixed.

262.   Defendants' acts and omissions posed the tendency or capacity to mislead or create the likelihood of deception regarding a material fact.

263.   Defendants knew that the annual cord blood storage fees were not fixed as represented, and that the increased fees that Defendants charged Plaintiff Cohen and Florida Subclass Members were not applied to storage-related costs.

264.   Defendants' acts and omissions, as described herein, repeatedly occurred in its trade or commerce, and were capable of deceiving a substantial portion of the consuming public.

265.   Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive, cause misunderstanding, and/or, in fact, caused Plaintiff Cohen and the Florida Subclass to be deceived about the fixed or unfixed nature of their annual cord blood storage fees.

266.   Defendants intended that Plaintiff Cohen and the Florida Subclass would rely on their misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the fixed nature of their annual cord blood storage fees.

267.   The facts concealed or not disclosed by Defendants are, and would be, material in that Plaintiff Cohen the Florida Subclass, and any reasonable Consumer would have considered the cost of Defendants' annual cord blood storage fees important in deciding whether to contract and pay for Defendants' cord blood services.

268.    Had Plaintiff Cohen and the Florida Subclass known that Defendants' annual cord blood storage fees were not actually fixed, as represented by Defendants, they either would not have contracted for Defendants' cord blood services or they would have paid less for them.

269.    As a direct and proximate result of Defendants' unfair and deceptive trade practices, Plaintiff Cohen and the Florida Subclass suffered ascertainable losses and actual damages.

270.    Plaintiff Cohen and the Florida Subclass did not receive the benefit of their bargains.

273.    The cost of Defendants' annual cord blood storage fees are not fixed as marketed and advertised by Defendants. This has caused Plaintiff Cohen and Florida Subclass Members' damages, which can be measured with specificity based upon, *inter alia*, the incrementally increased annual cord blood storage fees that Defendants charged and Plaintiff Cohen and Florida Subclass Members paid during the lifetime of their cord blood storage.

274.    Plaintiff Cohen and Florida Subclass Members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under FUDTPA.

## COUNT IX
### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. §56:8-1, *ET SEQ.*
### (Plaintiff Vaccarella individually, and on behalf of the New Jersey Subclass)

271.    Plaintiff Vaccarella realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

272.    Plaintiff Vaccarella brings this claim on behalf of herself and Florida Subclass Members.

273.    Plaintiff Vaccarella, the New Jersey Subclass Members, and GE are "persons" under the New Jersey Fraud Ac, N.J.S.A. § 56:8-1(d).

274.    The cord blood banking is "merchandise" within the definition of N.J. Stat. Ann. § 56:8-1(c).

275.   The cord blood banking is and has been the subject of "advertisement" and "sale" within the definition of N.J. Stat. Ann. § 56:8-1(a) & (e).

276.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby. . ." N.J. S.A.. § 56:8-2.

277.   Specifically, as part of the fraudulent marketing practices and recruitment program, CBR engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class. These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a.   Misrepresenting that the annual cord blood storage fee was fixed;

b.   Concealing, omitted, and failed to disclose that the annual cord blood storage fee would be regularly and incrementally increased; and

c.   Applying the increased annual cord blood storage fees towards business expenses unrelated to the storage costs.

278.   Plaintiffs were unaware of the deception and, therefore, were reasonable in incorporating the deceptive information when making their decisions to participate in cord blood banking and storage with CBR.

AMENDED CLASS ACTION COMPLAINT

279.   The Defendants' above-alleged actions constitute deceptive and fraudulent material acts and practices in connection with the advertisement and sale of merchandise, namely cord blood banking and storage.

280.   The deceptive and fraudulent acts and practices have directly, foreseeably and proximately caused ascertainable losses to Plaintiffs and other members of the Class.

281.   The Defendants' practices, in addition, are fraudulent and deceptive because they have caused Plaintiffs and the Class substantial harm, which is not outweighed by any countervailing benefits to consumers, and is not an injury consumers themselves could have reasonably avoided.

282.   The Defendants' acts and practices have misled and deceived the general public in the past, and will continue to mislead and deceive the general public into the future, by, among other things, causing them to pay increased annual storage fees or lose their cord blood.

283.   CBR had an ongoing duty to all Consumers to refrain from unfair and deceptive practices under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 in the course of its business.

284.   CBR's foregoing deceptive acts and practices, including its omissions, were material, in part, because they concerned essential parts of the cord blood banking.

285.   CBR's violations present continuing violations to Plaintiff Vaccarella, New Jersey Subclass Members, and the general public.  CBR's wrongful acts and practices complained of herein affect the public interest.

286.   As a direct and proximate result of CBR's deceptive acts and practices, including its omissions, Plaintiff Vaccarella and New Jersey Subclass Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

287.    In addition to compensatory and injunctive relief, Plaintiffs and members of the Class are entitled to treble damages, reasonable attorneys' fees, filing fees and reasonable costs of suit, N.J. Stat. Ann. § 56:8-19.

288.    In addition, Plaintiff Vaccarella and New Jersey Subclass Members seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## COUNT X
## BREACH OF EXPRESS WARRANTY
### (Against all Defendants)
### (Plaintiffs individually, and on behalf of the Nationwide Class, Florida, New York, and New Jersey Subclasses)

289.    Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

290.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

291.    Defendants aggressively and uniformly marketed and advertised the cord blood banking to Consumers as being reasonably priced, with statements such as "we made it affordable" with "no hidden fees."

292.    Defendants made affirmations of fact and promises in the cord blood banking marketing and advertising, and in the form Contract, as described herein.

293.    Defendants made the foregoing express representations and warranties to all Consumers, which became part of the basis of the bargain between Plaintiffs and Class Members, and Defendants.

294.    Defendants breached the foregoing express warranties by promising that the annual storage fees would be fixed, and then increasing the storage fees once the Consumers' cord blood was stored at Defendants' Arizona facility and Plaintiffs and Class Members had no choice but to pay the increased storage fees or lose the cord blood.

295.    Pursuant to relevant state laws, Defendants were provided reasonable notice of the aforementioned breaches of the above-described warranties via notice letters served upon Defendant CBR Systems, Inc. on August 19, 2021 and Defendant GI partners on August 20, 2021

296.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendants' breaches of warranty because they would not have entered into Contracts with Defendants for Cord Blood banking had they known Defendants would arbitrarily and unilaterally increase the fixed annual storage fees, and then hold the cord blood hostage in the event the Consumer refuses or is unable to make the additional fee payment.

297.    As a result of Defendants' breaches of warranty, Plaintiffs and Class Members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all other such relief deemed appropriate, in an amount to compensate them for not receiving the benefit of their bargain.

## COUNT XI
### FRAUDULENT CONCEALMENT
#### (Against all Defendants)
**(Plaintiffs individually, and on behalf of the Nationwide Class, Florida, New York, and New Jersey Subclasses)**

298.    Plaintiffs reallege and incorporates by reference each of the above paragraphs as if fully set forth herein.

299.    Defendants planned and conspired to covertly raise cord blood fees without full disclosure to Plaintiffs and Class Members, and otherwise failed to perform in accordance with the Contract, advertisements, and marketing materials and warranties disseminated by Defendants, and with the reasonable expectations of ordinary Consumers.

300.    Defendants fraudulently concealed from and/or intentionally failed to disclose to Plaintiff and the Class that Defendants would covertly raise cord blood storage fees as described herein.

AMENDED CLASS ACTION COMPLAINT

301.    Defendants conducted exclusive, unilateral actions by covertly increasing cord blood storage fees, which was not disclosed and otherwise concealed at the time the Contract was entered and later when Defendants increased the annual cord blood storage fees.

302.    Defendants had the capacity to, and did, deceive Plaintiffs and Class Members into believing that they were purchasing cord blood services for a fixed rate, when they were not.

303.    Defendants undertook active and ongoing steps to conceal from Plaintiffs and Class Members that they intended to raise cord blood storage fees. Plaintiffs and Class Members were not aware that Defendants would raise purported fixed cord blood storage fee in contravention to their Contract.

304.    The facts concealed and/or not disclosed by Defendants to Plaintiffs and Class Members are material facts that a reasonable person would have considered important in deciding whether to purchase (or to pay the same price for) the cord blood services.

305.    Defendants intentionally concealed and/or failed to disclose material factors for the purpose of inducing Plaintiffs and the Class to act thereon, and purchase cord blood services.

306.    Plaintiffs and the Class justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the cord blood services.

307.    Plaintiffs and Class Members suffered a loss of money in an amount to be proven at trial, *inter alia*, as a result of Defendants' fraudulent concealment and nondisclosure because: (a) they would not have purchased the cord blood services on the same terms if the true facts concerning Defendants' intent to raise the storage fees had been known; (b) they would not have paid a price premium for the cord blood services had they known Defendants would take ownership of and/or dispose of the cord blood if Plaintiffs and Class Members did not pay the elevated annual storage fees; and (c) Defendants otherwise did not perform as promised.

308.   Had Plaintiffs, Class Members, and the consuming public known that Defendants would unilaterally and covertly raise annual cord blood storage fees, they would not have purchased the cord blood services or would have paid less for them.

309.   By reason of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer damage and injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all other Class Members, respectfully request that the Court enter an Order:

a.  Declaring that this Action is a proper class action, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

b.  For a public injunction enjoining CBR from continuing the unlawful practices alleged herein;

c.  Ordering CBR to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other Class Members, as allowable by law;

d.  Ordering CBR to pay both pre- and post-judgment interest on any amounts awarded;

e.  Ordering CBR to pay attorneys' fees and costs of suit; and

f.  Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: October 7, 2021                         Respectfully submitted,

                                               /s/ Harper T. Segui
                                               Harper T. Segui*
                                               **MILBERG COLEMAN BRYSON**
                                               **PHILLIPS GROSSMAN, PLLC**
                                               825 Lowcountry Blvd., Unit 101
                                               Mount Pleasant, South Carolina 29464

AMENDED CLASS ACTION COMPLAINT

T: 919-600-5000
hsegui@milberg.com

Rachel Soffin*
Jonathan Cohen*
Blake Yagman*
Erin Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York, 11530
Tel:  (212) 594-5300
rsoffin@milberg.com
jcohen@milberg.com
byagman@milberg.com
eruben@miberg.com

Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 S. Beverley Drive, PH
Beverly Hills, CA 90212
Tel:     (917) 471-1894
astraus@milberg.com


*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

AMENDED CLASS ACTION COMPLAINT

## CERTIFICATE OF SERVICE

The undersigned certifies that today the foregoing *Amended Complaint* was filed on ECF which will send electronic notification to all attorneys registered for ECF-filing.

DATED: October 7, 2021

*/s/ Harper T. Segui*
Harper T. Segui
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
825 Lowcountry Blvd., Unit 101
Mount Pleasant, South Carolina 29464
T: 919-600-5000
hsegui@milberg.com

*Attorney for Plaintiffs*

AMENDED CLASS ACTION COMPLAINT