Rachel Soffin*
Jonathan B. Cohen*
Blake Yagman*
Erin Ruben*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York, 11530
Tel: 212-594-5300
rsoffin@milberg.com
jcohen@milberg.com
byagman@milberg.com
eruben@milberg.com

Harper T. Segui
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
825 Lowcountry Blvd., Unit 101
Mount Pleasant, South Carolina 29464
T: 919-600-5000
hsegui@milberg.com

Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
280 S. Beverley Drive, PH
Beverly Hills, CA 90212
Tel: 917-471-1894
astraus@milberg.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMY COHEN, KATHARINE VACCARELLA, and SIRISHA KONERU on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>CBR SYSTEMS, INC., GI PARTNERS, and DOES 1-10,<br><br>Defendants. | Case No. 4:21-cv-06527<br><br>**SECOND AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Amy Cohen, Katharine Vaccarella, and Sirisha Koneru (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint (the "Action") against Defendants CBR Systems, Inc. ("CBR"), GI PARTNERS, and DOES 1-10 (collectively, "Defendants") based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information, investigation, and belief of their undersigned counsel.

## INTRODUCTION

1.     Few bonds in human existence are as sacred as that between a parent and her or his child. When a baby is born, one of the important decisions that parents, relatives, and caregivers make about the health and future of their child is whether to preserve the child's cord blood for future protection against blood disorders and cancer.

2.     According to the United States Food and Drug Administration ("FDA"), Cord blood is the blood contained in the placental blood vessels and umbilical cord that connects an unborn baby to the mother's womb, which can be collected (or recovered) from the umbilical cord at birth.[1] Cord blood contains hematopoietic progenitor cells (HPCs), which are blood-forming stem cells that are routinely used in hematopoietic stem cell transplantation procedures to treat patients with certain cancers, such as leukemia or lymphoma, and other disorders of the blood and immune systems.[2][3]

3.     "Cord blood can be donated to a public cord blood bank, where it will be stored for potential future use by anyone who may need it. Alternatively, parents may arrange for the cord blood to be stored in a private cord bank, for potential use if it is later needed for treatment of the child from whom it was recovered, or for use in first- or second-degree relatives."[4]

---

[1] www.fda.gov/vaccines-blood-biologics/consumers-biologics/cord-blood-banking-information-consumers (last accessed Nov. 4, 2021).

[2] *Id.*

[3] *Id.*

[4] *Id.*

4.     Defendants own one such private cord blood bank, operated under the "CBR by Generate Life Sciences" brand name, which has the largest market share in the United States for private cord blood banking.[5] Over 900,000 cord blood samples are preserved by CBR in its warehouse in Arizona for consumers to be able to use in the future, if necessary.

5.     Since its founding in 1992, CBR has been providing newborn stem cell processing and preservation services and is now the world's largest stem cell collection and storage company.

6.     In August 2018, Defendant CBR was acquired by Defendant GI Partners for a cost of $530 Million, confirming the incredibly lucrative nature of the cord blood banking business.

7.     Defendant GI Partners is a middle market private equity firm that has described its role in the acquisition of CBR as that of "Lead Investor."[6] As one advisor to GI Partners stated regarding the acquisition, "[t]he transaction is indicative of the high level of investor interest in the women's health, fertility and stem cell sectors."[7]

8.     The consumers in this Action are caring parents, relatives, and/or caregivers who made the decision to store and preserve their newborn children's cord blood with CBR for the future protection of their children who may later develop blood disorders and blood cancers ("Consumers" or "Class Members."). When these Consumers contracted with CBR for cord blood banking, they agreed to pay a hefty up-front fee, as well as an annual storage fee that they reasonably believed was fixed, but which CBR has deceptively and unlawfully increased over time. This increased annual storage fee has resulted in tens of millions of dollars or more in revenue for Defendants CBR and GI Partners as the lead investor.

9.     While Consumers enter into contracts with Defendant CBR for the storage and preservation of cord blood, through a quagmire of business operations, including partnerships, mergers,

---

[5] https://www.cordblood.com/cbr-difference/compare (last accessed Nov. 4, 2021).

[6] https://www.gipartners.com/private-equity/portfolio/generate-life-sciences (last accessed Oct. 11, 2021).

[7] https://www.harriswilliams.com/news/harris-williams-advises-gi-partners-its-acquisition-california-cryobank-and-cord-blood-registry. (last accessed Oct. 19, 2021).

investors, and asset ownership, Defendant GI Partners, among other DOE companies, have benefitted financially from CBR's stem cell storage and preservation services.

10.     When Consumers sign up with CBR in order to secure the once-in-a-lifetime opportunity to protect their children, they pay a substantial initial fee of approximately $1,500.00 or more, in addition to shipping costs of $150.00-$170.00. Consumers also contract with CBR to pay an annual storage fee of at least $125.00 over the lifespan of the cord blood storage, which CBR deceptively leads Consumers to believe is a fixed fee through its sales representatives, website representations, and its service contract.

11.     Consumers, selflessly, are willing to pay these exorbitant initial fees and costs, and fixed annual storage fees, to preserve their children's cord blood at birth in order to potentially protect their children and other potential end-users in the event of a serious illness.

12.     Given the substantial costs associated with cord blood banking, including the large up-front fee, CBR heavily markets and promises to consumers that the annual storage fee will be fixed. No reasonable consumer would contract with CBR for cord blood banking if they knew CBR could or would unconscionably, unilaterally, and indiscriminately increase these annual storage fees.

13.     Unbeknownst to Consumers and inconsistent with CBR's pervasive marketing, advertising, and uniform service contract, the annual fee is not fixed. Rather, CBR unlawfully and substantially increases the annual fee over time so that over the lifetime of their cord blood storage, Consumers are paying hundreds of additional dollars in excess of the agreed upon fee. For Consumers who are storing cord blood for more than one child, these hidden and undisclosed fees could cost them thousands of additional dollars. And, collectively, these excess storage fees charged to CBR's clients for the 900,000 cord blood samples translate to tens of millions of dollars or more in revenue for Defendants CBR and GI Partners over the course of the cord blood storage.

14.     When Consumers sign the service contract with CBR for cord blood banking, they contract with CBR only. They do not contract with GI Partners, or any of its business affiliates, nor are they informed that these companies are investors in and profit from their cord blood banking, including the deceptive and unlawful increase of their fixed annual storage fees.

15.     Nonetheless, Defendants CBR and GI Partners collectively benefit and profit from the deceptive and unlawful increase of the fixed annual storage fees, which are used for purposes other than actual cord blood storage. Notably, these increased storage fees are not reasonably related to the service provided by CBR (i.e., cord blood storage), but are instead used by Defendants to fund unrelated business expenses and marketing ventures designed to increase Defendants' own market share and thereby amass greater profits. Paying for Defendants' unrelated business expenses is not a burden that Consumers should have to bear, as such expenses are wholly unrelated to the storage of cord blood, and Consumers have already paid substantial up-front fees and costs for cord blood banking services.

16.     Defendants' lack of financial resources to fund their business expenses, or their desire to avoid reducing their profits by funding such expenses themselves, do not justify Defendants' deceptively and unlawfully tacking unauthorized charges onto the cord blood storage fees paid by Consumers. The annual storage fee is just that – a fee for storage – and reasonable Consumers do not expect this fee to include costs for Defendants' unrelated corporate schemes.

17.     Further, if and when Consumers discover the increased storage fees and explore the possibility of taking their business elsewhere, CBR represents that the transfer of cord blood to a competitor is difficult or impossible, effectively holding the cord blood for ransom and forcing Consumers to choose between continuing to pay the increased annual storage fees or losing access to the cord blood they have been paying to store and preserve.

18.     Indeed, when Consumers cannot afford to pay the deceptive and unlawfully increased annual storage fees imposed upon them, CBR notifies the consumers that CBR now "owns" their children's cord blood and the Consumers –and their children whose cord blood is being stored – lose any possibility of ever being able to use it. Once CBR collects and stores the cord blood in order to maintain its potential utility, Defendants then increase the annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants' conduct is fundamentally deceptive, unlawful, and unfair, and threatens the future health of Consumers by jeopardizing the potential life-saving utility of the stored cord blood.

19.     Thus, while Defendants' mission may seem altruistic, they abuse the very Consumers who depend on CBR's services in the event of a health emergency, and Defendants use their possession and control of the cord blood to force Consumers to pay undisclosed costs to ensure the continued preservation of their children's cord blood.

20.     Defendants take advantage of the sacred bond between child and parent, relative, and/or caregiver, and abuse families who may ultimately have to depend on CBR's services to overcome terminal illness, thereby harming Consumers and the public at-large.

21.     Defendants' behavior is unlawful, deceptive, and ethically reprehensible. As such, Plaintiffs, individually and on behalf of themselves and all others similarly situated, bring this Action against Defendants, seeking all allowable forms of damages, restitution, a public injunction, reasonable attorneys' fees, and all other relief that this Court deems necessary and proper.

22.     Further, this Action presents a classic circumstance warranting class treatment. Defendants' conduct, including all relevant practices, contracts, deceptive representations, and omissions, is uniform to all Consumers. Defendants' common course of conduct will determine liability for the Class, ensuring the rights of thousands of thousands of Consumers are vindicated through the efficiency of a single trial.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (1) there are one hundred or more (named and unnamed) Class Members, (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (3) there is minimal diversity because at least one Plaintiff and one Defendant are citizens of different States. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

24.     This Court may exercise personal jurisdiction over Defendants, who do substantial business in this State and within this District, receive substantial compensation and profits from the

marketing, distribution, and sale of services in this District, and have engaged in the unlawful practices described in this Complaint within this District. In addition, Defendants' principal places of business are located in California.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants resides in this District and are residents of the State of California.

## INTRADISTRICT ASSIGNMENT

26.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) and 3-5(b), this action is properly assigned to the San Francisco or Oakland division because a substantial part of the events and omissions which give rise to the claims emanated from California, and from San Francisco County in particular.

## PARTIES

*Plaintiffs*

27.     Plaintiff Amy Cohen is the grandparent of two children whose cord blood is stored and preserved by CBR. Plaintiff Cohen is a citizen and resident of Florida and was harmed by Defendants' immoral, oppressive, and unlawful conduct alleged herein. When Plaintiff Cohen purchased cord blood banking services from CBR, she was led to reasonably believe, through CBR's marketing and advertising, and the service contract, that the annual cord blood storage fees were fixed.

28.     Plaintiff Katharine Vaccarella is a parent of a child whose cord blood is stored and preserved by CBR. Plaintiff Vaccarella is a resident of New Jersey and was harmed by Defendants' immoral, oppressive, and unlawful conduct alleged herein. When Plaintiff Vaccarella purchased cord blood banking services from CBR, she was led to reasonably believe, through CBR's marketing and advertising, and the service contract, that the annual cord blood storage fees were fixed.

29.     Plaintiff Sirisha Koneru is a parent of a child whose cord blood is stored and preserved by CBR. Plaintiff Koneru is a citizen and resident of New York and was harmed by Defendants' immoral, oppressive, and unlawful conduct alleged herein. When Plaintiff Koneru purchased cord blood banking

services from CBR, she was led to reasonably believe, through CBR's marketing and advertising, and the service contract, that the annual cord blood storage fees were fixed.

***Defendants: CBR and GI Partners Profit and Benefit from CBR's Income.***

30.    Defendant CBR Systems, Inc., described in further detail herein, is a corporation headquartered in Los Angeles, California that specializes in the storage and preservation of cord blood.

31.    Defendant GI Partners is a middle market private investment firm headquartered in San Francisco, California**.** GI Partners raises capital from institutional investors across the world, with "control-oriented investments in North American companies with solid downside protection and substantial growth potential" in the healthcare sector, among others.[8]

32.    GI Partners' diverse global investor base includes pensions, sovereign wealth funds, investment management firms, financial institutions, family offices, endowments, and foundations.[9] GI Partners has raised over $28 billion in capital from these leading institutional investors around the world to invest in private equity, real estate, and data infrastructure. As indicated on its website, "[t]hroughout our history, our approach has remained consistently focused on identifying investments that optimize the balance between risk and return."[10] In describing its role as a private investment firm, GI Partners states: "Leveraging our knowledge and experience, we prioritize capital preservation by investing in companies that GI Partners believes have the potential for significant downside protection and consistent value creation. We position our portfolio companies for long-term growth and success."[11]

33.    As part of its investment portfolio, GI Partners acquired CBR in August 2018, for a cost of $530 Million, and became the Lead Investor in CBR. GI Partners included its acquisition of CBR in

---

[8]  https://www.gipartners.com/news/gi-partners-closes-39-billion-private-equity-fund-vi (last accessed Nov. 4, 2021).

[9]      https://www.gipartners.com/news/gi-partners-closes-oversubscribed-fund-v-with-27-billion-in-limited-partner-commitments (last accessed Nov. 4, 2021).

[10] www.gipartners.com/about/investment-strategy (last accessed Nov. 4, 2021).

[11] https://www.gipartners.com/private-equity (last accessed Nov. 4, 2021).

GI Partners Fund V, a $2.8 billion private equity fund raised in 2017, which was financed by Golub Capital and Owl Rock.[12] Since the acquisition, CBR has continued to operate under the CBR brand name, although GI Partners, as the Lead Investor, has benefited financially from the decision to increase the fixed annual storage fees. GI Partners has described its relationship with CBR as a collaboration that extended CBR's capabilities to make critical investments to support and accelerate its growth[13], stating "[w]e are excited to collaborate with management to extend the combined company's capabilities internationally and make critical investments to support its next phase of growth."[14]

34.     In describing the investment Fund V in which GI Capital included CBR, GI Partners stated it "continued its investment strategy from earlier funds and [sought] to deploy Fund V capital into control-oriented investments in North American middle market businesses with downside protection and significant untapped growth potential" for "attractive risk-adjusted returns with minimal loss of capital…Fund V will primarily target investments with enterprise values between $250 million and $1 billion in several sectors, including IT Infrastructure, Healthcare, Software, and Services."

35.     Further, noting its continued investors who chose to invest in and profit from Fund V, GI Partners' directors stated: "We are very pleased that an overwhelming majority of our existing investors re-committed to our latest fund and that a number of new leading investors have entrusted their capital with our team and investment strategy…  We are excited to further build our investment portfolio from the attractive pipeline of investment opportunities we have identified." GI partners further stated: "We are grateful for the continued support from our investors who believe we can create superior value in our

---

[12]https://www.gipartners.com/news/gi-partners-to-acquire-and-simultaneously-combine-cord-blood-registry-and-california-cryobank and www.gipartners.com/news/gi-partners-completes-acquisition-and-merger-of-california-cryobank-and-cord-blood-registry (last accessed Oct. 6, 2021).

[13]https://www.prnewswire.com/news-releases/gi-partners-to-acquire-and-simultaneously-combine-cord-blood-registry-and-california-cryobank-300666931.html    and    https://www.azbio.org/amag-announces-plans-to-sell-cbr-to-gi-partners-for-530m  (last accessed Oct. 19, 2021).

[14]    https://www.gipartners.com/news/gi-partners-to-acquire-and-simultaneously-combine-cord-blood-registry-and-california-cryobank (last accessed Oct. 19, 2021).

attractive targeted industries. We are fortunate to have their trust and support as we work collaboratively to implement real operational improvements and build value for our investors."[15]

36.  Defendants Does 1-10 are subsidiaries, affiliates, or other related entities to the above Defendants that may be responsible for the conduct alleged herein. Such parties are named "Doe Defendants" pending the discovery portion of this Action.

37.  At all times relevant herein, all Defendants jointly transacted and conducted business in California and the United States and continue to do so today.

38.  Together, Defendants' immoral, oppressive, and unlawful conduct alleged herein is the source of Plaintiffs' economic harm and harm to Consumers and the public at-large.

## FACTUAL ALLEGATIONS

### A.  The Cord Blood Registry

39.  As indicated on Defendant CBR's website, "[f]ounded in 1992, CBR is entrusted by parents with storing more than 900,000 cord blood and cord tissue samples for their children. CBR is dedicated to advancing the clinical application of cord blood and cord tissue stem cells by partnering with institutions to establish FDA-regulated clinical trials for conditions that have no cure today."[16]

40.  Of the 900,000 cord blood and cord tissue samples, "CBR has helped more than 600 families use their cord blood stem cells for established and experimental treatments."  Remarkably, this represents only .067% of its customers.

41.  In any event, Consumers paying for cord blood banking do so in the event the cord blood is needed for life-saving treatment.

42.  On its website and in other marketing materials, CBR *aggressively* markets its private cord blood banking as a life-saving measure, with representations such as:

---

[15]https://www.gipartners.com/news/gi-partners-closes-oversubscribed-fund-v-with-27-billion-in-limited-partner-commitments (last accessed Oct. 19, 2021).

[16] https://www.cordblood.com/about-cbr/about-cbr (last accessed August 23, 2021).

Doctors are *using cord blood to save lives today and researching cord blood as potential treatment for diseases that currently have no cure.* [Emphasis added][17]

\*\*\*

Today, cord blood stem cells are successfully being used to save lives. They also are being researched in an exciting new area of medicine called regenerative medicine, where scientists are studying the use of cord blood stem cells in experimental treatments for conditions like brain injury and acquired hearing loss.

\*\*\*

Currently, thousands of parents are taking advantage of this once-in-a-lifetime opportunity.

\*\*\*

Although no one can predict future illness or injury, published estimates of the odds of needing stem cells for current uses in transplant medicine are 1 in 217.

\*\*\*

Why do families choose to collect and store their babies' cord blood?

Banking may give families a powerful resource against injuries and diseases that can occur in the future. Every month, thousands of new parents, a number of them doctors, nurses, and scientists, store their newborn's stem cells with CBR. Some of the important reasons to save cord blood include the following:

- Cord blood is a rich source of hematopoietic stem cells, which are used in transplant medicine to treat many life-threatening diseases, such as leukemia and other cancers[].

- Cord blood is being evaluated today for its ability to treat cerebral palsy, traumatic brain injury, acquired hearing loss, and juvenile diabetes.

- Your baby's cord blood is available for your family if needed for treatment, without the need for painful and potentially time-consuming bone marrow harvest surgery. Early treatment can minimize disease progression.

---

[17] www.cordblood.com/faqs/CordBloodBanking. (last accessed August 23, 2021).

- If ever required for a transplant, using your own family's cord blood instead of an unrelated donor's can have significant advantages, including fewer complications and improved medical outcomes.

- Current clinical trials in the U.S. that use cord blood require the child's own stem cells.

- Having a family history of disease.

- Having a baby of an ethnic minority or mixed ethnicity, in which there is greater difficulty finding stem cell donors.

- Adopting a newborn and wanting a valuable source of stem cells genetically identical to the adopted baby.[18]

43.     CBR is marketed as "the world's largest stem cell collection and storage company," and the "most recommended by OB/GYNs and expecting parents."[19] CBR maintains a dedicated webpage listing its advantages over competing cord blood banks, including the fact that CBR is the only company to offer a program for families to participate in a health registry where they "are the first to know about important clinical trials that could potentially help their loved ones." CBR also claims to be the only company that provides families with access to Certified Genetic Counselors or clinical specialists to discuss how newborn stem cells may be applicable to the family.

44.     To further differentiate itself from the competition, CBR manipulates Arizona's historically low risk of natural disasters[20] to suggest that storage facilities in Kentucky and Florida are less safe for consumers due to their respective tornado and hurricane risks.

45.     Likewise, CBR also represents to consumers that their stem cell recovery is 95-97%, while the competition's is 76% and 64%.[21]

---

[18] *Id.*

[19]  www.cordblood.com/CBR-Difference/Finding-Treatments-Together  and  www.cordblood.com/cbr-difference/compare.  (last accessed August 23, 2021).

[20] *Id.*

[21] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

### i.     CBR's Breach of the Uniform Contract, Which Promises and Leads Reasonable Consumers to Believe the Annual Storage Fees Are Fixed.

46.     Plaintiffs and each putative Class Member entered into an identical or substantially similar pre-printed contractual agreement with CBR governing their relationship with respect to cord blood banking, including cord blood storage. Copies of Plaintiffs' Contracts are attached hereto as Exhibits A, B and C.

47.     In the Contract, which is solely between Consumers and CBR, Plaintiffs and Class Members agree to the following: a hefty upfront initial cost of as much as $1,500.00, or more, and shipping of approximately $150.00-$170.00.

48.     In addition, pursuant to the uniform Contract, each Class Member agrees to a fixed annual fee for cord blood storage of $125.00 or more. Each contract has the same or substantially similar language confirming that the annual storage fees will be fixed from at least years 2-18 of storage. This language is in a bold font, reaffirming to consumers that the annual fee will not change from years 2-18, as follows: "**Annual Storage Fee Per Year (Years 2-18).**" Thus, the form Contract expressly does not allow CBR to charge storage fees beyond the fixed amount set forth in the Contract.

49.     After entering into the Contract with CBR for the fixed annual storage fee, which is automatically charged to Consumers' credit cards on file, CBR unilaterally increases the annual storage fee in breach of the plain terms of the Contract between Consumers and CBR, and contrary to its marketing and advertising representations, and the representations of its customer service representatives.

50.     CBR uses the increased costs to generate additional profits from Consumers, despite CBR representing prior to and at the time it contracts with Consumers that the annual storage fee is both fixed and legitimately related to the storage of cord blood. In reality, the increase in fees bears no relation to storage costs and, even if it did, CBR should not rely on unsuspecting Consumers to provide the capital necessary to cover its own financial shortfalls—especially when the increased fees amount to a unilateral modification of the existing contract terms.

51.     Despite marketing the storage fee as fixed to consumers, and CBR entering into a Contract with Consumers for the payment of the fixed storage fee, CBR has systemically increased Consumers' storage fees, ostensibly to fund new research related to cord blood, as reflected in emails to consumers stating the following:

> We are committed to keeping our costs low and our quality high, while we continue to work to advance the science of newborn stem cells. Recently, we've established the Family Health Registry™, which helps match families with researchers conducting clinical trials. We've also maintained a team of Certified Genetic Counselors available to all CBR families for questions on medical history and family health in using newborn stem cells. <u>We've partnered with and provided financial support to reputable research institutions on FDA-regulated clinical trials that investigate the potential for these cells to treat conditions that currently have no cure. To help us continue to offer programs and resources like these that help to advance the science of newborn stem cells, we've implemented an increase to the yearly fee of cord blood storage by $25 for your account currently at $125.</u>Your new yearly storage fee of $150* will be reflected in your next billing cycle.

52.     Even more, <u>CBR has also increased storage fees to pay for other business costs, such as investing in its call center and customer service infrastructure</u>.

53.     CBR has uniformly breached its Contract with Consumers by holding Consumers' cord blood hostage in exchange for the extraction of the unfair and deceptive increased storage fees. Moreover, CBR prevents the easy transfer of the cord blood to a different cord blood storage facility and takes permanent possession of Consumers' cord blood if and when Consumers refuse to pay or are unable to pay for continued storage due to the increased fee.

54.     CBR breached the form Contract entered into by Plaintiffs and Class Members, and violated the duty of good faith and fair dealing by entering into a Contract with Plaintiffs and Class Members for their payment of fixed annual storage fees when the fees are not fixed, but rather are part of CBR's plan to rope Consumers into extended Contracts that they cannot break without losing the cord blood (which is irreplaceable) and all of the fees, costs, and expenses paid to that date.

55.     The payment of fees associated with any services other than the storage of cord blood is never contemplated in the Contract, nor would a reasonable Consumer expect to pay increased fees

unrelated to the service CBR purports to provide to Consumers. Notifying Consumers via email of an annual fee increase does not exonerate CBR's blatant breach of the terms of the Contract; nor does it negate the fact that CBR markets its cord blood service as "affordable" and having "no hidden fees," including promises from CBR's sales representatives that the annual storage fees are fixed. Consumers have no choice but to continue to pay whatever fee is charged or face the loss of the cord blood that CBR says can save their child's life.

56.     Even more, the storage fee increase is not a one-time assessment for a specific purpose, but rather is a continuing breach of the promises CBR made to Consumers and of the Contract as CBR regularly increases the annual fee by up $25.00 every few years, or less. Thus, the annual fee increases are substantial, and can amount to a more than 50% increase in storage fees over the lifetime of the storage, forcing Consumers to foot the bill for CBR's customer service infrastructure, clinical research and marketing via its storage fees, which is deceptive and unlawful.

57.     Given that CBR is storing more than 900,000 samples, an increase of up to $25.00 every 2-3 years over the course of years 2-18 of storage would result in ill-gotten revenues in excess of $100,000,000.00.

58.     The fixed annual storage fee is just that – a fixed fee for storage which should not increase. Yet, CBR has placed the burden of paying for its clinical trials or other business costs on Consumers and buried it within the annual storage fee, which has no relationship to the storage costs.

59.     By increasing the fixed annual storage fees, CBR has breached the form Contracts. The increased fees, which are wholly unrelated to actual storage costs, violate the agreed-upon annual storage fees. The increased storage fee is a force-placed charge, the true nature of which is hidden from Plaintiffs and putative Class Members.

60.     As described herein, Class Members enter into the Contract only with CBR –not GI Partners or any of its affiliates. However, as the "Lead Investor" in CBR, and having acquired CBR for $530 Million, GI Partners is certainly aware of the service Contract between CBR and Consumers, as well as CBR's representations and marketing to Consumers, all of which lead reasonable Consumers to

believe the annual cord blood storage fee is fixed. Thus, as the "Lead Investor" in CBR, GI Partners is aware of and has profited substantially from Class Members' cord blood banking and CBR's collection of unlawful and excessive cord blood storage fees from Class Members. GI Partners, as a private investment firm whose "approach has remained consistently focused on identifying investments that optimize the balance between risk and return,"[22] is able to optimize the returns on its investment in CBR by colluding with CBR to pass on the costs of its corporate expansion to Consumers. As a result, GI Partners is able to increase the value of its investment in CBR while limiting any financial risk to its own portfolios—all at the expense of Consumers who unwittingly provide capital in the form of unlawful fee increases and receive no benefit in return.

### ii.    CBR's Deceptive and Misleading Marketing of Fixed Annual Storage Fees.

61.    CBR markets its services in a variety of ways, including at obstetrician and gynecologists' offices (where they cannot be missed by parents visiting the office), on its own website, through its customer service representatives, and in other marketing materials, such as sweepstakes where parents can hope to become one of the lucky few to win free cord blood services and storage.

---

[22] https://www.gipartners.com/about/investment-strategy (last accessed Oct. 6, 2021).

62.     There is no doubt that the cost of cord blood banking is significant, which is exactly why CBR aggressively markets the service as having the ability *to save a child's life*. However, in order to gain Consumers' trust and to counter any concerns regarding the costs, CBR leads Consumers to believe that there are no "hidden fees," an example of which is shown below[23]:



63.     In addition, CBR's customer service representatives represent to Consumers that the annual storage fees are fixed.

64.     CBR has engaged in this aggressive, uniform marketing campaign because it is savvy and knows that no reasonable Consumers would pay $1,500.00 or more as an up-front fee and then agree to pay annual storage fees that CBR can unilaterally and indiscriminately increase. This is particularly true of reasonable consumers who are entering parenthood or who are already parents, and whose expenses are going to naturally increase as a result of having children, making them money conscious.

65.     Despite representing to Consumers that cord blood banking is "affordable" with "no hidden fees," and that the annual storage fees are fixed, CBR's representations are false, as the annual storage fees charged to Consumers include substantial hidden fees.

---

[23] https://www.cordblood.com/cord-blood-banking-cost/cord-blood-stem-cells (last accessed June 18, 2021).

66.     Further, if and when Consumers learn of the unlawful increase in the annual storage fee, they are left with no choice but to pay the increased fee or lose their children's cord blood, which was stored for potential future lifesaving uses.

**iii.     Defendants CBR and GI Partners' Further Deceptive and Unlawful Conduct**

67.     Defendants CBR and GI Partners, as a silent investor, have engaged in a pattern and practice of deceptive, fraudulent, and unfair conduct in the increase of fixed annual storage fees.

68.     Defendant GI Partners acquired Defendant CBR as part of its investment portfolio to bolster its "attractive pipeline of investment opportunities" for its investors. In other words, GI Partners acquired CBR to increase its profits and attract investors.

69.     With the acquisition of CBR, GI Partners and CBR collectively benefit and profit from the deceptive and unlawful increase in the fixed annual storage fees, which are used for purposes other than actual cord blood storage. These increased storage fees are not reasonably related to the service provided by CBR (i.e., cord blood storage), but are instead used by Defendants to pay for unrelated business expenses, such as customer service infrastructure, or to fund clinical studies that Defendants use to tout their cord blood services and attract new Consumers, thereby amassing greater profits.

70.     Thus, rather than use their own funds and investments to finance their business costs and lure investors, Defendants CBR and GI Partners have deceptively and unlawfully placed the burden of these expenses onto Consumers. But paying for Defendants' unrelated business expenses and undisclosed clinical studies is not a burden that Consumers agreed to bear. It is up to Defendants to responsibly manage their funds, and not place the burden of unrelated expenses onto Consumers who store cord blood with CBR based upon the reasonable belief that the annual storage fees they agreed to were fixed. Defendants' lack of financial resources to fund their business expenses or clinical studies, and their desire to avoid reducing their profits by funding such expenses themselves, are not sufficient reasons to

deceptively and unlawfully tack additional, irrelevant charges onto the cord blood storage fees paid by Consumers.

71.     The increased annual storage fees are, in fact, unlawful hidden price increases, which force Plaintiffs and Class Members to pay more for services than promised and agreed upon, and are arbitrary in methodology and amount, except for the fact that they are not being used for costs associated with the storage of cord blood, but rather to fund Defendants' business expenses and clinical studies, and to potentially purchase new companies to add to their life sciences inventory.

72.     Defendants have failed to act in good faith in charging increased storage costs when the increased fees bear no relationship to the cord blood storage, but rather are (as Defendants admit) being used to fund Defendants' unrelated business expenses and clinical studies, and to preserve and increase Defendants' profits.

### iv.     Consumer Complaints and CBR's Responses

73.     Numerous Consumers have complained to CBR about its deceptive and unlawful billing practices and, rather than changing its practices, CBR addresses each complaint and comes to a private agreement with the complaining Consumers. Below is a small sample of these numerous Consumer complaints:

**Complaint Type**: Billing/Collection Issues; June 24, 2021

We banked our daughter's cord blood with CBR in 2013, and chose to pay an annual fee of $130 a year instead of a lifetime payment, knowing that we would always stay on top of this annual bill. CBR claimed that price was fixed, but instead has continued to raise storage fees annually, and this year our annual payment is up to $185. They mislead those of us who chose the annual fee years ago, and it feels like they are essentially holding our child's cord blood hostage and could just continue raising prices to whatever they feel like with no notification to those of us storing the cord blood with them. In addition, they recommend storing a credit card and doing automatic billing, which allows them to just annually bill whatever they feel like charging with no statement or explanation of billing ever presented. I would not recommend this company to others based on this misleading billing practice.

**Response**: June 30, 2021

*We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.* [24]

***

**Complaint Type**: Billing/Collection Issues; March 2, 2021

Since my daughter was born in 2009 <u>the yearly storage fee has gone up year after year, when it was supposed to be a locked in rate for 18 years I was told</u>. 2009-2017 - $125 a year 2018 - $150 2019 - $175 2020 - $180 2021 - $185 This is absolutely ridiculous. I didn't realize this since my payment is autodraft.

**Response**: March 8, 2021

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science. [25]

***

**Complaint Type**: Billing/Collection Issues; February 3, 2021

When I enrolled in CBR in 2015, a CBR representative ***** ******* informed me: "you do not need to do anything else to lock in the $130 annual storage fee. Now that you are enrolled, that $130 is locked in for 18 years." However, I was charged $145 in annual storage fee around 1/30/2019, $160 around 1/30/2020, and $175 around 1/30/2021. These charges were more than the $130 that was locked in for 18 years.

**Response**: February 5, 2021

We appreciate you taking the time to connect with our Client Services Team and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the

---

[24]https://www.bbb.org/us/az/tucson/profile/cord-blood-banking/cbr-systems-inc-1286-20007493/complaints (last accessed July 22, 2021) (emphasis added)
[25] *Id.* (emphasis added).

highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a va**ed member of the CBR family today and continuing to partner with us into the future of stem cell science.[26]

**Complaint Type**: Problems with Product/Service; May 4, 2020

CBR raises rates almost annually, even though the initial agreement was a level annual fee.

**Response**: May 7, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[27]

***

**Complaint Type**: Billing/Collection Issues; May 3, 2020

We selected the CBR to store my son cord blood & tissue in 2014. The option we chose is to pay one-time fee for collection and processing and then annual fee of $260 for the following 18 years, as clearly said on the document: The service we bought will end in 2032. We confirmed with the sales representative before deciding using their service that we will pay 260$ annually in the next18 years. Since purchasing this 18-year service package from CBR.We trusted and recommended CBR to my cousind. Again we selected CBr for my second baby in 2018 and paid for life long plan. we paid the bill every year in the past 5 years were very surprised by this unexpected bill change to 290$ in 2019. Since we observed this later just forgot it. Again this year we have got new invoice increased to 320$. This sounds unfair and there is no point of paying and lock in for 18 tears. This is really not acceptable and its not just a matter of few bucks. CBR is really taking advantage Since there is no other option for us other than maintaing [sic] the existing accounts.

**Response**: May 8, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the

---

[26] *Id.*

[27] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[28]

\*\*\*

**Complaint Type**: Billing/Collection Issues; April 28, 2020

I have been requesting my account to be closed for four years. I have sent my request in writing multiple times. CBR has failed to send me their required paperwork to close the account and continues to bill me an annual storage fee. <u>This annual storage fee has increased twice, despite being told the rate was locked in until my child turned 18. The original annual storage rate was $125. It has increased by $25 two times, now to $175.</u> CBR continues to contact me with past due statements and is threatening collection services. They refuse to close the account unless it is paid in full.

**Response**: May 8, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you.[29]

\*\*\*

**Complaint Type**: Billing/Collection Issues; April 13, 2020

I have banked both my kids cord blood with CBR. I have signed up for $125 storage fees for the first kid and $130 for the second kid and have set up auto pay for the annual fees. I have now realized that CBR has been increasing the annual storage fees pretty steeply. The $ 125 has become $180 in a matter of few of years and the 130 and has become 145. This is pretty steep increase in annual fees and I am not sure where this will stop. It was not made obvious or stated while signing up that the fees will increase sharply every year.

**Response**: April 13, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out

---

[28] *Id.*

[29] *Id* (emphasis added)

to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[30]

\*\*\*

**Complaint Type**: Billing/Collection Issues; January 15, 2020

I selected CBR for my 3 children and opted for this service as I was clearly told that my $125 rate would be locked in for 18 years. To my surprise, rates were increased by $25 twice in 3 years! I contacted the company, and was told that I could elect to have the samples destroyed or pay the higher fee. After the first increase, I was also told at that time that no further price increases were expected in the future and this was the first in 25 years. Two years later, another $25 increase. This was falsely advertised by CBR agent when told this rate would be locked in for 18 years. If there is a possibility of rate increases, then state that clearly. DON'T LIE! Disappointed and don't recommend this company.

**Response**: January 10, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[31]

\*\*\*

**Complaint Type**: Billing/Collection Issues; January 15, 2021

Like many other customers, CBR has raised my child's cord blood storage rate multiple times, despite the rep stating that it would remain the same rate of $125/year until my child reaches the age of 18. We selected CBR after reviewing several cord blood firms, and were happy and satisfied until we realized they had increased our rates beginning in 2017. In the last few years CBR has increased to cost of our storage rates by close to 40% despite being told that we would have the same storage rate of $125/year "locked in" for 18 years. In 2017, it went up from $125/yr to $150/yr. Two years later, it increased again to $175/yr. Since our account is setup for auto-pay through our bank and online billing, we did not notice the increases until doing our yearly budget planning this week. 40% increase in the span of 3 years is highway robbery and telling us it would be locked in and then changing that is fraudulent. We feel like we are being held hostage with big transfer fees and only alternative being to destroy the samples. As a single income family, we

---

[30] *Id.*

[31] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

don't have extra money for these unexpected and unplanned expenses especially from a business that claimed and advertised locking in my original storage rate until they are 18. I am worried this trend will continue until it reaches the point it forces me to no longer continue and choosing between the health of my children and the ability to live within my means. I am disappointed, and very saddened, to be doing business with a company that does not honor their word treating and is treating their customers like this.

**Response**: January 8, 2020

We appreciate you taking the time to connect with our Client Services Leadership and understand that we were able to come to an agreement on the concern that was submitted.  We will continue to ensure that you, and all of our CBR clients, have the highest level of service and dedication that has helped us grow into the leader in private newborn stem cell preservation.  If we can be of any additional assistance please reach out to us at any time.  Thank you for being a valued member of the CBR family today and continuing to partner with us into the future of stem cell science.[32]

74.    In perhaps the most egregious of its responses, and what is a clear admission of wrongdoing, CBR admits that the added storage fees may not even benefit the Consumers who are paying such fees:

**Complaint Type**: Billing/Collection Issues; January 17, 2020

I have stored my two children's cord blood with CBR (2008 and 2011). Like many complaints listed here, I recall being told that the storage fee would remain the same for 18 years. Still, the price increased from $125/year to $150/year a couple of years ago and initially I didn't even notice it because I had automatic billing. Although I was told (in 2017 and this year) that the price increase was due to expense and need for R&D, the real reason is quite different. CBR was sold to AMAG in 8/2015 for $700M, and subsequently AMAG increased price (for the first time in a decade) in order to mine more money from this acquisition. In fact, AMAG boasted about CBR "growth" driving by annual storage fees in 2017. In June 2018, CBR was sold again to GI Partners for $530 million, and GI Partners once again increased the price to $175/year in 2019! Note that there was NO price increases when CBR's ownership didn't change prior to 2015, because the unit cost of storage should generally decrease when there are more units stored. Units being safely stored is all that I, as a customer, expects of CBR (so we shouldn't shoulder any R&D outside of storage and storage related issues); and CBR had been very profitable all along ($45M EBITDA on $126 million revenue in 2014, that's 36% margin, higher than a vast majority of American businesses). So at least CBR should be honest when they increased the price -- "our new owner really wants to harvest more money from our captive customer like you!". Because the way that CBR was increasing price, and because there was almost

---

[32] *Id.*

no alternative solution (I can't donate my children's cord blood to public banks), I feel that I am a captive hostage rather than a customer. CBR essentially treats people who have trusted it with their children's cord blood as a source to harvest more money. I'm so disappointed in the company and outraged by the corporate greed demonstrated by the two new owners.

**Response:** January 27, 2020

Thank you again for trusting CBR with the stem cells of your family.  Our goal as a company is to lead the industry in helping discover new, innovative ways cord blood and cord tissue might be used in the future, providing more long-term value to our families. We're investing in best-in-class technologies for storage, infrastructure, support services for clients, and scientific research.  While it may not immediately impact your family, these investments could mean a greater likelihood for our client families to have more opportunities to use their stem cells in the future.  As you know, CBR is committed to three key areas: quality, affordability, and investing in the research and development of newborn stem cell applications. Balancing these areas can be challenging, but a slight adjustment in annual storage rates will allow us to maintain our high standards of quality while investing more into R&D and expanding the potential value of your family's precious resource(s).  We are glad to hear that you have been able to connect with our management team and work on the resolution of your concerns directly.  Thank you again.[33]

**B.  Injury to the Public-at-Large and Potential for Future Harm**

75.     Defendants' wrongful conduct harms the public-at-large.

76.     Namely, by raising monthly fees for the storage of cord blood, fewer families are able to afford paying for the continued storage and thus are forced to have it "disposed" of by CBR. In effect, this causes the first- and second-degree relatives of the donor of the cord blood to lose the ability to use that cord blood to potentially save their life in the event of one of the aforementioned medical uses of cord blood. This literally endangers all potential end users of the cord blood and it proliferates harm beyond just the economic harm caused by the increases in price.

77.     In addition, because CBR's deceptive advertising is ongoing and directed to the public, the deception poses an ongoing risk to the public.

---

[33] *Id.* (emphasis added)

78.     As such, a public injunction is necessary to enjoin Defendants' continued harm of Consumers and the public-at-large.

79.     Similarly, should Defendants not be enjoined from their unlawful and deceptive conduct, Plaintiffs and Class Members face the potential for irreparable future harm, including continued, involuntary increases in storage fees and disposal of "life saving" cord blood.

## C.  Unconscionability of Arbitration Clause

80.     Consumers entered into Contracts with CBR for cord blood services.  While CBR and GI Partners have jointly engaged in the deceptive and unlawful conduct of increasing consumers fixed annual storage fees to fund its business ventures, GI Partners is not a party to this Contract, but rather is profiting from the deceptive and unlawful increased annual storage fees.

81.     The arbitration clause included in the uniform Contract between consumers and CBR is procedurally and substantially unconscionable due to the harsh, one-sided fee and cost-shifting provision for all arbitration and court costs, the requirement that Plaintiffs and Class Members pay all fees and costs to bring an arbitration, the procedural surprise associated with the vagueness of the arbitration clause, and the unequal bargaining power between the parties.

82.     The arbitration clause in the form Contract contains a harsh, one-sided fee and cost-shifting "loser pays" provision, indicating that, "[i]n the event of arbitration, or any court proceedings, the court or arbitrator may awarded reasonable attorneys' fees and costs to the prevailing party in addition to any other relief to which the party is entitled." This creates a greater risk in arbitrating claims than Plaintiffs and Class Members would face if they were to litigate the same claims in federal court. This provision also only benefits CBR, which is backed by billions of dollars in private investments and is in a substantially stronger bargain position due to having greater resources than Plaintiffs and Class Members.

83.     The harsh, one-sided fee and cost-shifting "loser pays" provision is also unconscionably broad, as it requires the losing party to pay both fees *and* costs in the event of arbitration *and any* court

SECOND AMENDED CLASS ACTION COMPLAINT

proceedings, which could include any initial decision of arbitrability, any costs associated with the arbitration, or any merits determinations in court or arbitration. The intended and actual result of this provision is the creation of a chilling effect on Plaintiffs and Class Members' rights because it exposes them to the possibility of paying attorneys' fees and costs associated with any and all litigation and arbitration issues.

84.     Further, the "loser pays" provision violates Title 9 of the California Code of Civil Procedure, which is referenced in the Contract, and states that such clauses are unlawful. Specifically, California Code of Civil Procedure §1284.3 states that "(a) No neutral arbitrator or private arbitration company shall administer a consumer arbitration under any agreement or rule requiring that a consumer who is a party to the arbitration pay the fees and costs incurred by an opposing party if the consumer does not prevail in the arbitration, including, but not limited to, the fees and costs of the arbitrator, provider organization, attorney, or witnesses."

85.     Moreover, the vague language of the arbitration provision does not give Plaintiffs or Class Members an opportunity to fully understand the terms or nature of the agreement, including where to file, how to file, or the costs associated with filing, making the entire arbitration provision a procedural surprise. Further, the arbitration provision is vague as to where any arbitration would be filed, or any other circumstances regarding filing, and consequently requires Plaintiffs and Class Members to pay all arbitration fees and costs. Thus, the arbitration provision is too vague to be enforceable.

86.     Further, had Plaintiffs or Class Members known that, contrary to CBR's marketing and advertising representations and the form Contract, the annual cord blood fee was not fixed and that the cost of the increased fees would likely be less than the costs of having to arbitrate their claims to seek redress for CBR's misconduct, they would not have signed the Contract with CBR on the same terms.

87.     In addition, the standard CBR service Contract is a contract of adhesion, imposed upon Plaintiffs and Class Members without an opportunity to negotiate the terms. Plaintiffs and Class Members are in a substantially weaker bargaining position than CBR, which is owned and managed by a multi-billion-dollar private investment firm. The arbitration provision is presented to consumers on a take-it-

or-leave-it basis due to the inequality of bargaining power that resulted in no real negotiation and an absence of meaningful choice. This is especially true here, where Consumers are often parents or caregivers who are presented with the Contract while facing parenthood for the first time, or adding to their growing family, and are told that they must sign the Contract in order to take advantage of the "once-in-a-lifetime opportunity" of cord blood banking.

88.     Further, the arbitration provision is not clear or conspicuous, as it is buried within 11 pages of "Family Banking Enrollment Forms," which have multiple sections, including the client service agreement, medical and health history profile, and payment information.

89.     Plaintiffs request that this Court decide that the arbitration provision is unlawful, unfair, deceptive, and unenforceable.

## PLAINTIFFS' ALLEGATIONS

### *Katherine Vaccarella*

90.     Plaintiff Katherine Vaccarella signed a Contract with CBR on January 23, 2015, for the collection and storage of her child's cord blood. Plaintiff Vaccarella's Contract with CBR is appended to this Class Action Complaint as Exhibit A.

91.     Prior to entering into the Contract with CBR for cord blood storage, Plaintiff Vaccarella performed research on cord blood banking, including on CBR's website. Plaintiff Vaccarella also spoke with a service representative of CBR. Through CBR's website representations and the promises from CBR's service representative, Plaintiff Vaccarella reasonably believed that the cord blood banking included a large up-front cost, and fixed annual storage fees. The fixed nature of the annual storage fees was important to Plaintiff Vaccarella because of the significant expenses associated with cord blood banking, and for her future family planning.

92.     In that Contract, Plaintiff Vaccarella agreed to the following: a hefty upfront initial cost of $1,595.00, including shipping of $170.00, and a fixed annual storage fee of $130.00.

93.     Pursuant to that Contract, under the "Annual Storage Fee" provision, it states in bold font: "**Annual Storage Fee Per Year (Years 2-18)** $130.00." *See* Exhibit A. This confirms that the annual storage fee is fixed pursuant to the Contract during the entirety of the cord blood storage for years 2-18.

94.     Contrary to CBR's website representation and the promises of the CBR service representative, as well as the explicit promise in the service Contract, CBR unilaterally increased Plaintiff Vaccarella's annual storage fee to $160.00.

95.     CBR chose not to abide by its representations and promises on its website, and made through its service representatives, as well as the Contract terms that it unilaterally drafted and to which it is a party. In so doing, CBR chose to charge Plaintiff Vaccarella storage fees which were not consistent with the "Annual Storage Fee" provision of the Contract. Indeed, the annual storage fees that Plaintiff Vaccarella was charged are significantly higher than what the Contract guaranteed.

96.     Plaintiff Vaccarella relied on the aforementioned representations made by CBR both in the Contract and in advertising, including representations on the CBR website and from its service representative, regarding the fixed nature of the annual storage fees.

97.     Plaintiff Vaccarella would not have signed the Contract with CBR on the same terms if CBR had disclosed the fact that the annual storage fee was not actually fixed and that CBR intended to charge her incrementally increased annual storage fees.

98.     As such, CBR breached its express warranties with Plaintiff Vaccarella, and the Contract with Plaintiff Vaccarella, and restitution and damages are required in order to make Plaintiff Vaccarella whole due to the breach. In addition, CBR's conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

99.     Plaintiff Vaccarella does not recall reading, viewing, or agreeing to any arbitration terms or agreement on the CBR website.

100.    The standard CBR service Contract is a contract of adhesion imposed upon Plaintiff Vaccarella, and Plaintiff Vaccarella did not have an opportunity to negotiate the terms.

101.    Plaintiff Vaccarella has not entered into a contractual agreement with GI Partners and has not had or received any communications from GI Partners.

102.    Plaintiff Vaccarella was never notified in writing or verbally that, by banking cord blood with CBR, she would be agreeing to have any or all causes of action in a lawsuit against GI Partners subject to arbitration.

**Plaintiff Amy Cohen**

103.    Plaintiff Amy Cohen signed a Contract with CBR on October 25, 2012, and another Contract on November 7, 2013, for the collection and storage of her two grandchildren's cord blood. Plaintiff Cohen's Contracts with CBR are appended to this Class Action Complaint as Exhibit B.

104.    Plaintiff Cohen was persuaded to sign the Contracts with CBR because of its marketing representations that the cord blood is stored in Arizona, which CBR represents as having historically fewer natural disasters than competitor cord blood banking companies. This was material to Plaintiff Cohen and her daughter because they live in Florida, where hurricanes regularly impact the State.

105.    Prior to signing both Contracts, Plaintiff Cohen also spoke with service representatives of CBR who confirmed that the annual cord blood storage fee would be fixed and charged annually on her grandchildren's birthdays. The fixed nature of the annual storage fees was important to Plaintiff Cohen because of the significant expenses associated with cord blood banking.

106.    In the October 25, 2012, Contract, Plaintiff Cohen agreed to the following: a hefty upfront initial cost of as $1,945.00, including shipping of $150.00, and a fixed annual storage fee of $125.

107.    Pursuant to the October 25, 2012, Contract, under the "Annual Storage Fee" provision, it states in bold font: "**Annual Storage Fee Per Year (Years 2-18)** $125.00." *See* Exhibit B. This confirms that the annual storage fee is fixed pursuant to the Contract during the entirety of the cord blood storage for years 2-18.

108.    In the November 7, 2013, Contract, Plaintiff Cohen agreed to the following: a hefty upfront initial cost of $1,595.00, including shipping of $170.00, and a fixed annual storage fee of $130.00.

109.     Pursuant to the November 7, 2013, Contract, under the "Annual Storage Fee" provision, it states in bold font: "**Annual Storage Fee Per Year (Years 2-18)** $130.00." *See* Exhibit B. This confirms that the annual storage fee is fixed pursuant to the Contract during the entirety of the cord blood storage for years 2-18.

110.     Contrary to CBR's representations and the promises of the CBR service representative, as well as the promise in the service Contract, CBR unilaterally increased Plaintiff Cohen's annual storage fees of $125.00 subject to the October 25, 2012, contract to $150.00 in 2017 and 2018, $175.00 in 2019 and $180.00 in 2020, rather than the $125.00 fixed annual storage fee she agreed to.

111.     Contrary to CBR's representations and the promises of the CBR service representative, as well as the promise in the service Contract, CBR unilaterally increased Plaintiff Cohen's annual storage fee subject to the November 7, 2013, Contract so that she is now paying $175.00, rather than the $130.00 fixed annual storage fee to which she agreed.

112.     CBR chose not to abide its representations and promises and made through its service representatives, as well as the Contract terms that it unilaterally drafted and to which it is a party.  In so doing, CBR chose to charge Plaintiff Cohen storage fees which were not consistent with the "Annual Storage Fee" provision of the Contracts. Indeed, the annual storage fees that Plaintiff Cohen was charged are significantly higher than what the Contracts guaranteed.

113.     Plaintiff Cohen relied on the aforementioned representations made by CBR both in the Contracts and marketing, including representations from CBR's service representative, regarding the fixed nature of the annual storage fees.

114.     Plaintiff Cohen would not have signed the Contracts with CBR on the same terms if CBR had disclosed the fact that the annual storage fee was not actually fixed and that CBR intended to charge her incrementally increased annual storage fees.

115.     As such, CBR breached its express warranties with Plaintiff Cohen, and the Contracts with Plaintiff Cohen, and restitution and damages are required in order to make Plaintiff Cohen whole

due to the breaches. In addition, CBR's conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

116.   Plaintiff Cohen did not read, view or agree to any arbitration terms or agreement on the CBR website.

117.   The standard CBR service Contract is a contract of adhesion imposed upon Plaintiff Cohen, and Plaintiff Cohen did not have an opportunity to negotiate the terms.

118.   Plaintiff Cohen has not entered into a contractual agreement with GI Partners and has not had or received any communications from GI Partners.

119.   Plaintiff Cohen was never notified in writing or verbally that, by banking cord blood with CBR, she would be agreeing to have any or all causes of action in a lawsuit against GI Partners subject to arbitration.

***Sirisha Koneru***

120.   Plaintiff Sirisha Koneru signed a Contract with CBR on April 6, 2011, for the collection and storage of her child's cord blood. Plaintiff Koneru's Contract with CBR is appended to this Class Action Complaint as Exhibit C.

121.   Prior to entering into the Contract with CBR for cord blood storage, Plaintiff Koneru performed research on cord blood banking, including on CBR's website. Plaintiff Koneru also spoke with a service representative of CBR. Through CBR's website representations and the promises from CBR's service representative, Plaintiff Koneru reasonably believed that the cord blood banking included a large up-front cost, and fixed annual storage fees. The fixed nature of the annual storage fees was important to Plaintiff Koneru because of the significant expenses associated with cord blood banking, and for her future family planning.

122.   In that Contract, Plaintiff Koneru agreed to the following: a hefty upfront initial cost of as $1,445.00, including shipping of $150.00, and a fixed annual storage fee of $125.00.

123.    Pursuant to that Contract, under the "Annual Storage Fee" provision, it states in bold font: "**Annual Storage Fee Per Year (Years 2-18)** $125.00 *See* Exhibit C. This confirms that the annual storage fee is fixed pursuant to the Contract during the entirety of the cord blood storage for years 2-18.

124.    Contrary to CBR's website representation and the promises of the CBR service representative, as well as the promise in the service Contract, CBR unilaterally increased Plaintiff Koneru's fixed annual storage fee of $125.00 to $150.00 in 2017 and 2018, $175.00 in 2019[34], $180.00 in 2020, and $185.00 in 2021.

125.    CBR chose not to abide by its representations and promises on its website, and made through its service representatives, as well as the Contract terms that it unilaterally drafted and to which it is a party.  In so doing, CBR chose to charge Plaintiff Koneru storage fees which were not consistent with the "Annual Storage Fee" provision of the Contract. Indeed, the annual storage fees that Plaintiff Koneru was charged are significantly higher than what the Contract guaranteed.

126.    Plaintiff Koneru relied on the aforementioned representations made by CBR both in the Contract and in advertising, including representations on the CBR website and from its service representative, regarding the fixed nature of the annual storage fees.

127.    Plaintiff Koneru would not have signed the Contract with CBR on the same terms if CBR had disclosed the fact that the annual storage fee was not actually fixed and that CBR intended to charge her incrementally increased annual storage fees.

128.    As such, CBR breached its express warranties with Plaintiff Koneru, and the Contract with Plaintiff Koneru, and restitution and damages are required in order to make Plaintiff Koneru whole due to the breach. In addition, CBR's conduct is fraudulent, deceptive, unlawful, and misleading in violation of relevant consumer protection laws.

129.    Plaintiff Koneru did not read, view or agree to any arbitration terms or agreement on the CBR website.

---

[34] Plaintiff Koneru received referral credits in 2019 and 2020 and thus did not pay those increased annual fees, but did not receive a credit in any other years, and thus her current annual storage fee is $185.00.

130.    The standard CBR service Contract is a contract of adhesion imposed upon Plaintiff Koneru, and Plaintiff Koneru did not have an opportunity to negotiate the terms.

131.    Plaintiff Koneru has not entered into a contractual agreement with GI Partners and has not had or received any communications from GI Partners.

132.    Plaintiff Koneru was never notified in writing or verbally that, by banking cord blood with CBR, she would be agreeing to have any or all causes of action in a lawsuit against GI Partners subject to arbitration.

### DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT

133.    The applicable limitations period in this Action has been tolled because Defendants concealed their misconduct such that Plaintiffs and Class Members could not discover the misconduct through the exercise of reasonable diligence. Through the time period relevant to this Action, Defendants concealed from and failed to disclose to Plaintiffs and Class Members that they intended to deceive consumers who purchased cord blood banking services from CBR, and to impose additional fees upon Plaintiffs and Class Members for cord blood storage.

134.    Plaintiffs and Class Members did not discover – and could not have discovered through the exercise of reasonable diligence – that Defendants intended to profit from charging and collecting more money for annual cord blood storage fees than represented to Plaintiffs and Class Members. Prior to Defendants' imposition of increased annual cord blood storage fees, in contravention of Plaintiffs and Class Members' reasonable expectations, the plain terms of the Contract, and the plain representations in CBR's marketing and advertising, Plaintiffs and Class Members reasonably trusted CBR's representations that the annual storage fees were fixed. Further, Plaintiffs and Class Members were unaware of GI Partners' deceptive and unlawful conduct in the collection of the excessive annual storage fees.

135.    Moreover, CBR's conduct is a continuing breach and, thus, the statute of limitations is tolled during the pendency of the breach.

## FED. R. CIV. P. 9(b) ALLEGATIONS
### (Affirmative and By Omission)

136.    Rule 9(b) of the Federal Rules of Civil Procedure provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Although, Defendants are in the best position to know what content they placed on their website and in marketing materials during the relevant timeframe, to the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

137.    **WHO:** CBR made material misrepresentations and/or omissions of fact in uniform website representations, marketing, through its customer service representatives, and the service Contract, that the annual cord blood storage fee would be fixed, when in reality, CBR and GI Partners intended to, and did, systemically increase the annual cord blood storage fees.

138.    **WHAT:** CBR's conduct here was, and continues to be, fraudulent because it omitted and concealed the fact that the annual cord blood storage fee was not fixed, and led reasonable Consumers to believe that the fee was fixed, when it was not. If and when Consumers learn of the unlawful increase in the annual storage fee, they are left with no choice but to pay the fee or lose their cord blood. Thus, CBR is able to breach the Contract with Consumers, and the express warranties and representations made to consumers, because it essentially holds Consumers' cord blood hostage in exchange for the extraction of the unfair and increased pricing imposed on Consumers. Defendant GI Partners, the Lead Investor in CBR whose "approach has remained consistently focused on identifying investments that optimize the balance between risk and return,"[35] is able to optimize its return on its investment in CBR by charging CBR's Consumers for its business costs, rather than bearing the financial burden of its own business operations.

---

[35] www.gipartners.com/about/investment-strategy (last accessed August 13, 2021).

139.   **WHEN:** CBR made the material misrepresentations and omissions detailed herein at the time Plaintiffs and Class Members performed research on cord blood banking to gather information that would aid them in determining whether to bank their cord blood and, if so, whether to bank the cord blood with CBR or one of its competitors, prior to and at the time Consumers entered into the service Contracts for cord blood banking, and continuously through the applicable class period. Once GI Partners acquired CBR in 2018, it asserted some control over CBR's operations and/or knew of and participated in the scheme to deceptively and unlawfully increase Consumers' fixed annual storage fees in order to pay for its unrelated business expenses. Since at least its acquisition of CBR in August 2018, Defendant GI Partners, the Lead Investor in CBR whose "approach has remained consistently focused on identifying investments that optimize the balance between risk and return,"[36] is able to optimize its return on its investment in CBR by charging CBR's Consumers for its business costs, rather than bearing the financial burden of its own business operations.

140.   **WHERE:** CBR's material misrepresentations and omissions were made on its website, through its marketing materials, its customer service representatives, and in the service Contract, prior to and at the time Consumers entered into the service Contracts for cord blood banking. Once GI Partners acquired CBR in 2018, it asserted some control over CBR's operations and/or knew of and participated in the scheme to deceptively and unlawfully increase of consumers fixed annual storage fees in order to pay for its unrelated business expenses. Since at least its acquisition of CBR in August 2018, Defendant GI Partners, the Lead Investor in CBR whose "approach has remained consistently focused on identifying investments that optimize the balance between risk and return,"[37] is able to optimize its return on its investment in CBR by charging CBR's Consumers for its business costs, rather than bearing the financial burden of its own business operations.

141.   **HOW:** CBR made material misrepresentations and omissions on its website, through its marketing materials, its customer service representatives, and in the service Contract, that the annual

---

[36] www.gipartners.com/about/investment-strategy (last accessed August 13, 2021).

[37] www.gipartners.com/about/investment-strategy (last accessed August 13, 2021).

storage fees were fixed when they were not. Once GI Partners acquired CBR in 2018, it asserted some control over CBR's operations and/or knew of and participated in the scheme to deceptively and unlawfully increase Consumers 'fixed annual storage fees in order to pay for its unrelated business expenses. Since at least its acquisition of CBR in August 2018, Defendant GI Partners, the Lead Investor in CBR whose "approach has remained consistently focused on identifying investments that optimize the balance between risk and return,"[38] is able to optimize its return on its investment in CBR by charging CBR's Consumers for its business costs, rather than bearing the financial burden of its own business operations.

142.   **WHY:** CBR engaged in the material misrepresentations and/or omissions detailed herein (e.g., knowing and concealing its knowledge of the deceptive and unlawful conduct) for the express purpose of inducing Plaintiffs and Class Members to purchase cord blood banking services from CBR. After Consumers contracted with CBR for this fixed annual storage fee, Defendants unlawfully and unilaterally increased annual storage fees to generate profits and fund their clinical studies or other business expenses that have no rational relationship to cord blood storage. Defendants use the increased annual storage fees to generate greater profits at the expense of Consumers after deceiving Consumers into believing (at the time they entered into the Contract with CBR) that the annual storage fee is both fixed and legitimately related to cord blood storage. But the increased storage fees bear no relation to storage costs and, even if they did, Consumers should not be responsible for paying additional fees due to Defendants' financial forecasting failures.

143.   **INJURY**: Plaintiffs and Class Members have been injured because they were duped into entering Contracts for cord blood banking services from CBR, which promised and led reasonable Consumers to believe that they included a fixed annual storage fee, which is not actually fixed and will cost Consumers hundreds or thousands of additional dollars over the course of the cord blood storage. If and when Consumers learn of the unlawful and unexpected increase in the annual storage fee, they are

---

[38] www.gipartners.com/about/investment-strategy (last accessed August 13, 2021).

left with no choice but to pay the unlawful fee or lose their cord blood. Thus, Consumers have been or will be injured in the amount of unexpected and hidden storage fees.

## CLASS ACTION ALLEGATIONS

144.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following classes (hereinafter, the "Classes"):

**Nationwide Class**:
During the fullest period allowed by law, all Consumers who purchased cord blood or tissue storage services from CBR.

**Florida Subclass**:
During the fullest period allowed by law, all Consumers in the State of Florida who purchased cord blood or tissue storage services from CBR.

**New Jersey Subclass:**
During the fullest period allowed by law, all Consumers in the State of New Jersey who purchased cord blood or tissue storage services from CBR.

**New York Subclass:**
During the fullest period allowed by law, all Consumers in the State of New York who purchased cord blood or tissue storage services from CBR.

145.    Excluded from the Classes are Defendants, their subsidiaries, affiliates, officers, directors, and employees.

146.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The Members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Plaintiffs are informed and believe—based upon the publicly-available information discussed herein— that there are hundreds of thousands of Class Members, making joinder impracticable. Those individuals' identities are available through Defendants' records, and Class Members may be notified of the pendency of this Action by recognized, Court-approved notice dissemination methods.

147.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Defendants have acted in a manner generally applicable to Plaintiffs and the other Members of

the proposed Classes. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class Members. The questions of law and fact common to the Classes predominate over the questions that may affect individual Class Members, including the following:

a. Whether CBR breached its uniform Contracts with Plaintiffs and Class Members;

b. Whether any such breach caused harm or injury to Plaintiffs and Class Members;

c. Whether CBR made or disseminated to the public any representation about the annual cord blood banking storage fees that were deceptive or misleading;

d. Whether CBR breached the implied covenant of good faith and fair dealing with Plaintiffs and Class Members;

e. Whether Defendant GI Partners has deceptively or unlawfully profited from Plaintiffs' and Class Members increased annual storage fees;

f. Whether Defendant GI Partners has collected and retained money from Plaintiffs and Class Members that it is not entitled to;

g. Whether Defendants violated the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.;*

h. Whether Defendants violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

i. Whether Defendant CBR violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500;

j. Whether Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*;

k. Whether Defendants violated New York General Business Law § 349;

l. Whether Defendant CBR violated New York General Business Law § 350;

m. Whether Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. §56:8-1, *et seq.;*

n.  Whether Defendant GI Partners has been unjustly enriched by Plaintiffs' and Class Members increased annual storage fees;

o.  Whether Defendants' conduct warrants a public injunction enjoining Defendants' continued course of conduct;

p.  Whether compensatory or consequential damages should be awarded to Plaintiffs and the other Class Members;

q.  Whether actual, punitive, trebled, or statutory damages should be awarded to Plaintiffs and other Class Members;

r.  Whether restitution should be awarded to Plaintiffs and the other Class Members;

s.  Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

t.  Additional common questions to be supplemented as a result of discovery.

148.  **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way. Plaintiffs and Class Members were subjected to CBR's uniform marketing and advertising promising no hidden fees and fixed cord blood storage fees, and each entered into a uniform Contract with CBR for fixed storage fees. Further, each Class Member's increased storage fees have been used to pay for Defendants' unrelated business expenses.

149.  **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives because their interests do not conflict with the interests of Class Members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this Action vigorously. The Class Members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

150.  **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible

standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making final, public injunctive relief or corresponding declaratory relief appropriate.

151.    Injunctive relief, and specifically public injunctive relief, is necessary in this Action.

152.    The harm that Defendants imposes on Consumers causes ripple effects for the public at-large.

153.    Namely, by raising prices on fixed annual fees for the storage of cord blood, fewer families are able to afford paying for the continued storage and thus are forced to have it "disposed" of by Defendants. In effect, this causes the first- and second-degree relatives of the donor of the cord blood to lose the ability to use that cord blood to potentially save their lives in the event of one of the aforementioned medical uses of cord blood. This literally endangers all potential end users of the cord blood and it proliferates harm beyond just the economic harm caused by the increases in annual storage fees.

154.    **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

1

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (Against Defendant CBR)
### (Plaintiffs individually, and on behalf of the Nationwide Class
### and Florida, New York, and New Jersey Subclasses)

155.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

156.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class and the State Subclasses.

157.    Plaintiffs and putative Class Members entered into a contractual agreement with CBR governing their relationship with respect to cord blood banking, including cord blood storage.

158.    A material term of the Contract includes the Payment Information Section, which promises and represents that the annual storage fee will be fixed. As shown in Exhibits A-B, the Contract states that annual storage fees will be fixed for years 2-18.

159.    Plaintiffs and putative Class Members fully performed their material obligations under the Contract with CBR by paying the initial cord blood banking fees and annual storage fees thereafter.

160.    CBR materially breached the Contract with Plaintiffs and Class Members because the storage fee was not fixed as promised, represented, and agreed to in the Contract.

161.    After entering into the Contract with CBR for the fixed annual storage fee, which is automatically charged to Consumers' credit cards on file, CBR increases the annual storage fee in breach of the plain terms of the Contract.

162.    CBR uses the increased annual storage fees to generate greater profits at the expense of Consumers after deceiving them into believing (at the time they enter into the Contract) that the annual storage fee is both fixed and legitimately related to cord blood storage. But the increased storage fees bear no relation to storage costs and, even if they did, Consumers should not be responsible for paying additional fees due to CBR's financial forecasting failures.

163.    The annual storage fee is just that – a fee for storage. Yet, CBR has placed the burden of paying for its clinical trials on Consumers and tethered it to the annual storage fee, despite the fact that such clinical trials have no relationship to storage costs.

164.    Even more, the annual storage fee increase is not a one-time assessment, but rather is a continuing breach, as CBR regularly increases the annual fees at up to $25.00 intervals every few years. Thus, the annual storage fee increases are substantial, and can amount to a more than 50% increase in storage fees (or more) over the lifetime of the cord blood storage, deceptively and unlawfully forcing Consumers to foot the bill for CBR's clinical research and marketing via its annual storage fees.

165.    Further, if and when Consumers learn of the unlawful increase of the annual storage fees, they are left with no choice but to pay the fees or lose their cord blood.

166.    CBR thus breached the form Contract entered into with Plaintiffs and Class Members, and violated the duty of good faith and fair dealing by entering into a Contract with Plaintiffs and Class Members for their payment of fixed annual storage fees when the fees are not fixed, but rather are part of CBR's plan to rope Consumers into extended Contracts that they cannot break without losing the cord blood (which is irreplaceable) and all of the fees, costs, and expenses paid to that date.

167.    Further, the increased annual fees that CBR requires in order to continue storing Consumers' cord blood further breaches the Contract between Consumers and CBR because CBR increases the cost of services without providing proper consideration – namely, that CBR increases the cost of its services without providing an added benefit to Consumers; and thus, Consumers fail to receive the benefit of their bargain when the storage fees are increased.

168.    Plaintiffs and Class Members were injured as a direct, proximate, and foreseeable result of CBR's material breach of the Contracts. Had CBR disclosed to Plaintiffs and Class Members that the annual storage fees were not fixed, but rather, that they would be increased over time in unknown amounts, costing Consumers hundreds or thousands of additional dollars for cord blood storage, they either would not have entered into the Contract with CBR, or would not have agreed to pay CBR as much as they did for cord blood banking.

SECOND AMENDED CLASS ACTION COMPLAINT

169.     Plaintiffs and Class Members are entitled to an award of damages as redress for CBR's material breach of the Contracts with Plaintiffs and Class Members, including, but not limited to, compensatory damages and/or benefit-of-the-bargain damages.

170.     Plaintiffs and Class Members, who continue to pay increased annual storage fees, are also entitled to injunctive relief to enjoin CBR from continuing to breach their Contracts.

## COUNT II

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Pled in the Alternative to Breach of Contract, Against Defendant CBR)**
**(Plaintiffs individually, and on behalf of the Nationwide Class and**
**Florida, New York, and New Jersey Subclasses)**

171.     Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

172.     Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and the State Subclasses.

173.     Plaintiffs bring this cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing in the alternative to Count I.

174.     Plaintiffs and putative Class Members each entered into a contractual agreement with CBR governing their relationship with respect to cord blood banking, including cord blood storage. Copies of the subject agreement are attached hereto as Exhibits A-C.

175.     Plaintiffs and putative Class Members fully performed their material obligations under the Contract with CBR by paying the initial cord blood banking fees and annual storage fees thereafter.

176.     A material term of the Contract includes the Payment Information Section, which promises and represents that the annual storage fee will be fixed. As shown in Exhibit A-C, the Client Service Agreement states that annual storage fees will be fixed for years 2-18.

177.     The Contract includes the implied covenant of good faith and fair dealing.

178.    Pursuant to the implied covenant, CBR has a duty not to commit acts that would improperly deprive Plaintiffs and Class Members of the intended benefits of the Contract.

179.    The principal benefit and purpose for which Plaintiffs and Class Members contracted included cord blood and tissue banking, including storage. The implied covenant imposes a duty upon CBR to perform its obligations under the Contract in good faith.

180.    CBR failed to act in good faith and acted contrary to fair dealing by increasing the annual storage fees, despite promising and representing to Plaintiffs and Class Members in the Contract that the fee would be fixed over the lifetime of the cord blood storage.

181.    CBR unfairly interfered with Plaintiffs and Class Members' rights to receive the benefits of the Contract – the fixed annual storage fee for the safekeeping of the cord blood. CBR uses the increased storage fees to generate profit at the expense of Consumers after deceiving them into believing (at the time they enter into the Contract) that the fee is both fixed and legitimately related to cord blood storage. But the increased storage fees bear no relation to storage costs and, even if they did, Consumers should not be responsible for paying additional fees due to CBR's financial forecasting failures.

182.    The annual storage fee is just that – a fee for storage. Yet, CBR has placed the burden of paying for its clinical trials on Consumers and tethered it to the annual storage fee, despite the fact that such clinical trials have no relationship to storage costs.

183.    Even more, the storage fee increase is not a one-time assessment, but rather is a continuing breach, as CBR regularly increases the annual fees at up to $25.00 intervals every few years. Thus, the annual storage fee increases are substantial, and can amount to a more than 50% increase in fees (or more) over the lifetime of the storage, deceptively and unlawfully forcing Consumers to foot the bill for CBR's clinical research and marketing via its storage fees.

184.    Further, if and when Consumers learn of the unlawful increase in the annual storage fee, they are left with no choice but to pay the fee or lose their cord blood.

185.     Plaintiffs and Class Members performed all conditions, covenants, and promises required to be performed in accordance with the Contract. All conditions precedent to CBR's performance have occurred or been satisfied.

186.     The foregoing facts constitute a violation of the implied covenant of good faith and fair dealing.

187.     As a result of such conduct, Plaintiffs and Class Members have been deprived of the intended benefit of the Contract (fixed annual storage fees) and have suffered, and continue to suffer, economic losses.

188.     CBR's breach of the implied covenant of good faith and fair dealing is the direct, proximate, and producing cause of damages to Plaintiffs and Class Members.

189.     Because of CBR's breach of the implied covenant of good faith and fair dealing, Plaintiffs and Class Members should be made whole for all amounts CBR overcharged them by charging more than the fixed annual storage fees.

**COUNT III**
**BREACH OF EXPRESS WARRANTY**
**(Against Defendant CBR)**
**(Plaintiffs individually, and on behalf of the Nationwide Class, and**
**Florida, New York, and New Jersey Subclasses)**

190.     Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

191.     Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and the State Subclasses.

192.     CBR aggressively and uniformly marketed and advertised the cord blood banking to Consumers as being reasonably priced, with statements such as "we made it affordable" with "no hidden fees."

193.     CBR made affirmations of fact and promises in the cord blood banking marketing and advertising, and in the form Contract, as described herein.

194.    CBR made the foregoing express representations and warranties to all Consumers, which became part of the basis of the bargain between Plaintiffs and Class Members, and CBR.

195.    CBR breached the foregoing express warranties by promising that the annual storage fees would be fixed, and then increasing the storage fees once the Consumers' cord blood was stored at CBR's Arizona facility and Plaintiffs and Class Members had no choice but to pay the increased storage fees or lose the cord blood.

196.    Pursuant to relevant state laws, Defendants were provided reasonable notice of the aforementioned breaches of the above-described warranties via notice letters served upon Defendant CBR Systems, Inc. on August 19, 2021.

197.    Plaintiffs and Class Members were injured as a direct and proximate result of CBR's breaches of warranty because they would not have entered into Contracts with CBR for cord blood banking had they known CBR would arbitrarily and unilaterally increase the fixed annual storage fees, and then hold the cord blood hostage in the event the Consumer refuses or is unable to make the additional fee payment.

198.    As a result of CBR's breaches of warranty, Plaintiffs and Class Members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all other such relief deemed appropriate, in an amount to compensate them for not receiving the benefit of their bargain.

**COUNT IV**
**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA")**
**Cal. Civ. Code §§ 1750, *et seq.***
**(Against Defendants CBR and GI Partners)**
**(Plaintiffs individually, and on behalf of the Nationwide Class)**

199.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

200.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

201.    Defendants' conduct constitutes violations under California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

202.    Defendants' conduct falls within the meaning of this statute because they caused transactions to occur, resulting in the sale or lease of goods or services to Consumers – namely, the sale of cord blood services, including preservation and storage, to Plaintiffs and Class Members. The preservation and storage of cord blood is considered a service within the meaning of the statute under Civil Code § 1761(a) and Defendants' sale of cord blood services is considered a service under Civil Code § 1761(b).

203.    Plaintiffs and Class Members are consumers pursuant to the CLRA.

204.    Defendants violated the CLRA by way of the following provisions:

a.    In violation of Civil Code § 1770(a)(1), Defendants have passed off services as those of another by representing (and continuing to represent) the annual cord blood storage fees as fixed, when they are not;

b.    In violation of Civil Code § 1770(a)(5), Defendants have represented that their services have characteristics they do not have by representing (and continuing to represent) that annual cord blood storage fees as fixed, when they are not; and

c.    In violation of Civil Code §1770(a)(9), Defendants have advertised the cord blood banking as having fixed annual cord blood storage fees, when they are not fixed.

d.    In violation of Civil Code §1770(a)(9), CBR inserted an unconscionable provision in a contract.

205.    When Consumers contract with CBR, in order to secure the "once-in-a-lifetime opportunity[39]" to protect their children, they pay a substantial initial fee of $1,500.00 or more, in addition

---

[39] www.cordblood.com/benefits-cord-blood/cord-blood-faqs#covid19

to shipping costs of $150.00 to $170.00. Consumers also contract with CBR to pay an annual storage fee of at least $125.00 over the lifespan of the cord blood storage in CBR's Arizona facility, which CBR deceptively leads Consumers to believe is a fixed fee.

206.    Consumers are willing to pay these exorbitant initial costs and fixed annual storage fees to preserve their children's cord blood at birth in order to potentially protect their children in the event of a serious illness.

207.    Because of the substantial up-front costs, CBR heavily markets the annual storage fees as fixed in its advertising materials and the Contract.

208.    In its marketing and advertising, with respect to cord blood banking, CBR states, "we made it affordable" and represented to Plaintiffs and Class Members that the Contract would include "no hidden fees," and would be fixed from years 2-18.

209.    Prior to purchasing cord blood banking services from CBR, Plaintiffs reviewed and relied upon statements in CBR's marketing and advertising, and from CBR's sales representatives, that the cord blood banking annual storage fee would be fixed.

210.    Thus, the annual storage fee was reasonably understood by Consumers, and was so understood by Plaintiffs, to be – a fixed fee for storage.

211.    However, unbeknownst to Plaintiffs and Class Members, and inconsistent with CBR's pervasive marketing and advertising, and uniform service Contract, the annual storage fee is not fixed. Defendants CBR and GI Partners, as the Lead Investor in CBR, profit substantially from increasing the annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants unlawfully and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars.

212.    Notably, these increased storage fees are not reasonably related to the service provided by CBR (i.e., cord blood storage), but are instead used by Defendants to fund unrelated business expenses

and marketing ventures designed to increase Defendants' own market share and thereby amass greater profits. Defendants have placed the burden of paying for their clinical trials and customer service costs on Consumers and tethered it to the annual storage fee, even though such clinical trials and customer service costs have no relationship to storage costs. Paying for Defendants' unrelated business expenses is not a burden that Consumers should have to bear, as such expenses are wholly unrelated to the storage of cord blood, and Consumers have already paid substantial up-front fees and costs for cord blood banking services.

213.   Even more, the annual storage fee increase is not a one-time assessment, as Defendants regularly increase the annual storage fees at $25.00 intervals every few years. Thus, the annual storage fee increases are substantial, and can amount to a more than 50% increase in fees (or more) over the lifetime of the storage, deceptively and unlawfully forcing Consumers to foot the bill for Defendants' clinical research and marketing via their storage fees.

214.   It is up to Defendants to responsibly manage their funds, and not place the burden of unrelated business expenses onto Consumers, who purchase cord blood banking services from CBR based upon the reasonable belief that the annual storage fees they agreed to and contracted for would be fixed.

215.   That Defendants have nearly $30 billion in capital is evidence that they enjoy substantial benefits from their investments, including the CBR brand, and that they do not need to further dip into Consumers' pockets to fund their research and customer service costs, and do so only to preserve and increase their profits at the expense of Consumers.

216.   Further, if and when Consumers learn of the unlawful increase in the annual storage fee, they are left with no choice but to pay the fee or lose their cord blood.

217.   Reasonable Consumers would not have purchased cord blood banking services from CBR had they known that CBR, in concert with its private and lead investor GI Partners, would arbitrarily and unilaterally increase their fixed annual storage fees, and then hold the cord blood hostage in the event the Consumer refuses or is unable to make the additional fee payment.

218.     Plaintiffs and Class Members have suffered injury-in-fact and actual damages resulting from Defendants' omissions and misrepresentations.

219.     As a result of Defendants' unlawful conduct, Plaintiffs and Class Members are entitled to recover injunctive and other equitable relief, including restitution, as determined by the Court, pursuant to the CLRA.

220.     On August 19, 2021 (to Defendant CBR Systems, Inc.) and August 20, 2021 (to Defendant GI Partners), via USPS certified letter, return requested, by undersigned counsel, Plaintiffs and Class Members put Defendants on written notice of the claims arising from violations of the numerous provisions of California Law, including the CLRA, in addition to breaches of warranties and other consumer protection statutes.  Defendant CBR responded on September 22, 2021 and refused to remedy the violations listed in the CLRA demand letter.

221.     Plaintiffs additionally seek monetary damages from Defendants in the form of actual, compensatory, trebled, statutory, punitive, or any other allowable damages permitted under the law that this Court deems just and proper.

## COUNT V
### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")
### (Against Defendants CBR and GI Partners)
### (Plaintiffs individually, and on behalf of the Nationwide Class)

222.     Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

223.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

224.     Defendants engaged in unlawful, fraudulent, and unfair business practices.

225.     Defendants' conduct was unlawful because it violates the CLRA.

226.     Defendant CBR's breach of contract is also unlawful in violation of the UCL.

227.     Defendant CBR's breach of the implied covenant of good faith and fair dealing is also an unlawful violation of the UCL.

228.    Defendants' conduct is fraudulent because they have represented and continue to represent that the annual cord blood storage fees are fixed, when they are not.

229.    Defendants' acts and business practices, as alleged herein, are also unfair in violation of the UCL because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or are substantially injurious to Consumers. There is no countervailing benefit of these acts and practices to Consumers or competition. These acts and practices caused injures to Plaintiffs and Class Members and could not reasonably have been avoided because they were not informed of the breach until after Defendants were storing and maintaining their cord blood and Plaintiffs and Class Members had no choice but to pay the increased annual storage fees or lose the cord blood.

230.    Defendants' retention of profits from the aforementioned conduct does not outweigh the economic harm that said retention imposes on Consumers. The lone parties that benefit are Defendants. Their conduct also harms competitors, who would otherwise be the recipients of Consumers' business, which Defendants acquired using omissions and misrepresentations.

231.    All of the conduct, representations, and omissions alleged herein occurred in the course of Defendants' business and were part of a pattern or generalized course of illegal conduct.

232.    When Consumers contract with CBR, in order to secure the "once-in-a-lifetime opportunity"[40] to protect their children, they pay a substantial initial fee of $1,500.00 or more, in addition to shipping costs of $150.00 to $170.00, and agree to pay a fixed annual storage fee of at least $125.00 over the lifespan of the cord blood storage in CBR's Arizona facility, which CBR deceptively leads Consumers to believe is a fixed fee.

233.    Consumers are willing to pay these exorbitant initial costs and fixed annual storage fees to preserve their children's cord blood at birth in order to potentially protect their children in the event of a serious illness.

---

[40] www.cordblood.com/benefits-cord-blood/cord-blood-faqs#covid19

234.    Because of the substantial up-front costs, CBR heavily markets the annual storage fees as fixed in its advertising materials and the Contract.

235.    In its marketing and advertising, CBR represented to Plaintiffs and Class Members that the Contract would include "no hidden fees," and would be fixed from ages 2-18.

236.    Prior to purchasing cord blood banking services from CBR, Plaintiffs and Class Members reviewed and relied upon statements in CBR's marketing and advertising materials, and from CBR's sales representatives, that the cord blood banking annual storage fee would be fixed.

237.    However, unbeknownst to Plaintiffs and Class Members, and inconsistent with CBR's pervasive marketing and advertising, and uniform service Contract, the annual storage fee is not fixed. Defendants CBR and GI Partners, as the Lead Investor in CBR, profit substantially from increasing the annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants unlawfully and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars.

238.    Notably, these increased storage fees are not reasonably related to the service provided by CBR (i.e., cord blood storage), but are instead used by Defendants to fund unrelated business expenses and marketing ventures designed to increase Defendants' own market share and thereby amass greater profits. Defendants have placed the burden of paying for their clinical trials and customer service costs on Consumers and tethered it to the annual storage fee even though such clinical trials and customer service costs have no relationship to storage costs. Paying for Defendants' unrelated business expenses is not a burden that Consumers should have to bear, as such expenses are wholly unrelated to the storage of cord blood, and Consumers have already paid substantial up-front fees and costs for cord blood banking services.

239.     Even more, the annual storage fee increase is not a one-time assessment, as Defendants regularly increase the annual fees at $25.00 intervals every few years. Thus, the annual storage fee increases are substantial, and can amount to a more than 50% increase in fees (or more) over the lifetime of the storage, deceptively and unlawfully forcing Consumers to foot the bill for Defendants' clinical research and marketing via their storage fees.

240.     The annual storage fee was reasonably understood by Class Members to be just that – a fee for storage. Yet, Defendants have placed the burden of paying for their clinical trials on Consumers and tethered it to the annual storage fee, despite the fact that such clinical trials have no relationship to storage costs.

241.     Reasonable Consumers would not have purchased cord blood banking services from CBR had they known that CBR, in concert with its private and lead investor GI Partners, would arbitrarily and unilaterally increase the fixed annual storage fees, and then hold the cord blood hostage in the event the Consumer refuses or is unable to make the additional fee payment.

242.     Defendants' acts and practices, as alleged herein, have caused injury to Plaintiffs and Class Members.

243.     Because Defendants violated the UCL, Plaintiffs and Class Members should be made whole for amounts Defendants overcharged them for cord blood storage.

244.     Plaintiffs, on behalf of themselves and all others similarly situated, seek an order of this Court awarding monetary damages, restitution, disgorgement, injunctive relief, and all other relief allowed under the UCL.

## COUNT VI
### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
### Cal. Bus. & Prof. Code § 17500 ("FAL")
### (Against Defendant CBR)
### (Plaintiffs individually, and on behalf of the Nationwide Class)

245.     Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

246.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

247.     CBR violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"), by publicly disseminating misleading and false advertisements through advertising and marketing statements, suggesting that annual storage fees are fixed when they are not.

248.     CBR's false and misleading advertisements were made in order to increase profits at the expense of Consumers.

249.     CBR knew these false and misleading advertisements were untrue, as evidenced by the increase in the annual storage fees, which it plainly represented as fixed, and by its admission to Consumers that CBR is adding unrelated fees for clinical studies into the storage fee, which is contrary to the terms of the Contract and CBR's advertising and marketing representations that "we made it affordable" with "no hidden fees."

250.     Plaintiffs and Class Members would not have contracted with CBR for the storage of their children's cord blood had they known that CBR and GI Partners would arbitrarily and unilaterally increase the fixed annual storage fees, and then hold the cord blood hostage in the event the Consumer refuses or is unable to make the additional fee payment.

251.     Pursuant to Business & Professions Code § 17500, Plaintiffs and Class Members seek an order of this Court permanently enjoining CBR from continuing to publicly disseminate misleading and false advertisements as alleged herein. Plaintiffs and Class Members also seek an order requiring CBR to: (a) make full restitution for all monies wrongfully obtained; and (b) disgorge all ill-gotten revenues and/or profits. Plaintiffs seek all other available relief as pled in this Complaint.

**COUNT VII**
**VIOLATION OF NEW YORK GBL §§ 349,** *et seq.*
**(Against Defendants CBR and GI Partners)**
**(Plaintiff Koneru individually, and on behalf of the New York Subclass)**

252.     Plaintiff Koneru realleges and incorporates by reference paragraphs 1-154 as if fully set forth herein.

253.    Plaintiff Koneru brings this claim on behalf of herself and New York Subclass Members.

254.    New York General Business Law § 349 ("NY GBL § 349") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in furnishing of any service in this state. . . ." NY GBL § 349(a).

255.    Defendants' foregoing acts and practices, including their concealment and omissions, were directed at Consumers.

256.    Defendants' foregoing deceptive acts and practices, including their concealment and omissions, were material, in part, because they concerned a material aspect of the pricing for cord blood services, including fixed annual cord blood storage fees.

257.    CBR aggressively and uniformly marketed and advertised the cord blood banking to Consumers as being reasonably priced, with statements such as "we made it affordable" with "no hidden fees," along with promises from its sales representatives that the annual storage fees would be fixed.

258.    CBR made affirmations of fact and promises in the cord blood banking marketing and advertising, and in the form Contract, as described herein, regarding the fixed annual storage fees.

259.    CBR misrepresented and/or omitted material facts regarding the costs associated with its cord blood services by advertising, marketing, and representing in its form Contract that the annual cord blood storage fees were fixed when they were not.

260.    Contrary to the above-described representations in CBR's marketing, advertising, and form Contract that the annual cord blood storage fee was fixed, Defendants CBR and GI Partners regularly increased the annual fees at $25.00 intervals every few years.

261.    Defendants CBR and GI Partners increase the annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars.

262.   Defendants did not disclose the fact that their annual cord blood storage fee would be regularly and incrementally increased to Consumers or otherwise cause this information to be disclosed to Consumers, including Plaintiff Koneru and New York Subclass Members.

263.   Defendants' foregoing deceptive and unfair acts and practices, including their concealment and omissions, were and are deceptive acts or practices in violation of New York's General Business Law § 349, Deceptive Acts and Practices, N.Y. Gen. Bus. Law §§ 349, *et seq*., by:

   a.   Misrepresenting that the annual cord blood storage fee was fixed;

   b.   Concealing, omitting, and failing to disclose that the annual cord blood storage fee would be regularly and incrementally increased; and

   c.   Applying the increased annual cord blood storage fees towards business expenses unrelated to the storage costs.

264.   Defendants' business practices, in marketing, advertising, and selling cord blood services, including cord blood storage and preservation, while misrepresenting, failing to disclose, concealing or omitting material information, including the fact that the fixed annual storage fees were not, in fact, fixed and would be incrementally increased by Defendants, constitutes the use of fraud, misrepresentation, and deceptive practices.

265.   These practices deceived Plaintiff Koneru and New York Subclass Members, causing them to lose money by paying more than they otherwise would have, as herein alleged, and deceived and are likely to deceive the consuming public.

266.   As detailed herein, Defendants CBR and GI Partners, as the Lead Investor in CBR, profit substantially from deceptively and unlawfully increasing the annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants unlawfully and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars.

267.     Notably, these increased storage fees are not reasonably related to the service provided by CBR (i.e., cord blood storage), but are instead used by Defendants to fund unrelated business expenses and marketing ventures designed to increase Defendants' own market share and thereby amass greater profits. Defendants have placed the burden of paying for their clinical trials and customer service costs on Consumers and tethered it to the annual storage fee, even though such clinical trials and customer service costs have no relationship to storage costs. Paying for Defendants' unrelated business expenses is not a burden that Consumers should have to bear, as such expenses are wholly unrelated to the storage of cord blood, and Consumers have already paid substantial up-front fees and costs for cord blood banking services.

268.     Accordingly, Defendants' business acts and practices, as alleged herein, have caused injury to Plaintiff Koneru and New York Subclass Members.

269.     Defendants' unconscionable, deceptive and/or unfair practices caused actual damages to Plaintiff Koneru and New York Subclass Members who were unaware that, contrary to CBR's marketing and advertising and the express terms of its form Contract, the fixed annual storage fees would be incrementally increased by Defendants and were not, in fact, fixed. Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, Consumers acting reasonably under the circumstances.

270.     Consumers, including Plaintiff Koneru and New York Subclass Members, either would not have purchased cord blood banking services from CBR had they known that the fixed annual storage fees would be increased by Defendants and were not, in fact, fixed, or they would have paid less for the cord blood services.

271.     As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Koneru and New York Subclass Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

272.    In addition, Plaintiff Koneru and New York Subclass Members seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

**COUNT VIII**
**VIOLATION OF NEW YORK GBL §§ 350, *et seq*.**
**(Against Defendant CBR)**
**(Plaintiff Koneru individually, and on behalf of the New York Subclass)**

273.    Plaintiff Koneru realleges and incorporates by reference paragraphs 1-154 as if fully set forth herein.

274.    Plaintiff Koneru brings this claim on behalf of herself and New York Subclass Members.

275.    New York General Business Law § 350 ("NY GBL § 350") prohibits "[f]alse advertising in the conduct of any business, trade or commerce . . . ." NY GBL § 350.

276.    CBR's foregoing acts and practices, including its advertising, were directed at Consumers.

277.    Through the acts and conduct alleged herein, Defendant CBR committed unfair or deceptive acts and practices, by falsely advertising and misleadingly representing that its annual cord blood storage fees were fixed.

278.    CBR also committed unfair or deceptive acts and practices by concealing or omitting material information from its advertising and representations, including its failure to disclose that the fixed annual storage fees would be increased by CBR and were not, in fact, fixed.

279.    CBR did not disclose this information to Consumers in its advertising or representations.

280.    CBR's foregoing, consumer-oriented, unfair or deceptive acts and practices, including its advertising, representations, concealment, and omissions, constitute false and misleading advertising in a material way in violation of the New York's General Business Law § 350.

281.    CBR's false, misleading, and deceptive advertising and representations include:

   a.   Misrepresenting that the annual cord blood storage fee was fixed;

   b.   Concealing, omitting, and failing to disclose that the annual cord blood storage fee would be regularly and incrementally increased; and

c.   Applied the increased annual cord blood storage fees towards business expenses unrelated to the storage costs.

282.   CBR's false, misleading, and deceptive advertising and representations of fact were and are directed at Consumers.

283.   CBR's false, misleading, and deceptive advertising and representations of fact were and are likely to mislead reasonable Consumers acting reasonably under the circumstances.

284.   CBR's false, misleading, and deceptive advertising and representations of fact have resulted in Consumer injury or harm to the public interest.

285.   Plaintiff Koneru and New York Subclass Members were injured because (a) they would not have contracted for CBR's cord blood services on the same terms if the true facts concerning the incremental increases of annual blood cord storage fees had been known; (b) they would have paid less for the blood cord services if the true facts concerning CBR's intent to incrementally increase the annual blood cord storage fees had been known; and (c) the annual blood cord storage fee is not fixed, despite CBR's representations to the contrary.

286.   On behalf of herself and New York Subclass Members, Plaintiff Koneru seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

287.   CBR's business practices, in marketing and advertising its cord blood services, while concealing, failing to disclose, suppressing or omitting material information, including the fact that CBR would be incrementally increasing the annual blood cord storage fees, all while continuing to misrepresent to Consumers, including Plaintiff Koneru and New York Subclass Members that this storage fee was fixed, constitutes the use of fraud, misrepresentation, and deceptive practices. These practices deceived Plaintiff Koneru and New York Subclass Members, causing them to lose money by contracting for CBR's cord blood services or paying more than they otherwise would, as herein alleged, and deceived and are likely to deceive the consuming public. Accordingly, CBR's business acts and practices, as alleged herein, have caused injury to Plaintiff Koneru and New York Subclass Members.

288.   Plaintiff Koneru and New York Subclass Members suffered damages when they contracted and paid for CBR's cord blood services. Defendants CBR's unconscionable, deceptive and/or unfair practices caused actual damages to Plaintiff Koneru and New York Subclass Members who were unaware that the annual blood cord storage fees were not fixed and that CBR would be incrementally increasing these fees. Defendant CBR's foregoing deceptive acts and practices, including omissions, were likely to deceive, and did deceive, Consumers acting reasonably under the circumstances.

289.   Consumers, including Plaintiff Koneru and New York Subclass Members, either would not have contracted and paid for CBR's cord blood services had they known that the annual blood cord storage fees were not actually fixed, and that CBR would be incrementally increasing these fees, or they would have paid less for the cord blood services.

290.   As a direct and proximate result of CBR's deceptive acts and practices, including its omissions, Plaintiff Koneru and New York Subclass Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

291.   In addition, Plaintiff Koneru and New York Subclass Members seek equitable and injunctive relief against Defendant CBR on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## COUNT IX
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
("FDUTPA") §§ 501.201,** *et seq.*
**(Against Defendants CBR and GI Partners)
(Plaintiff Cohen individually, and on behalf of the Florida Subclass)**

292.   Plaintiff Cohen realleges and incorporates by reference paragraphs 1-154 as if fully set forth herein.

293.   Plaintiff Cohen brings this claim on behalf of herself and Florida Subclass Members.

294.   Plaintiff Cohen and the Florida Sub-Class are "consumers" within the meaning of Fla. Stat. § 501.203(7).

295.     Defendants engaged in "trade" or "commerce" within the meaning of Fla. Stat. § 501.203(8). The FDUTPA makes it unlawful to use "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).

296.     As described above, Plaintiff Cohen and Florida Subclass Members suffered damages because CBR misrepresented in marketing and advertising that its annual cord blood storage fee was fixed. However, Defendants CBR and GI Partners increase the fixed annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants unlawfully and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars. This has caused Plaintiff Cohen and other Florida Sub-Class Members to sustain damages in the form of loss of money in connection with Defendants incrementally increasing the annual cord blood storage fee, which was represented as being fixed.

297.     Further, as a direct and proximate result of Defendants' unlawful conduct, Plaintiff Cohen and the Florida Sub-Class Members suffered harm in that they overpaid for Defendants' cord blood services, which they otherwise would not have, and they did not receive the benefit of their bargain.

298.     By making misrepresentations and material omissions to Plaintiff Cohen and the Florida Subclass regarding the cost of their annual cord blood storage fees, Defendant CBR affected commerce and trade within the State of Florida. Specifically, CBR engaged in unfair or deceptive acts or practices in violation of the FDUTPA when, in connection with marketing and advertising its cord blood services, CBR:

a.  Misrepresented that the annual cord blood storage fee was fixed;

b.  Concealed, omitted, and failed to disclose that the annual cord blood storage fee would be regularly and incrementally increased; and

    c.  Applied the increased annual cord blood storage fees towards business expenses unrelated to the storage costs.

262.    Defendants knew that their annual cord blood storage fees were not fixed and that they intended to and did incrementally increase the annual cord blood storage fees charged to Plaintiff Cohen and Florida Subclass Members, yet continued to represent that these fees were fixed.

299.    Defendants' acts and omissions posed the tendency or capacity to mislead or create the likelihood of deception regarding a material fact.

300.    Defendants knew that the annual cord blood storage fees were not fixed as represented, and that the increased fees that Defendants charged Plaintiff Cohen and Florida Subclass Members were not applied to storage-related costs.

301.    Defendants' acts and omissions, as described herein, repeatedly occurred in trade or commerce, and were capable of deceiving a substantial portion of the consuming public.

302.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive, cause misunderstanding, and/or, in fact, caused Plaintiff Cohen and the Florida Subclass to be deceived about the fixed or unfixed nature of their annual cord blood storage fees.

303.    Defendants intended that Plaintiff Cohen and the Florida Subclass would rely on CBR's misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the fixed nature of their annual cord blood storage fees.

304.    The facts concealed or not disclosed by CBR are, and would be, material in that Plaintiff Cohen, the Florida Subclass, and any reasonable Consumer would have considered the cost of the annual cord blood storage fees important in deciding whether to purchase cord blood banking services from CBR.

305.    Had Plaintiff Cohen and the Florida Subclass known that the annual cord blood storage fees were not actually fixed, as represented by CBR, they either would not have contracted for CBR's cord blood services or they would have paid less for them.

306.     As detailed herein, Defendants CBR and GI Partners, as the Lead Investor in CBR, profit substantially from deceptively and unlawfully increasing the annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants unlawfully and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars.

307.     Notably, these increased storage fees are not reasonably related to the service provided by CBR (i.e., cord blood storage), but are instead used by Defendants to fund unrelated business expenses and marketing ventures designed to increase Defendants' own market share and thereby amass greater profits. Defendants have placed the burden of paying for their clinical trials and customer service costs on Consumers and tethered it to the annual storage fee, even though such clinical trials and customer service costs have no relationship to storage costs. Paying for Defendants' unrelated business expenses is not a burden that Consumers should have to bear, as such expenses are wholly unrelated to the storage of cord blood, and Consumers have already paid substantial up-front fees and costs for cord blood banking services.

308.     As a direct and proximate result of Defendants' unfair and deceptive trade practices, Plaintiff Cohen and the Florida Subclass suffered ascertainable losses and actual damages.

309.     Plaintiff Cohen and the Florida Subclass did not receive the benefit of their bargains.

273.     The cost of CBR's annual cord blood storage fees are not fixed as marketed and advertised by CBR. This has caused Plaintiff Cohen and Florida Subclass Members' damages, which can be measured with specificity based upon, *inter alia*, the incrementally increased annual cord blood storage fees that Defendants charged and Plaintiff Cohen and Florida Subclass Members paid during the lifetime of their cord blood storage.

274.     Plaintiff Cohen and Florida Subclass Members seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages and any other just and proper relief available under FUDTPA.

### COUNT X
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. §56:8-1, *et seq.***
**(Against Defendants CBR and GI Partners)**
**(Plaintiff Vaccarella individually, and on behalf of the New Jersey Subclass)**

310.     Plaintiff Vaccarella realleges and incorporate by reference paragraphs 1-154 as if fully set forth herein.

311.     Plaintiff Vaccarella brings this claim on behalf of herself and New Jersey Subclass Members.

312.     Plaintiff Vaccarella, the New Jersey Subclass Members, and GE are "persons" under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1(d).

313.     The cord blood banking is "merchandise" within the definition of N.J. Stat. Ann. § 56:8-1(c).

314.     The cord blood banking is and has been the subject of "advertisement" and "sale" within the definition of N.J. Stat. Ann. § 56:8-1(a) & (e).

315.     The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby. . ." N.J. S.A.. § 56:8-2.

316.     Specifically, as part of the fraudulent marketing practices and recruitment program, CBR engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs

and the Members of the New Jersey Subclass. These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

a. Misrepresenting that the annual cord blood storage fee was fixed;

b. Concealing, omitting, and failing to disclose that the annual cord blood storage fee would be regularly and incrementally increased; and

c. Applying the increased annual cord blood storage fees towards business expenses unrelated to the storage costs.

317.     Plaintiffs were unaware of the deception and, therefore, were reasonable in incorporating the deceptive information when making their decisions to participate in cord blood banking and storage with CBR.

318.     As detailed herein, Defendants CBR and GI Partners, as the Lead Investor in CBR, profit substantially from deceptively and unlawfully increasing the annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants unlawfully and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars.

319.     Notably, these increased storage fees are not reasonably related to the service provided by CBR (i.e., cord blood storage), but are instead used by Defendants to fund unrelated business expenses and marketing ventures designed to increase Defendants' own market share and thereby amass greater profits. Defendants have placed the burden of paying for their clinical trials and customer service costs on Consumers and tethered it to the annual storage fee, even though such clinical trials and customer service costs have no relationship to storage costs. Paying for Defendants' unrelated business expenses is not a burden that Consumers should have to bear, as such expenses are wholly unrelated to the storage

of cord blood, and Consumers have already paid substantial up-front fees and costs for cord blood banking services.

320.    Further, Defendants CBR and GI Partners increase the fixed annual storage fees, knowing that Consumers will have no choice but to pay the exorbitant fees or forever lose the cord blood. Defendants slyly and substantially increase the annual storage fee over time, so that Consumers are paying hundreds of additional dollars or more over the course of the cord blood storage. For Consumers who are storing cord blood for more than one child, the undisclosed and increased storage fees could cost them thousands of additional dollars.

321.    Defendants' above-alleged actions constitute deceptive and fraudulent material acts and practices in connection with the advertisement and sale of merchandise, namely cord blood banking and storage.

322.    The deceptive and fraudulent acts and practices have directly, foreseeably, and proximately caused ascertainable losses to Plaintiffs and other Members of the New Jersey Subclass.

323.    Defendants' practices, in addition, are fraudulent and deceptive because they have caused Plaintiffs and the New Jersey Subclass substantial harm, which is not outweighed by any countervailing benefits to Consumers, and is not an injury Consumers themselves could have reasonably avoided.

324.    Defendants' acts and practices have misled and deceived the general public in the past and will continue to mislead and deceive the general public in the future, by, among other things, causing them to pay increased annual storage fees or lose their cord blood.

325.    Defendants had an ongoing duty to all Consumers to refrain from unfair and deceptive practices under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 in the course of their business.

326.    Defendants' foregoing deceptive acts and practices, including their omissions, were material, in part, because they concerned essential parts of the cord blood banking.

327.     Defendants' violations present continuing violations to Plaintiff Vaccarella, New Jersey Subclass Members, and the general public. Defendants' wrongful acts and practices complained of herein affect the public interest.

328.     As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Vaccarella and New Jersey Subclass Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

329.     In addition to compensatory and injunctive relief, Plaintiffs and  New Jersey Subclass Members are entitled to treble damages, reasonable attorneys' fees, filing fees, and reasonable costs of suit. N.J. Stat. Ann. § 56:8-19.

330.     In addition, Plaintiff Vaccarella and New Jersey Subclass Members seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

**COUNT XI**
**FRAUDULENT CONCEALMENT**
**(Against Defendants CBR and GI Partners)**
**(Plaintiffs individually, and on behalf of the Nationwide Class and**
**Florida, New York, and New Jersey Subclasses)**

331.     Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

332.     Defendants planned and conspired to covertly raise cord blood fees without full disclosure to Plaintiffs and Class Members.

333.     Defendants fraudulently concealed from and/or intentionally failed to disclose to Plaintiffs and the Class that Defendants would covertly raise cord blood storage fees as described herein.

334.     Defendants conducted exclusive, unilateral actions by covertly increasing and profiting from cord blood storage fees in a manner that was not disclosed to, and otherwise concealed from, Plaintiffs and Class Members at the time they purchased cord blood banking services from CBR.

335.    Defendants had the capacity to, and did, deceive Plaintiffs and Class Members into believing that they were purchasing cord blood services for a fixed rate, when they were not.

336.    Defendants undertook active and ongoing steps to conceal from Plaintiffs and Class Members that they intended to raise cord blood storage fees. Plaintiffs and Class Members were not aware that Defendants would deceptively and unlawfully raise their purported fixed cord blood storage fees.

337.    The facts concealed and/or not disclosed by Defendants to Plaintiffs and Class Members are material facts that a reasonable person would have considered important in deciding whether to purchase (or to pay the same price for) the cord blood services.

338.    Defendants intentionally concealed and/or failed to disclose material facts for the purpose of inducing Plaintiffs and the Class to act thereon, and purchase cord blood services.

339.    Plaintiffs and the Class justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the cord blood services.

340.    Plaintiffs and Class Members suffered a loss of money in an amount to be proven at trial, *inter alia*, as a result of Defendants' fraudulent concealment and nondisclosure because: (a) they would not have purchased the cord blood services on the same terms if the true facts concerning Defendants' intent to raise the storage fees had been known; (b) they would not have paid a price premium for the cord blood services had they known Defendants would take ownership of and/or dispose of the cord blood if Plaintiffs and Class Members did not pay the elevated annual storage fees; and (c) Defendants otherwise did not perform as promised.

341.    Had Plaintiffs, Class Members, and the consuming public known that Defendants would unilaterally and covertly raise annual cord blood storage fees, they would not have purchased the cord blood services or would have paid less for them.

342.    By reason of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer damage and injury.

**COUNT XII**
**BREACH OF FIDUCIARY DUTY**
**(Against Defendant CBR)**
**(Plaintiffs individually, and on behalf of the Nationwide Class and**
**Florida, New York, and New Jersey Subclasses)**

343.   Plaintiffs incorporate by reference paragraphs 1-154 as if fully set forth herein.

344.   By virtue of the relationship between Defendant CBR and Plaintiffs and Class Members, Defendant CBR at all times relevant herein owed Plaintiffs and Class Members fiduciary obligations, including an unwavering commitment to loyalty, candor and full disclosure. As such, Defendant CBR was bound to act in the highest good faith and with the highest regard for Plaintiffs and Class Members' best interests, placing Plaintiffs and Class Members' interests above its own, particularly as it possessed and preserved the cord blood of Plaintiffs and Class Members' loved ones, which Defendant CBR markets as lifesaving technology.

345.   By reason of the acts and omissions set forth herein, Defendant CBR owed to Plaintiffs and Class Members extensive fiduciary duties including, without limitation:

    a.   To properly manage accounts, including all payments due under any contracts or other promises made to Class Members, and to not collect or demand monies to which Defendant CBR was not entitled;

    b.   To properly and prudently select investors in its company that would not impact its loyalty and fiduciary obligations to Plaintiffs and Class Members;

    c.   To ensure, at all times, that Plaintiffs and Class Members were not charged amounts, including cord blood storage fees, in excess of amounts due or owed;

    d.   To act in the best interest of Plaintiffs and Class Members instead of increasing its profits and the profits of its business affiliates or investors at the expense of Plaintiffs and Class Members; and

e. To place Plaintiffs and Class Members' interests above the interests of its business affiliates or investors with undivided loyalty and above the interests of billing and collecting fees to which it is not entitled.

346.   As a direct, proximate and substantial cause and result of Defendant CBR's breaches of fiduciary duty, Plaintiffs and Class Members have suffered injuries and damages in an amount subject to proof at trial, including, but not limited to: incurring legal fees in bringing this litigation for Defendant CBR's breaches of fiduciary duty, and amounts charged in excess of the annual cord blood storage fees to which Defendant CBR is not entitled.

<u>**COUNT XIII**</u>
**UNJUST ENRICHMENT**
**(Against Defendant GI Partners)**
**(Plaintiffs individually, and on behalf of the Florida, New York, and New Jersey Subclasses)**

347.   Plaintiffs incorporate by reference paragraphs 1-154 as if fully set forth herein.

348.   By its wrongful acts and omissions described herein, Defendant GI Partners was unjustly enriched at the expense of Plaintiffs and Subclass Members.

349.   Plaintiffs and Subclass Members' detriment and GI Partners' enrichment were related to and flowed from the wrongful conduct alleged in this Complaint.

350.   Plaintiffs and Subclass Members conferred a monetary benefit on Defendant GI Partners, and GI Partners had knowledge of this benefit.

351.   As alleged herein, Defendant GI Partners is an investment firm and a self-described "Lead Investor" in CBR. Defendant GI Partners' investment strategy is to generate returns on its investments like CBR. Thus, GI Partners acquired Defendant CBR for the purpose of increasing its profits.

352.   As part of its revenue generation, Defendant GI Partners, by the actions alleged herein, collected and/or retained money from Plaintiffs and the Subclasses under such circumstances that, in equity and good conscience, it cannot retain, and which in justice and fairness belongs to Plaintiffs and the Subclasses.

353.    Defendant GI Partners used money charged and collected from Plaintiffs and Subclass Members, which Defendant GI Partners was not entitled to, to pay for business expenses other than annual storage fees, including, but not limited to, customer service infrastructure, or to fund clinical studies that Defendant GI Partners uses to tout CBR's cord blood services and attract new Consumers and investors to GI Partners, thereby amassing greater profits.

354.    It would be inequitable for GI Partners to retain the profits, benefits, or other compensation obtained in connection with the excess annual cord blood storage fees.

355.    The retention of money gained through the wrongful conduct of Defendant GI Partners is unjust considering the circumstances under which the funds were obtained.

356.    Plaintiffs and Subclass Members seek restitution from Defendant GI Partners and an order of this Court proportionally disgorging all profits, benefits and other compensation obtained by Defendant GI Partners from its wrongful conduct and establishing a constructive trust from which Plaintiffs and Subclass Members may seek restitution.

## COUNT XIV
## CONVERSION
### (Against Defendant GI Partners)
### (Plaintiffs individually, and on behalf of the Nationwide Class
### and the Florida, New York and New Jersey Subclasses)

357.    Plaintiffs reallege and incorporate by reference paragraphs 154 as if fully set forth herein.

358.    As alleged herein, Defendant GI Partners is an investment firm and a self-described "Lead Investor" in CBR. Defendant GI Partners' investment strategy is to generate returns on its investments like CBR. Thus, GI Partners acquired Defendant CBR for the purpose of increasing its profits.

359.    As part of its revenue generation, GI Partners has collected and retained money from Plaintiffs and Class Members to which it is not entitled.

360.    Plaintiffs and Class Members paid monies to Defendant CBR for annual storage fees to preserve cord blood. Defendant CBR charged and collected money for these annual storage fees in an amount greater than Plaintiffs and Class Members agreed to and/or an amount greater than Plaintiffs and

Class Members reasonably expected to pay based upon Defendant CBR's representations in advertising and marketing, and from CBR's customer service representatives.

361.   As part of Defendant CBR and GI Partners' shared plan to increase profits at the expense of Consumers, Defendant CBR charged and collected this excess money from Plaintiffs and Class Members in order to fund its business operations and to increase its profits, which were shared with or transferred to GI Partners.

362.   Defendants CBR and GI Partners did not have a right to collect, possess or convert this excess money, which belonged to Plaintiffs and Class Members with whom GI Partners had no contract.

363.   GI Partners unlawfully used and converted the excess money charged and collected by CBR from Plaintiffs and Class Members to pay for business expenses other than annual storage fees, including, but not limited to, customer service infrastructure, or to fund clinical studies that Defendants use to tout their cord blood services and attract new Consumers and investors, thereby amassing greater profits.

364.   Despite Plaintiffs and Class Members' demands, Defendants have not returned to Plaintiffs and Class Members the amounts paid in excess of what they owed for annual storage fees, and Plaintiffs and Class Members are entitled to damages in this amount.

## COUNT XV

**MONEY HAD AND RECEIVED**
**(Against Defendant GI Partners)**
**(Plaintiffs individually, and on behalf of the Nationwide Class**
**and the Florida, New York, and New Jersey Subclasses)**

365.   Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

366.   Defendant GI Partners, by the actions alleged above, collected money from Plaintiffs and the Class under such circumstances that, in equity and good conscience, it cannot retain, and which in justice and fairness belongs to Plaintiffs and the Class.

367.     As alleged herein, Plaintiffs and Class Members paid money to Defendant CBR for annual storage fees to preserve cord blood. Defendant CBR charged and collected money for these annual storage fees in an amount greater than Plaintiffs and Class Members agreed to and/or an amount greater than Plaintiffs and Class Members reasonably expected to pay based upon Defendant CBR's representations in advertising and marketing, and from CBR's customer service representatives.

368.     Defendant CBR charged and collected this money from Plaintiffs and Class Members to fund its business operations and to increase its profits, which were shared with or transferred to the GI Partners.

369.     Defendants CBR and GI Partners used the money charged and collected by CBR to pay for business expenses other than annual storage fees, including, but not limited to, customer service infrastructure, or to fund clinical studies that Defendants use to tout their cord blood services and attract new Consumers and investors, thereby amassing greater profits.

370.     Defendant GI Partners had no right to retain Plaintiffs and Class Members' annual storage fee payments in amounts in excess of what was actually owed.

371.     Despite Plaintiffs and Class Members' demands, GI Partners has not returned to Plaintiffs and Class Members the amounts paid in excess of what they owed for annual storage fees.

372.     Because GI Partners maintains that it is entitled to the amounts requested under this Claim for Relief, Defendant GI Partners has not repaid any portion of the amount sought by Plaintiffs or Class Members.

373.     The retention of money gained through the wrongful conduct of Defendant GI Partners is unjust considering the circumstances under which the funds were obtained.

374.     As a result of the foregoing, Plaintiffs and the Class have been deprived of their money and suffered loss in an amount to be determined at trial, including prejudgment interest.

SECOND AMENDED CLASS ACTION COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other Class Members, respectfully request that the Court enter an Order:

a. Declaring that this Action is a proper class action, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

b. For a public injunction enjoining Defendants from continuing the unlawful practices alleged herein;

c. Ordering Defendants to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other Class Members, as allowable by law;

d. Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

e. Ordering Defendants to pay attorneys' fees and costs of suit; and

**f.** Ordering such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: November 10, 2021                    Respectfully submitted,

                              */s/ Rachel Soffin*
                              Rachel Soffin*
                              Jonathan Cohen*
                              Blake Yagman*
                              Erin Ruben*
                              **MILBERG COLEMAN BRYSON**
                              **PHILLIPS GROSSMAN, PLLC**
                              100 Garden City Plaza, Suite 500
                              Garden City, New York, 11530
                              Tel: (212) 594-5300
                              rsoffin@milberg.com
                              jcohen@milberg.com

SECOND AMENDED CLASS ACTION COMPLAINT

byagman@milberg.com
eruben@miberg.com

Harper T. Segui
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
825 Lowcountry Blvd., Unit 101
Mount Pleasant, South Carolina 29464
T: 919-600-5000
hsegui@milberg.com

Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
280 S. Beverley Drive, PH
Beverly Hills, CA 90212
Tel:    (917) 471-1894
astraus@milberg.com

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT

## CERTIFICATE OF SERVICE

The undersigned certifies that today the foregoing *Second Amended Complaint* was filed on ECF which will send electronic notification to all attorneys registered for ECF-filing.

DATED: November 10, 2021

*/s/ Rachel Soffin*
Rachel Soffin*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York, 11530
Tel: (212) 594-5300
rsoffin@milberg.com